## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LYNNE ANNE-BRIGITTE RUSSELL**, *et al.*, | ) | |
| | ) | |
| **Appellants** | ) | |
| | ) | |
| v. | ) | **No.: 25-7163** |
| | ) | |
| **DISTRICT OF COLUMBIA**, *et al.* | ) | |
| | ) | |
| **Appellees.** | ) | |
| _____ | ) | |

## FILING OF UNDERLYING DECISION FROM WHICH APPEAL ARISES
## AND CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2025, I filed a copy of the underlying decision from which this appeal arises, Doc. 46 Order and Doc. 47 Memorandum Opinion, copies attached hereto, with the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system, which will cause it to be served on all counsel of record.

/s/ *George L. Lyon, Jr.*
George L. Lyon, Jr.
(DCB 388678)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**LYNNE ANNE-BRIGITTE RUSSELL** *et al.*

        **Plaintiffs**

        v.

**DISTRICT OF COLUMBIA** *et al.*
        **Defendants**

**Civil Action No. 24-1820 (JDB)**

## ORDER

Upon consideration of [30] plaintiffs' partial motion for summary judgment, [33] defendants' motion for summary judgment, [34] defendants' motion to strike, and the entire record herein, for the reasons set forth in the memorandum opinion issued today, it is hereby

- **ORDERED** that [30] plaintiffs' partial motion for summary judgment is **DENIED**; it is further

- **ORDERED** that [33] defendants' motion for summary judgment is **GRANTED** and judgment is accordingly **ENTERED** in favor of defendants; and it is further

- **ORDERED** that [34] defendants' motion to strike is **DENIED** as moot.

**SO ORDERED**.

                                        /s/
                                        JOHN D. BATES
                                        United States District Judge

Dated: September 24, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LYNNE ANNE-BRIGITTE RUSSELL *et al.*

       Plaintiffs

       v.

DISTRICT OF COLUMBIA *et al.*

       Defendants

Civil Action No. 24-1820 (JDB)

## <u>MEMORANDUM OPINION</u>

This case is about the Second Amendment.  Plaintiffs bring a pre-enforcement challenge to the District of Columbia's regulation requiring that concealed-carry licensees carry their pistols holstered on their person.  Instead, plaintiffs would prefer to carry their firearms off-body, for example in a purse or sling bag or in a vehicle glove box or console.

At the threshold, despite this Circuit's unconventional approach to pre-enforcement standing for <u>statutory</u> challenges, plaintiffs have standing to challenge this <u>regulation</u>.  That is so because they assert their intent to engage in proscribed conduct and show a credible threat of enforcement based on the arrest of one plaintiff, two attempted license revocations, and no disavowal by the District of future prosecutions.

On the merits, plaintiffs have carried their burden to show that the conduct at issue—off-body carry—is covered by the Second Amendment's plain text to "bear" arms.  However, the District has also carried its burden to demonstrate that this regulation has a distinctly similar historical analogue: regulations of manner of carry, including bans of concealed carry.  The District's regulation therefore survives Second Amendment scrutiny.

Accordingly, the Court denies plaintiffs' partial motion for summary judgment, grants the District's motion for summary judgment, and denies as moot the District's motion to strike evidence.

## Background

The District of Columbia permits carrying a concealed pistol with a license issued by the Metropolitan Police Department (MPD). See D.C. Code §§ 22-4504(a), 22-4506. Open carry is not permitted. Id. § 7-2509.07(e). The MPD Chief "shall issue rules" to "establish the methods by which a pistol may be carried, including any standards for safe holstering." Id. § 7-2509.11(3). Under those rules, licensees "shall carry any pistol in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol."[1] D.C. Mun. Regs. tit. 24 § 2344.2. MPD may revoke a license if the licensee violates the on-body holster rule. Id. § 2341.1(2); see also D.C. Code § 7-2509.05(a)(1). Revocations do not take effect until after a timely appeal to the Office of Administrative Hearings (OAH). D.C. Code § 7-2509.05(a)(4); see also D.C. Mun. Regs. tit. 24 § 2341.3(b).[2] Violations of carrying regulations are also criminally punishable as a misdemeanor, with up to six months in jail. D.C. Code § 7-2509.10(a).

Four D.C. concealed carry licensees—Lynne Russell, Charles de Caro, Leanne Reilly, and Timothy Beck—and one former licensee—Eric Christian Jr.—bring this action. Russell, de Caro, and Reilly are not residents of the District but regularly visit the District, intend to continue doing so, and would like to carry their pistols in the District in a manner contrary to the rule at issue here

---

[1] When traveling in a vehicle, a pistol may instead be kept unloaded and out of reach. See D.C. Code § 22-4504.02(b)(1), (d).

[2] Appeals formerly heard by the Concealed Pistol Licensing Review Board are now heard by OAH. See Office of Administrative Hearings Jurisdiction Emergency Amendment Act of 2023, D.C. Act 25-138 (2023).

but fear that doing so could expose them to license revocation, arrest, and prosecution. Pls.' Statement of Undisputed Facts ¶¶ 1-39 ("Pls.' Facts"), Dkt. 30-1. Beck and Christian are D.C. residents who both had recent run-ins with law enforcement implicating their concealed carry licenses and who would also like to carry their pistols in the District off-body but fear license revocation, arrest, and prosecution. Id. ¶¶ 40-67.

Plaintiffs identify several manners of carry that they would engage in but for D.C.'s regulation: in a gun purse, sling bag, tactical diaper bag, backpack, or vehicle glove box or console. Id. ¶¶ 15-16, 18, 33, 36, 60; Pls.' Mem. in Supp. of Mot. for Partial Summ. J. 15 ("Pls.' Mot. Summ. J."), Dkt. 30-2. They emphasize that doing so would be more convenient for a variety of daily pursuits, including yoga, bicycling, or lying at the pool, and highlight that on-body carry is less compatible with women's fashion constraints. Pls.' Mot. Summ. J. 35-37. Conversely, the District underscores the variety of ways in which plaintiffs can comply, including by holstering at hip-level—at the strong side of the waist, in a cross-draw position, at the appendix, or at the small of the back—or under the shoulder, or on the thigh or ankle. See Decl. of Stephen Amodeo ¶ 12 ("Amodeo Decl."), Dkt. 33-14.

Beck was pulled over and arrested last year for soliciting prostitution and for a pistol license violation. Gerstein Aff., Dkt. 33-8.[3] Beck's arresting officer characterized his firearm offense as failing to disclose his pistol but Beck states that the officer told him the offense was not carrying his gun either holstered on his person or unloaded and out of reach. Contrast id., with Decl. of Timothy Beck 1, Dkt. 9-6. The government brought no formal charges against Beck. Pls.' Facts ¶¶ 61-62; Defs.' Statement of Undisputed Material Facts ¶¶ 22-24 ("Defs.' Facts"), Dkt. 33-1.

---

[3] A Gerstein affidavit provides the basis for a judicial finding of probable cause to justify restraint after an arrest. In re Holloway, 995 F.2d 1080, 1083 (D.C. Cir. 1993) (citing Gerstein v. Pugh, 420 U.S. 103 (1975)).

Instead, MPD issued Beck a notice of revocation for violating the D.C. rule that weapons "shall be carried in a holster approved by" MPD.  Beck Notice of Revocation, Dkt. 33-11; D.C. Mun. Regs. tit. 24 § 2304.9.  Beck timely appealed.  Beck Req. to Appeal 2, Dkt. 33-12; Off. of Admin. Hr'gs Final Order 2, ("Beck Appeal Order"), Dkt. 33-13.  OAH agreed with Beck that MPD could not revoke his license based on section 2304.9 because that regulation had been repealed.  Beck Appeal Order 3.  Accordingly, OAH reversed the notice of revocation and ordered that it "never took effect." Id. at 4 (citation modified).

Christian was pulled over last year for failure to use his turn signal.  Decl. of Eric Christian, Dkt. 9-5.  During the traffic stop, officers discovered that Christian's pistol was not holstered on his person and confiscated it.  Id.  Officers then released Christian but also "submitted an arrest warrant" to the D.C. Attorney General's Office for a pistol license violation.  Offense/Incident Report Cover Sheet 2, Dkt. 21-3.  Christian was not arrested but MPD did later issue him a notice of revocation for violating section 2344.2, the rule at issue here.  Christian Notice of Revocation, Dkt. 33-6.  He also timely appealed.  Christian Req. to Appeal, Dkt. 33-7.  During the pendency of that appeal, however, Christian's license expired.  Attach. D to Pls.' Facts: Notice of Expiration and Mot. to Dismiss Appeal 13.  As a result, he voluntarily dismissed his appeal as moot on the "understand[ing] that the incident leading to the revocation notice" would "not bar him from receiving a newly issued [license]." Id.  Christian is applying for a new license. Id.

Plaintiffs sued the District along with individual MPD defendants under 42 U.S.C. § 1983, alleging Second Amendment and other violations and seeking injunctive and declaratory relief as well as nominal and actual damages.  Compl. ¶¶ 57-62, 81-122, Dkt. 1.  After subsequently amending their complaint, only the District and MPD Chief Pamela Smith remain as defendants

and only the facial and as-applied Second Amendment challenges remain as claims.[4]  Second Am. Compl. ¶¶ 55-56, 87-103 & Prayer for Relief 35, Dkt. 29.  Plaintiffs initially moved for a preliminary injunction but later withdrew that motion.  Mot. for Prelim. Inj., Dkt. 9; Notice of Withdrawal of Mot., Dkt. 25.  Instead, the parties agreed to resolve the case on cross-motions for summary judgment.  Joint Mot. for Briefing Schedule, Dkt. 27; <u>see also</u> Order Granting Joint Mot., Dkt. 28.  Plaintiffs accordingly moved for partial summary judgment as to their claims for declaratory and injunctive relief, deeming their actual damages claims more fact-dependent and unripe for summary judgment.  Pls.' Mot. Summ. J.  The District also moved for summary judgment.  Defs.' Mot. for Summ. J., Dkt. 33.  After full briefing, the Court held oral argument on the cross-motions on September 12, 2025.

## <u>Discussion</u>

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 to hear this action.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The movant must identify the parts of the record that "demonstrate the absence of a genuine issue of material fact" and the nonmovant must "go beyond the pleadings" to identify such facts in opposition.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

---

[4] Because plaintiffs sue Smith in her official capacity, this opinion simply refers to the District.  <u>See, e.g.</u>, <u>Monell v. Dep't of Social Servs. of City of New York</u>, 436 U.S. 658, 690 n.55 (1978) (explaining that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").

To obtain a permanent injunction, in addition to success on the merits a plaintiff "must demonstrate: (1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

A declaratory judgment is a milder form of relief that may be available where not all four injunction factors are satisfied. Steffel v. Thompson, 415 U.S. 452, 466-75 (1974). Declaratory relief may generally be sought to challenge "the constitutionality of a law threatened to be enforced." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007) (citing Steffel, 415 U.S. at 458-60). Indeed, "it was the very purpose of the Declaratory Judgment Act" to avoid putting a "challenger to the choice between abandoning his rights or risking prosecution." Id. at 129 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).

## I.      Standing

Federal courts are limited to deciding "cases" and "controversies." U.S. Const. art. III § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (citation modified). To establish standing, a plaintiff must show (1) "injury in fact that is concrete, particularized, and actual or imminent," (2) "that the injury was likely caused by the defendant," and (3) "that the injury would likely be redressed by judicial relief." Id. (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).

For a pre-enforcement challenge to a criminal statute, the Supreme Court has stated that "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course

of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014) (SBA List) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). An "actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." Id. at 158 (citing Steffel, 415 U.S. at 459).

In assessing the credibility of a threat of prosecution, the Court has considered factors indicating that the risk is "substantial," including (1) "past enforcement against the same conduct," (2) authority to initiate charges that is "not limited to a prosecutor or an agency," and (3) the frequency of proceedings or whether the government has "disavowed enforcement" in the future. Id. at 164-65; see also Woodhull Freedom Found. v. United States, 948 F.3d 363, 373 (D.C. Cir. 2020). Though one might be enough without the other, at least the "combination" of threats of administrative proceedings and criminal prosecution suffices to create an Article III injury. SBA List, 573 U.S. at 166.

That said, this Circuit's pre-enforcement standing jurisprudence is idiosyncratic. Plaintiffs seeking to bring certain pre-enforcement challenges must show they "have been singled out or uniquely targeted by the . . . government for prosecution." Parker v. District of Columbia, 478 F.3d 370, 374-76 (D.C. Cir. 2007), aff'd sub nom., District of Columbia v. Heller, 554 U.S. 570 (2008) (first citing Seegars v. Gonzales, 396 F.3d 1248 (D.C. Cir. 2005); then citing Navegar, Inc. v. United States, 103 F.3d 994 (D.C. Cir. 1997)). Seegars cabined its rule to "preenforcement challenges to a criminal statute not burdening expressive rights and not in the form of an appeal from an agency decision." 396 F.3d at 1253; see also id. at 1254 (applying Navegar because it

was "the only circuit case dealing with a non-First Amendment preenforcement challenge to a criminal statute that ha[d] not reached the court through agency proceedings").[5]

In <u>Parker</u>, the court recognized that this Circuit's test is "in tension" with the Supreme Court's approach to pre-enforcement standing, including as expressed in <u>Farm Workers</u>. <u>Id.</u> at 374-75. Nevertheless, it observed that "unless and until" the Circuit "en banc overrules [them], we must be faithful to <u>Seegars</u> just as the majority in <u>Seegars</u> was faithful to <u>Navegar</u>." <u>Id.</u> at 375; <u>see also</u> <u>Ord v. District of Columbia</u>, 587 F.3d 1136, 1153 (D.C. Cir. 2009) (Brown, J., dissenting) (calling for rehearing en banc to overrule <u>Navegar</u>); <u>Seegars</u>, 396 F.3d at 1254 (acknowledging "sharp tension").[6] That constraint applies to district courts a fortiori.

Although the Circuit has not overruled <u>Navegar</u> and <u>Seegars</u>, plaintiffs argue that the Supreme Court "effectively" has, citing for support <u>SBA List</u> and <u>Whole Woman's Health v. Jackson</u>, 595 U.S. 30 (2021). Pls.' Mot. Summ. J. 9. Not so. "For a panel to reconsider a prior decision of this court in favor of new Supreme Court precedent, the Court's intervening decision must effectively overrule, i.e., eviscerate the law of our circuit." <u>Bahlul v. United States</u>, 77 F.4th 918, 925 (D.C. Cir. 2023) (citation modified). As the District points out, the Supreme Court's decision in <u>SBA List</u> did not abrogate <u>Navegar</u> and <u>Seegars</u> because it was a First Amendment, not Second Amendment, case. Defs.' Mot. Summ. J. 10-11 (citing <u>Angelo v. District of Columbia</u>,

_____

[5] Courts' "willingness to permit pre-enforcement review is 'at its peak' when claims are rooted in the First Amendment," <u>Woodhull Freedom Found. v. United States</u>, 948 F.3d 363, 371 (D.C. Cir. 2020) (quotation omitted), although <u>Parker</u> questioned whether that should be so, 478 F.3d at 375 n.1. For statutes burdening expressive rights, this Circuit "requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce its law." <u>U.S. Telecom Ass'n v. FCC</u>, 825 F.3d 674, 739 (D.C. Cir. 2016) (quotation omitted).

[6] The <u>Navegar</u> test is hard but not impossible to meet. In <u>Ord</u>, a private security contractor met his standing burden—taking all facts as true at the motion-to-dismiss stage—where (1) his employees were arrested, and the District (2) had previously issued an arrest warrant for him, (3) conceded on appeal that it was targeting him, and (4) was allegedly acting in bad faith. 587 F.3d at 1153. Here, by contrast, the summary judgment standard is less favorable to plaintiffs and there are no concessions of targeting or allegations of judicial warrants or bad faith.

648 F. Supp. 3d 116, 123 (D.D.C. 2022)); cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Whole Woman's Health is even further afield because that case was about sovereign immunity and the narrow exception thereto under Ex parte Young, 209 U.S. 123 (1908).

Nevertheless, this Circuit has applied SBA List's "substantial risk" test beyond the First Amendment or even pre-enforcement context. See Attias v. Carefirst, Inc., 865 F.3d 620, 626-27 (D.C. Cir. 2017). And SBA List does not cabin its test for pre-enforcement standing to the First Amendment context. Indeed, SBA List cited as support for its rule MedImmune, 549 U.S. at 128-29, which was not a First Amendment case. 573 U.S. at 158. But cf. Angelo, 648 F. Supp. 3d at 129 (distinguishing MedImmune from the Supreme Court's First Amendment pre-enforcement standing jurisprudence).[7] Not confining SBA List to the First Amendment context also avoids treating the Second Amendment as a second-class right. See McDonald v. City of Chicago, 561 U.S. 742, 778-79 (2010) (rejecting idea that "the Second Amendment should be singled out for special—and specially unfavorable—treatment"); Parker, 478 F.3d at 375 n.1 (stating that the Seegars majority implicitly agreed that "the injury-in-fact requirement should be applied uniformly over the First and Second Amendments").

---

[7] Angelo, which involved a challenge to a D.C. law prohibiting carry on public transit, is distinguishable from this case because the plaintiffs there brought a statutory challenge that was therefore directly controlled by Navegar and Seegars. 648 F. Supp. 3d at 119, 132. Plaintiffs' counsel is currently litigating that case on appeal. Angelo v. District of Columbia, No. 24-7127 (D.C. Cir. Aug. 15, 2025) (setting oral argument for October 3, 2025). After the September 12 hearing, the District submitted as supplemental authority a decision by another court in this circuit dismissing a pre-enforcement Second Amendment challenge under Navegar. Not. of Suppl. Auth., Dkt. 45 (citing Wehr-Darroca v. District of Columbia, Civ. A. No. 24-3504 (RC) (D.D.C. Sept. 22, 2025)). Wehr-Darroca also involved a statute and so is equally distinguishable.

Of particular relevance here, the Circuit has suggested that the general requirement to wait for enforcement proceedings applies only to challenges directed to statutes, not regulations.  In Seegars, the court observed that "standard rules governing preenforcement challenges to agency regulations" permit review where "the issues are fit for judicial review without further factual development and denial of immediate review would inflict a hardship on the challenger," including by "risk[ing] subjection to costly enforcement processes."  396 F.3d at 1253 (emphasis added) (citing Abbott Labs., 387 U.S. at 149);[8] see also id. at 1254 (noting a "greater readiness to hear challenges to regulations than to statutes").

To be sure, the Seegars court found it difficult to articulate why regulations are treated differently from statutes, stopping short of a constitutional-avoidance theory because courts often reach constitutional questions when addressing pre-enforcement challenges to agency action.  396 F.3d at 1254.  But of course, challenges to regulations often can be resolved while avoiding constitutional questions—for example, by ruling that the regulation exceeds the scope of the statutory authority—whereas challenges to statutes generally cannot.  Congress itself has imposed additional procedural safeguards where a statute's constitutionality is called into question.  See 28 U.S.C. § 2403 (requiring courts to provide notice and allow governmental intervention for suits challenging the constitutionality of a federal or state statute affecting the public interest).  And statutes are often treated differently from regulations.  Contrast Loper Bright Enters. v. Raimondo,

---

[8] Abbott Labs described its test as whether the controversy is "'ripe' for judicial resolution."  387 U.S. at 148-49.  Navegar itself noted that ripeness is "a factor that overlaps with the 'injury in fact' facet of standing doctrine." 103 F.3d at 998; see also SBA List, 573 U.S. at 157 n.5 (explaining that in the pre-enforcement context standing and ripeness "boil down to the same question" (quoting MedImmune, 549 U.S. at 128 n.8)).  This opinion uses the term standing, consistent with the Supreme Court's approach in SBA List, 573 U.S. at 157 n.5, but notes that the dispute would be ripe under Abbott Labs as well because the issues are purely legal and plaintiffs risk serious penalties from non-compliance, 387 U.S. at 153.

603 U.S. 369, 412 (2024) (independent judicial interpretation of statute), with Kisor v. Wilkie, 588 U.S. 558, 573 (2019) (deference to agency interpretation of ambiguous regulation).

Since Seegars, the D.C. Circuit has reiterated that "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement" and held, albeit in a First Amendment and Administrative Procedure Act (APA) context, that under SBA List a plaintiff had standing to bring a pre-enforcement challenge to a regulation. U.S. Telecom Ass'n, 825 F.3d at 739 (quotation omitted). Of course, the APA does not apply to the District, see 5 U.S.C. § 701(b)(1)(D), and at oral argument the District pointed out that the APA is often considered to be sui generis, Oral Arg. Tr. 27:9-14.

But the court in U.S. Telecom went on to explain that its "conclusion" of reviewability was "fortified by the 'strong presumption of judicial review under the [APA],'" 825 F.3d at 740 (emphasis added) (citation omitted), indicating that its distinction of agency rules from statutes for the purpose of pre-enforcement reviewability was not predicated on the APA. Abbott Labs itself noted that "[e]arly cases in which [pre-enforcement] review was entertained have been reinforced by the enactment of the [APA], which embodies the basic presumption" of reviewability. 387 U.S. at 140 (emphasis added); see also McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp., 606 U.S. 146, 155-57 (2025) (reiterating the "basic presumption of judicial review of agency action" that is "codified in the [APA]" and comparing the "background presumption of judicial review" with 5 U.S.C. § 703). Therefore, the statutory-regulatory distinction for purposes of reviewability extends beyond the APA context.

Here, plaintiffs challenge only the District's regulation requiring that pistols be carried in a holster on the licensee's body, not any District statutes about carrying firearms, so Navegar is distinguishable and the SBA List framework reaffirmed in U.S. Telecom applies instead. All

plaintiffs wish to exercise their arguable Second Amendment right to carry their pistols off-body—which section 2344.2 forbids—but allege that fear of license revocation, arrest, and prosecution stop them from doing so.  See generally Pls.' Facts; SBA List, 573 U.S. at 159.[9]  Thus, the dispute turns on whether plaintiffs' fears of enforcement are credible.

Here, enforcement is limited to a prosecutor or agency and a declaration states that on-body holster regulation violations usually result in a license suspension rather than revocation and are "not usually prosecuted."  Amodeo Decl. ¶ 6.  However, there has been past enforcement, including as to these plaintiffs specifically.  Beck was arrested in part for a pistol-related violation and police initiated a license revocation proceeding under a similar, albeit then-repealed, rule to section 2344.2.  See Gerstein Affidavit; Beck Notice of Revocation.  Moreover, although the District has not prosecuted Beck it has not said that it would not prosecute section 2344.2 violations in the future.  Indeed, at oral argument it declined to disavow future prosecutions.  Oral Arg. Tr. 29:8.

Accordingly, because of the "combination" of the threat of license revocation and prosecution, at least Beck has standing.  See SBA List, 573 U.S. at 166.  And because plaintiffs'

---

[9] The district points out that Christian's license is expired but does not dispute that he is applying for a new license.  Contrast Defs.' Mot. Summ. J. 12, with Pls.' Mot. Summ. J. 1.  Of course, standing is assessed at the time a suit is filed.  Davis v. FEC, 554 U.S. 724, 734 (2008) (citation omitted).  And standing is "substantially more difficult to establish" when the plaintiff "is an unregulated party."  FDA v. All. for Hippocratic Med., 602 U.S. 367, 382-83 (2024) (quotation omitted).  At oral argument, plaintiffs' counsel explained that Christian has been seeking a new license but was denied because he did not have his gun—the police did.  Oral Arg. Tr. 8:2-4.  MPD licensing suggested that he retrieve his gun from MPD property, but MPD property refused to release it without a license.  Id. at 8:7-9.  Because Beck has standing, the Court need not resolve whether Christian would also have standing under these catch-22 circumstances.

The district also argues that Russell, de Caro, and Reilly—who do not live in the District—lack standing because they do not have sufficiently concrete plans to visit the District.  Defs' Mot. Summ. J. 6-8.  Whether or not that was so, plaintiffs have since provided supplementary declarations detailing specific plans to visit the District.  Decl. of Charles de Caro, Dkt. 39-1; Decl. of Lynne Russell, Dkt. 39-2; Decl. of Leanne Reilly, Dkt. 39-3; see also Fed. R. Civ. P. 56(e)(1) (explaining that courts may give parties the opportunity to properly support insufficiently supported facts on a motion for summary judgment).  Again, because Beck has standing the Court need not address whether Russell, de Caro, and Reilly have sufficiently shown a credible threat of enforcement.

partial motion for summary judgment seeks only declaratory and injunctive relief, "only one plaintiff need have standing." Hall v. District of Columbia Bd. of Elections, 141 F.4th 200, 209 (D.C. Cir. 2025); see also TransUnion, 594 U.S. at 431 ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each . . . form of relief that they seek."). Article III's standing requirement is therefore satisfied.

## II.    Merits

Under the Second Amendment, the right "to keep and bear Arms[] shall not be infringed." U.S. Const. amend. II.  However, that right is "not unlimited" and it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626.  As relevant here, the "manner of public carry" is "subject to reasonable regulation," which at least includes banning the carry of firearms in a manner "likely to terrorize others," providing "financial incentives for responsible arms carrying," or "eliminat[ing] one kind of public carry—concealed carry—so long as . . . the option to carry openly" remains. N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 59 (2022).  Thus, the question here is whether the District's requirement that licensees carry their pistol holstered on-body reasonably regulates the manner of carry.

As a methodological framework, the Supreme Court has said that (1) "when the Second Amendment's plain text covers an individual's conduct," (2) the "government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. at 17; see also Hanson v. District of Columbia, 120 F.4th 223, 231-32 (D.C. Cir. 2024) (describing Bruen as establishing a "two-part test").  Plaintiffs bear the burden at step one and the government at step two. Hanson, 120 F.4th at 232.  At step two, courts consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Bruen, 597 U.S. at 29.  In other words,

courts examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Id.  To avoid either a "regulatory straightjacket" or "regulatory blank check," the government must "identify a well-established and representative historical analogue, not a historical twin." Id. at 30.

A.    Step One

As relevant here, Bruen step one asks whether the government "regulates arms-bearing conduct." United States v. Rahimi, 602 U.S. 680, 691 (2024).  And as Heller explained, to "bear" arms means to "carry" arms "upon the person or in the clothing or in a pocket," for the purpose of confrontation, i.e., "being armed and ready for offensive or defensive action." Heller, 554 U.S. at 584 (quoting Muscarello v. United States, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); see also Muscarello, 524 U.S. at 139-40 (Ginsburg, J., dissenting) (arguing that a person "bears a firearm" when he "carries the weapon on or about his person" (emphasis added)); id. (contrasting carry "on or about one's person" with "transport[ation] out of hand's reach in a vehicle"); id. at 145 n.7 (arguing that "carry" encompasses keeping a firearm "so close to the person as to approximate placement in a pocket or holster, e.g., guns carried at one's side in a briefcase or handbag, or strapped to the saddle of a horse").  Given that "carry" is defined in relation to a purpose of readiness for confrontation, carrying a pistol off-body in a bag or within reach in a car—which approximates carrying in a pocket—is conduct that falls within the Second Amendment.

The District resists this conclusion, narrowly defining plaintiffs' proposed conduct as "carrying guns unholstered and off their bodies in an unsecure manner that is not designed to prevent loss, theft, or accidental discharge" and hence not protected by the Second Amendment. Defs.' Mot. Summ. J. 27.  But Bruen has already provided the appropriate level of generality for

arms-bearing conduct, defining the conduct at issue there as "carrying handguns publicly for self-defense." <u>See</u> 597 U.S. at 32. In that case, the requirement to show "special need" to carry in that manner fell outside of the historical tradition of regulation. <u>Id.</u> at 70-71. Here, the question is whether the requirement to carry holstered on-body does so as well.[10]

Under the Second Amendment, this right to carry a handgun publicly for self-defense must not be "infringed." In <u>Rahimi</u>, the Court explained that when the government "regulates arms-bearing conduct," it "bears the burden to 'justify its regulation.'" 602 U.S. at 691. If it meets that burden, then the right is not infringed. However, that inquiry takes place at <u>Bruen</u>'s second step. <u>See Maryland Shall Issue, Inc. v. Moore</u>, 116 F.4th 211, 238-39 (4th Cir. 2024) (Niemeyer, J., concurring in part and dissenting in part) (explaining that <u>Bruen</u> step one simply requires showing covered conduct and that it is "<u>only</u> after <u>both</u> steps are taken" that the "ultimate issue" of infringement can be determined); <u>see also id.</u> at 245 (Richardson, J., dissenting) ("A law need only regulate protected conduct to trigger Second Amendment scrutiny, and any regulation unjustified by our historical tradition 'infringes' the right"). Thus, the District is incorrect in asserting that plaintiffs must demonstrate an infringement of their rights at step one. Defs.' Mot. Summ. J. 28.

---

[10] The District cites a bevy of cases for the proposition that plaintiffs' conduct is not covered by the Second Amendment at step one. <u>See</u> Defs.' Mot. Summ. J. 18 n.7, 27; Defs.' Reply in Supp. of Defs.' Mot. Summ. J. 14, Dkt. 41. Those cases generally involved other kinds of restrictions. <u>See</u> <u>Oakland Tactical Supply, LLC v. Howell Township</u>, 103 F.4th 1186, 1195 (6th Cir. 2024) (training restrictions); <u>United States v. Manney</u>, 114 F.4th 1048, 1053 (9th Cir. 2024) (false statement laws); <u>United States v. Scheidt</u>, 103 F.4th 1281, 1284 (7th Cir. 2024) (same); <u>Maryland Shall Issue, Inc. v. Moore</u>, 116 F.4th 211, 225-26 (4th Cir. 2024) (license requirements); <u>Rocky Mountain Gun Owners v. Polis</u>, 121 F.4th 96, 119-21, 128 (10th Cir. 2024) (same); <u>McRorey v. Garland</u>, 99 F.4th 831, 838 (5th Cir. 2024) (same); <u>Mills v. City of New York</u>, 758 F. Supp. 3d 250, 264-65 (S.D.N.Y. 2024) (same); <u>United States v. Libertad</u>, 681 F. Supp. 3d 102, 109-10 (S.D.N.Y. 2023) (same); <u>United States v. Rush</u>, 130 F.4th 633, 640-41 (7th Cir. 2025) (same but resolving case on the basis that short-barreled rifles are not "arms" within the meaning of the Second Amendment); <u>cf.</u> <u>Gazzola v. Hochul</u>, 88 F.4th 186, 195-97 (2d Cir. 2023) (acknowledging that the Second Amendment protects the right to acquire arms and to learn to handle and use them but rejecting challenge to zoning law because residents could still freely purchase arms in the county). <u>But see</u> <u>Cocking v. State</u>, 567 P.3d 348, 252-53 (Nev. 2025) (defining the right to carry concealed as outside the plain text of the Second Amendment and rejecting challenge to concealed carry permit requirement at step one). Although licensing and training restrictions can impact the effective exercise of the right to keep and bear arms, they less directly affect the actual carry of arms than the regulation here, and of course there is no right to lie on federal gun transaction forms. Because under <u>Bruen</u> carrying a handgun publicly for self-defense is protected conduct, these cases addressing other restrictions are inapposite.

Instead, plaintiffs must simply show regulation of conduct protected by the Second Amendment, which they have done.

The District offers at least three more arguments at step one, none of which persuades. First, the District contends that a restriction must be a "severe ban" to fall afoul of the Second Amendment. Defs.' Mot. Summ. J. 15-20 (citation modified). In doing so, the District relies on definitions of "infringe" as "destroy" or "hinder," and of "hinder" as "obstruct" or "prevent." Id. at 16 (citations omitted). But contemporary dictionaries also state that "infringe" means "impede" or "cause impediments," so restrictions that fall short of "total or effectively total deprivations of the right to keep or bear arms" may still violate the Second Amendment if they are not justified at step two. Maryland Shall Issue, 116 F.4th at 244 (Richardson, J., dissenting) (first quoting 1 Samuel Johnson, Dictionary of the English Language (4th ed. 1775); and then quoting 1 Noah Webster, American Dictionary of the English Language (1828)). For the same reason, proceeding to step two once conduct is covered by the plain text does not read out the word "infringe" from the text or improperly "open the floodgates" to litigation. See Defs.' Mot. Summ. J. 28. Instead, that simply follows Bruen.

Second and similarly, the District offers a grab bag of arguments that this regulation escapes on step one because it is "reasonable" or "de minimis," even going so far as to suggest that Bruen supports any restrictions on "manner" whatever. Id. at 20-26. But step one simply asks whether the conduct at issue is covered by the text; step two then examines whether "modern and historical regulations impose a comparable burden." Bruen, 597 U.S. at 29. And Bruen makes clear that regulations on "manner" of carry must still be "reasonable." Id. at 59.

Third, the District argues that off-body carry is not common. See Defs.' Mot. Summ. J. 28-31. In Bruen, the Court observed that the parties agreed pistols were in "common use" today

for a lawful purpose—self-defense—even before proceeding to step one, so the D.C. Circuit in Hanson assumed without deciding that the "common use" test applies at step one. 120 F.4th at 232 & n.3 (citing Bruen, 597 U.S. at 32, 47). But the District itself notes that it is unclear whether the "common use" test applies beyond the question of what constitutes a firearm protected by the Second Amendment. Defs.' Mot. Summ. J. 29; see also Bruen, 597 U.S. at 47 ("[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" (quoting Heller, 554 U.S. at 627)). Regardless, Bruen held that the Second Amendment's plain text covers carrying handguns publicly for self-defense, so plaintiffs have met their step one burden. The Court will therefore consider the commonality of off-body carry, if relevant, at step two.

B.    Step Two

At Bruen step two, the relevant question is whether there is a historical analogue to regulating public carry for self-defense by requiring that carry be on-body and holstered. Relevant similarities to a historical analogue include "how and why the regulations burden" Second Amendment rights. Hanson, 120 F.4th at 234 (quoting Bruen, 597 U.S. at 29); see also id. at 235 (explaining that "the District must identify" a "historical tradition of regulation that burdens the right to armed self-defense in a manner similar to the burden" at issue "for a similar reason").

Even where there is no direct historical analogue, a regulation may still be constitutional if the government can identify "unprecedented societal concerns or dramatic technological changes" that "require a more nuanced approach." Id. at 241 (quoting Bruen, 597 U.S. at 27). But "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Bruen, 597

17

U.S. at 26.[11]  The same is true "if earlier generations addressed the societal problem, but did so through materially different means."  Id. at 26-27.

As Rahimi confirmed, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."  602 U.S. at 692 (emphasis added) (citing Bruen, 597 U.S. at 26-31); see also id. at 702 (Sotomayor, J., concurring) (explaining that this principles-based approach "permits a historical inquiry calibrated to reveal something useful and transferable to the present day"); id. at 739-40 (Barrett, J., concurring) (explaining that "[h]istorical regulations reveal a principle, not a mold" and that to "be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart"); id. at 741 (Jackson, J., concurring) (agreeing with the principles-based approach).  Otherwise, we would be left with "a law trapped in amber."  Id. at 691 (majority).

This regulation comports with the principles underpinning the Second Amendment because it reasonably regulates manner of carry in service of government goals of accident and crime prevention.  See Frey v. City of New York, No. 23-365, 2025 WL 2679729, at *12 (2d Cir. Sept. 19, 2025) (affirming denial of preliminary injunction as to open-carry ban because states have police power "to regulate 'a particular mode of bearing arms' that the legislature deems 'dangerous to the peace of society'" (quoting State v. Jumel, 13 La. Ann. 399, 400 (La. 1858))); cf. Koons v. Att'y Gen. N.J., Nos. 23-1900 & 23-2043, 2025 WL 2612055, at *18 (3d Cir. Sept. 10, 2025) (drawing from the "sensitive places" doctrine the principle that "legislatures may impose

---

[11] Plaintiffs argue that the District must show that its regulation is "distinctly similar," not simply "relevantly similar," to historical regulations because it addresses problems that have existed since the Founding.  See Pls.' Mot. Summ. J. 18-21.  Conversely, the District argues for a relaxed standard for similarity, asserting that this case implicates "unprecedented societal concerns" and "dramatic technological changes."  Defs.' Mot. Summ. J. 38.  This opinion assumes without deciding that "distinctly similar" sets a higher bar for similarity than "relevantly similar" and that the heightened standard applies here, because the District satisfies even that test.

conditions on the carry of weapons outside the home that are designed to ensure that those who choose to carry such weapons do so safely").

The District's regulation imposes a comparable burden because it provides similar procedural protections to historical concealed-carry restrictions and imposes a similar level and duration of punishment for violations. It is comparably justified because state legislatures and courts in the Antebellum and Reconstruction eras recognized broad police powers to reasonably regulate manner of carry, including by taking the more drastic step of banning concealed carry altogether. And in any event, it would be error to assume that "founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." Rahimi, 602 U.S. at 739-40 (Barrett, J., concurring). Although 19th-century legislatures more commonly banned concealed carry outright, states may instead allow such carry but regulate its form. See Commonwealth v. Murphy, 44 N.E. 138, 138 (Mass. 1896) ("[I]t has been almost universally held that the legislature may regulate and limit the mode of carrying arms." (collecting cases)).

### 1.    The "how"

As Bruen explains, "the manner of public carry was subject to reasonable regulation" in our historical tradition, and so "States could lawfully eliminate one kind of public carry— concealed carry—so long as they left open the option to carry openly." 597 U.S. at 59. Plaintiffs observe that the District does not permit open carry, Pls.' Mot. Summ. J. 40-41 & n.17, but it does not follow from the fact that a state must permit one form of carry if it bans the other that the permissible form may not be regulated.[12] To be sure, a state could not put manner-of-carry

_____

[12] After briefing but before argument, plaintiffs submitted as supplemental authority a Florida state intermediate court's decision striking down Florida's open-carry ban because, in its view, open carry was the default mode of carry at the Founding. Not. of Suppl. Auth., Dkt. 43; McDaniels v. State, No. 1D2023-0533, 2025 WL

regulations "toward abusive ends" by imposing burdens so heavy that they "deny ordinary citizens their right to public carry."  Bruen, 597 U.S. at 38 n.9; see also State v. Reid, 1 Ala. 612, 616-17 (Ala. 1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.").  But here no plaintiff alleges they effectively cannot carry their pistols in the District.  And plainly they can under the regulation.  Instead, they simply assert their preference to carry off-body.  Although plaintiffs point out that no historical regulations mandated that guns "be carried in a holster on the body,"  Pls.' Mot. Summ. J. 22, "a historical twin" is not required, Bruen, 597 U.S. at 30.[13]

In Rahimi, the Court clarified the "how" prong of the step two Bruen inquiry.  The Court there denied a facial challenge to 18 U.S.C. § 922(g)(8), which prohibits an individual from possessing firearms while a restraining order is in effect upon a finding that the individual poses a credible threat to the safety of an intimate partner.  Rahimi, 602 U.S. at 690.  The closest historical analogues were surety laws, which required a person reasonably accused of intent to breach the peace to post a bond before publicly carrying a firearm, Bruen, 597 U.S. at 55-59, and "going

---

2608688, at *9, 11 (Fla. Dist. Ct. App. Sept. 10, 2025).  But plaintiffs do not challenge the District's ban on open carry.  Pls.' Mot. Summ. J. 41 n.17.  Insofar as McDaniels is relevant here, it cuts against plaintiffs because the court recognized that the permitted form of carry is not "immune from reasonable regulation."  2025 WL 2608688, at *11.

[13] For its part, the District highlights that various Founding-era militia, to which many military-aged males had to belong, contemplated holsters.  Defs.' Mot. Summ. J. 33-34.  But the declaration on which the District relies cites only a Virginia committee report recommending that cavalrymen be provided pistols and holsters, a letter from George Washington to Philip Schuyler recommending that Congress provide cavalrymen with pistols and holsters, and federal and Pennsylvania militia statutes that required cavalry officers to purchase a sword, pistols, and holsters. Decl. of Nathan Kozuskanich ¶ 17, Dkt. 33-15.  Recommendations that cavalrymen be provided with holsters and two laws requiring that cavalry officers buy their own holsters are hardly akin to a regulation prohibiting off-body carry. Indeed, here plaintiffs state that they wish to carry holstered off-body and would not object to a holster rule without an on-body requirement.  See Pls.' Consol. Reply to Opp'n to Mot. for Partial Summ. J. & Opp'n to Defs.' Mot. for Summ. J. 15 ("Pls.' Reply"), Dkt. 38.  Similarly, the District points to a 19th-century commentator contrasting "a citizen who keeps a gun or pistol under judicious precautions" and "practises in safe places the use of it," thereby "exercis[ing] his individual right" to bear arms with one who "carr[ies] [it] carelessly in the pocket."  Benjamin Abbott, Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land 333 (1880); see Defs.' Mot. Summ. J. 37.  But again, plaintiffs do not seek to carry their firearms unholstered, and keeping their pistols holstered— even if off-body—would seem to address Abbott's concern.

armed" or "affray" laws, which prohibited carrying "dangerous or unusual weapons" to "terrify" people, id. at 39-52.  The Court held that the "how" of those laws was relevantly similar to those of 18 U.S.C. § 922(g)(8) after comparing the laws' (1) procedural protections, (2) duration of restriction, and (3) level of punishment.  Rahimi, 602 U.S. at 698-99.  First, as with surety and going-armed laws, 18 U.S.C. § 922(g)(8) applies only upon a court finding of credible threat to the safety of another.  Id. at 699.  Second, and similar to surety laws, the restriction was temporary, lasting only as long as the restraining order was in effect.  Id.  Third, the penalty of temporary disarmament was less than the punishment of imprisonment pursuant to going-armed laws.  Id.

Here, the closest analogues to the "how" of the challenged regulation are concealed-carry prohibitions, which are distinctly similar.  First, the procedural protections under the D.C. regulation are comparable to those afforded to individuals who violated concealed-carry prohibitions.  Concealed-carry violations would generally be prosecuted in state court and subject to review on appeal.  See, e.g., Aymette v. State, 21 Tenn. 154, 155 (Tenn. 1840).  Here, licensees alleged to have violated the on-body holster regulation receive a notice of revocation of their license and are afforded the chance to appeal that notice to OAH and then to petition the D.C. Court of Appeals for review.  D.C. Code §§ 7-2509.08(a)(3); 2-1831.16(e).

Second, the duration and severity of punishment for violating concealed-carry bans were also similar to those for violating the on-body carry requirement.  Concealed-carry ban convictions could result in a jail sentence of one to six months, see, e.g., Aymette, 21 Tenn. 155 (three to six months); State v. Stanford, 20 Ark. 145, 146 (Ark. 1859) (one to six months); State v. Smith, 11 La. Ann. 633, 634 (La. 1856) (up to one month for first offense, up to three months for second offense), during which time the misdemeanant would lose their Second Amendment rights.  By comparison, the District has provided a declaration that on-body holster rule violations typically

result in a temporary license suspension, Amodeo Decl. ¶ 6, and by statute jail time is at most six months, D.C. Code § 7-2509.10(a).[14]  Thus, the "how" is distinctly similar.

2.    *The "why"*

The parties disagree over the significance of the "why" behind historical concealed carry laws, contrast Defs.' Mot. Summ. J. 35, with Pls.' Mot. Summ. J. 23-25, but cases addressing such laws and other contemporary evidence make clear that states have broad powers to regulate manner of carry in furtherance of police-power goals.[15]

For plaintiffs, concealed-carry laws were "to prevent surprise attacks and assassinations." Pls.' Mot. Summ. J. 24.  Indeed, contemporary cases identified that type of violence as a relevant concern.  See State v. Chandler, 5 La. Ann. 489, 490 (La. 1850) (upholding concealed-carry ban because Second Amendment did not protect carry that had "tendency to secret advantages and unmanly assassinations"); Aymette, 21 Tenn. at 160 (upholding concealed-carry ban because state constitutional right to bear arms did not protect carry "to terrify the people or for the purposes of private assassination"); State v. Speller, 86 N.C. 697, 700 (N.C. 1882) ("[S]urely it cannot be supposed that the law intends that an unwary advantage should be taken even of an enemy."); cf. Reid, 1 Ala. at 617 (upholding concealed-carry ban because law intended "to promote personal

---

[14] Plaintiffs point out that a conviction for a violation of section 2344.2 could lead to permanent denial of their right to keep arms in the District because conviction of a weapons offense generally bars an individual from registering to legally possess a firearm in the District.  See Pls.' Mot. Summ. J. 16 n.5 (citing D.C. Code §§ 7-2502.03(a)(2), 7-2501.01(18)).  However, as the District points out, that is a collateral consequence from an unchallenged statute and is therefore not relevant here.  See Defs.' Mot. Summ. J. 44.  Notably, Rahimi did not consider as part of the penalty imposed by 18 U.S.C. § 922(g)(8) the collateral consequence that a conviction for violating that section would itself trigger a permanent ban on possessing firearms under section 922(g)(1).  Contrast 602 U.S. at 699, with id. at 748 (Thomas, J., dissenting).  Plaintiffs' counsel is currently representing another individual in challenging section 2502.03(a)(2) in a separate proceeding.  See Dotson v. District of Columbia, Civ. A. No. 24-1864 (LLA), 2024 WL 5046282, at *8 (D.D.C. Dec. 9, 2024) (denying preliminary injunction).

[15] The District also argues for the relevance of going-armed laws, see Defs.' Mot. Summ. J. 33, but as Rahimi explained, these laws—along with surety laws—stand for the principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."  602 U.S. at 698.  Here, there is no suggestion that plaintiffs pose a clear threat of violence to others, so the "why" of going-armed (or surety) laws is not distinctly similar to this regulation.

security" and "put down lawless aggression and violence" by banning the carry of weapons in a "manner" that "exert[s] an unhappy influence upon the moral feelings of the wearer[] by making him less regardful of the personal security of others"); State v. Wilforth, 74 Mo. 528, 530-31 (Mo. 1881) (upholding concealed-carry ban and quoting Reid approvingly); Stockdale v. State, 32 Ga. 225, 227 (Ga. 1861) (upholding concealed-carry ban because open carry allowed others to see that a person is "armed[] and dangerous").

But another contemporary court observed that it was "not unreasonable" for the legislature to impose a concealed-carry ban so "that those associating with the bearer may guard against injury by accident or otherwise." Carroll v. State, 28 Ark. 99, 101 (Ark. 1872) (emphasis added). Here, the District's stated goals are to prevent "loss, theft, or accidental discharge." D.C. Mun. Regs. tit. 24 § 2344.2.[16] Carroll makes clear that prevention of accidents was one reasonable goal of regulating manner of carry.[17] As to theft of a pistol, that is both a crime in itself and risks leading to further violent criminality by the thief. See 1 W. Blackstone, Commentaries on the Laws of England 84 n.11 (George Chase ed., 3d ed. 1894) ("[S]tatutes prohibiting the carrying of concealed weapons" generally do not violate the right to bear arms because "they merely forbid the carrying

---

[16] Plaintiffs fault the District for not issuing a "justification for the regulation," Pls.' Mot. Summ. J. 17 n.6, but for that proposition it only cites cases brought under the APA, which does not apply to the District, see 5 U.S.C. § 701(b)(1)(D), as well as one other federal scheme that mirrors the APA's standard of review, see End Citizens United v. FEC, 69 F.4th 916, 918 (D.C. Cir. 2023). In any event, the rule itself provides its three justifications.

[17] In terms of preventing gun-related accidents, another relevant historical analogue could be gunpowder regulations. But in Hanson, the D.C. Circuit discussed state gunpowder laws put in place for fire safety reasons and said that the "suggestion that [gunpowder restrictions] limited the Second Amendment right to keep and bear arms is silly." 120 F.4th at 235 & n.5. Accordingly, this Court does not rely on such laws here. However, such regulations did not appear silly to contemporary courts analyzing the right to keep and bear arms. In discussing the components necessary to operate a firearm, the Supreme Court of Arkansas observed that gunpowder fell into that category. State v. Buzzard, 4 Ark. 18, 21-22 (Ark. 1842). That court rejected the broad view of Second Amendment rights advanced there, observing that "the right of inhibiting by law the keeping of powder in places where its explosion would endanger the lives or property of others, has been constantly asserted and enforced, without question as to the legal right or power of imposing such restriction." Id. at 22. Hanson's comment about the irrelevance of gunpowder laws to a Second Amendment analysis may be dictum inapplicable beyond the large-capacity magazine issue there, but the Court need not opine on that point because this regulation passes muster under the concealed-carry analogue alone.

of arms in a particular manner, which is likely to lead to breaches of the peace <u>and provoke to the</u> <u>commission of crimes</u>." (second emphasis added)).

More importantly, it is clear that states had broad authority to regulate the manner of carry in furtherance of state police power goals, provided that they did not destroy the right to bear arms. So, the "why" is not confined to aims specifically identified by contemporary courts. For example, in striking down a "uniquely severe" ban on any carry, <u>Bruen</u>, 597 U.S. at 54, the Tennessee Supreme Court explained that a legislature may nevertheless "regulate the carrying" of pistols "publicly, or abroad, in such a manner as may be deemed most conducive to the public peace," <u>Andrews v. State</u>, 50 Tenn. 165, 187-88 (Tenn. 1871); <u>see also</u> <u>Bianchi v. Brown</u>, 111 F.4th 438, 511 (4th Cir. 2024) (Richardson, J., dissenting) (explaining that <u>Andrews</u> recognized that arms could be "<u>regulated</u> 'to subserve the general good' (such as to prevent crime)").[18]  As <u>Bruen</u> noted, shortly after <u>Andrews</u> was decided Tennessee codified an exception to the state's handgun ban

---

[18] <u>Andrews</u> actually upheld Tennessee's ban as to "belt or pocket pistol[s]" but remanded for an evidentiary determination on whether a ban on the ambiguous term "revolver[s]" encompassed "repeater[s]," which were military-style pistols that were the "usual equipment of the soldier."  50 Tenn. at 186-87.  If so, the ban would have been unconstitutional, <u>id.</u> at 187, because army pistols had become the "usual arms of the citizen of the country," <u>id.</u> at 179. Indeed, pistol nomenclature from that era appears ambiguous because <u>Bruen</u> contrasts pocket pistols—which had "barrel lengths of perhaps 3 or 4 inches"—with the "6-inch to 14-inch barrels found on the other belt and hip pistols that were commonly used for lawful purposes.  <u>See</u> 597 U.S. at 48.  Whether belt pistols are more akin to hip or army pistols, the cases suggest that legislatures could ban particularly small and easily concealable guns but had to permit the more typical size of pistol.  <u>See</u> <u>Wilson v. State</u>, 33 Ark. 557, 559 (Ark. 1878) (recognizing that the legislature could ban "easily concealed" arms under <u>Fife v. State</u>, 31 Ark. 455 (Ark. 1876), or concealed carry but not open carry of an eight-inch army-size revolver).  <u>But see</u> <u>Page v. State</u>, 50 Tenn. 198, 198-99 (Tenn. 1871) (holding that the legislature could ban an eight-inch revolver because it was not "an arm carried for war purposes").

Indeed, on the other end of the spectrum, Georgia's Supreme Court struck down a ban that permitted only "horseman's pistols."  <u>Nunn v. State</u>, 1 Ga. 243, 247, 251 (Ga. 1846).  Horseman's pistols were "large handguns that came with a double holster meant to be draped over a saddle and they were impracticable for anyone not riding a horse."  <u>United States v. Bridges</u>, No. 24-5874, 2025 WL 2250109, at *16 n.15 (6th Cir. Aug. 7, 2025) (Nalbandian, J., concurring in part and concurring in the judgment) (citation modified).  The horseman's pistol was also called the "dragoon or holster pistol," which the Texas Supreme Court contrasted with "such arms as are commonly kept[] . . . and are appropriate for open and manly use in self-defense, as well as . . . the defense of the State," including at least those pistols "not adapted to being carried concealed."  <u>State v. Duke</u>, 42 Tex. 455, 458-59 (Tex. 1874).  The common thread across these cases is a rejection on the one hand of the "militia-based interpretation of the right to bear arms," <u>Koons</u>, 2025 WL 2612055, at *27, and a recognition on the other that reasonable regulation of pistol size is permissible.  Likewise, reasonable regulation of manner of carry is permissible, and this regulation is not nearly as severe as the pistol-type restrictions deemed unconstitutional in <u>Andrews</u> and <u>Nunn</u>.

only for army pistols—as opposed to smaller pocket or belt pistols—that were carried "openly in one's hands." 597 U.S. at 54 n.21 (citation modified). The next year, Tennessee's Supreme Court upheld that new law. State v. Wilburn, 66 Tenn. 57, 58-63 (Tenn. 1872). The court did not resolve exactly what the legislature meant by carry "openly in the hands" but nevertheless determined that the law did not "interfere with the right of keeping the arm, or of bearing it for the common defense." Id. at 62-63.[19]

Ten years after Wilburn, Arkansas's Supreme Court upheld a similar restriction under its own constitution, which "did not expressly reserve to the legislature the right to regulate arms." Young v. Hawaii, 992 F.3d 765, 807 (9th Cir. 2021), vacated, 142 S. Ct. 2895 (2022) (mem.) (citing Haile v. State, 38 Ark. 564, 567 (Ark. 1882)); see also Ark. Const. of 1874, art. II, § 5 ("The citizens of this State shall have the right to keep and bear arms for their common defense."). In Haile, the court reasoned that the legislature may "regulate the mode of carrying any arms . . . in a reasonable manner, so as, in effect, not to nullify the right, nor materially embarrass its exercise." 38 Ark. at 565-66. It conceded that carrying a pistol in one's hand "is a very inconvenient mode of carrying them habitually," but emphasized that "habitual carrying does not seem essential to 'common defense.'" Id. at 566.

To be sure, Haile's common-defense framing is in tension with Heller's rejection of the militia model of the right to bear arms. See Koons, 2025 WL 2612055, at *46 (Porter, J., concurring in part and dissenting in part). However, the court went on to engage in a police power

---

[19] Tennessee's 1870 constitution expressly qualified the right to bear arms by recognizing the legislature's power to regulate carry "to prevent crime." Andrews, 50 Tenn. at 177. Other state constitutions likewise stated the scope of the right to bear arms more narrowly, and at that time the Bill of Rights had not been incorporated against the states. See Koons, 2025 WL 2612055, at *64 (Porter, J., concurring in part and dissenting in part); see also Strickland v. State, 72 S.E. 260, 263-64 (Ga. 1911) (discussing Second Amendment incorporation jurisprudence from the Antebellum to Reconstruction period). Nevertheless, Wilburn recognized that Tennessee's legislature had the power to regulate the carry of arms even before its 1870 constitution. 66 Tenn. at 59.

balancing, reasoning that such an "inconvenience [wa]s a slight matter compared with the danger to the whole community, which would result from the common practice of going about with pistols in a belt, ready to be used on every outbreak of ungovernable passion." Haile, 38 Ark. at 566. Thus, the state could permissibly impose such a "police regulation" of the manner of carrying arms. Id.

By contrast, the Georgia Supreme Court in Stockdale reversed a jury instruction that stated that carrying a gun tucked into a waistband violated the state's concealed-carry ban, reasoning that such a law would "amount[] to a prohibition" because it is "impossible" to carry arms "without having some part of the weapon concealed from view." 32 Ga. at 227. Thus, to avoid that unconstitutional result the court interpreted the concealed-carry ban not to prohibit open carry in a waistband. Id.; see also Peruta v. County of San Diego, 742 F.3d 1144, 1187 n.6 (9th Cir. 2014), rev'd en banc, 824 F.3d 919 (9th Cir. 2016) (Thomas, J., dissenting) (discussing Stockdale); Strickland v. State, 72 S.E. 260, 263-64 (Ga. 1911) (same). Unlike in Stockdale, here there is no impossibility of carry—indeed, requiring on-body holstered carry is more analogous to the in-the-waistband carry that Stockdale vindicated than the in-the-hand carry required by the laws at issue in Haile and Wilburn.[20] Thus, Stockdale reinforces the outer bound of states' ability to regulate manner of carry.

---

[20] Thirteen years after Stockdale, the Georgia Supreme Court took up yet another gun case in Hill v. State, 53 Ga. 472 (Ga. 1874), to decide the legality of the state's ban on guns in court. Reluctantly, the court felt bound by Nunn's determination that the definition of arms extended beyond military weapons, but it still upheld the ban on everyday pistols in court. Id. at 474-75. The court interpreted the state constitutional clause authorizing regulation of "manner" of carry to also cover time and place regulations. Id. at 480-81. In doing so, it contrasted reasonable regulations on manner of carry with regulations preventing carry "on the shoulder," "in the hands, or on the arms" and allowing only that firearms be "borne strapped or fastened upon the back," which would "in effect[] be a denial of the right to bear arms altogether." Id. at 481. In context, the court was explaining that to use a firearm a person eventually needs to take it from their back to their hand. And again, Hill is consistent with the principle that reasonable manner-of-carry regulations are permissible, but not those that amount to an effective denial of the right to bear arms.

Courts that upheld concealed-carry bans agreed that states enjoy broad police powers to regulate manner of carry for public safety reasons.[21]  See Reid, 1 Ala. at 616 (upholding ban and stating that the legislature may "enact laws in regard to the manner in which arms shall be borne" and "adopt such regulations of police[] as may be dictated by the safety of the people and the advancement of the morals" as long as those do not amount to "destruction" of the right); Speller, 86 N.C. at 700 (upholding ban and asking rhetorically whether it can "be doubted that the legislature might by law regulate th[e] right to bear arms . . . and require it to be exercised in a manner conducive to the peace and safety of the public"); Aymette, 21 Tenn. at 159 (upholding ban and stating that the legislature is not "prohibited altogether from passing laws regulating the manner in which . . . arms may be employed"); Jumel, 13 La. Ann. at 399-400 (upholding ban and stating that "a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society" does not infringe the Second Amendment); State v. Buzzard, 4 Ark. 18, 19, 28 (Ark. 1842) (upholding ban in view of legislature's authority to advance "the general interests or welfare of the whole community"); cf. State v. Shelby, 2 S.W. 468, 469 (Mo. 1886) ("The right of the legislature to prohibit the wearing of concealed weapons . . . is now generally conceded.").[22]

---

[21] One notable outlier case was Bliss v. Commonwealth, where the Kentucky Supreme Court struck down a concealed-carry ban. 12 Ky. 90, 93 (1822). "[Bliss] has not been followed, but severely criticised. The decisions are practically unanimous to the contrary." Young, 992 F.3d at 802-03 (alteration in original) (quoting Strickland, 72 S.E. at 261). Kentucky later overruled Bliss by constitutional amendment and passed a statute to ban concealed carry. See Peruta v. County of San Diego, 824 F.3d 919, 935-36 (9th Cir. 2016).

[22] The partial dissent in Koons casts doubt on the probative value of these cases, arguing that states misconstrued the Constitution, selectively enforced laws against Blacks, or based their interpretations on the "Militia Model" of the Second Amendment rejected by the Supreme Court in Heller, among other defects. Koons, 2025 WL 2612055, at *49 & nn. 16, 19, 22, *59 & n.67 (Porter, J., concurring in part and dissenting in part). Although some contemporary courts had too narrow a conception of the scope of the right to bear arms, they also had a broad view of the extent of state regulatory powers. The latter is not inconsistent with the right to bear arms for individual self-defense provided that the regulations are reasonable. Moreover, some states explicitly adopted an individual-rights model of the right to bear arms and still upheld concealed-carry bans. See Buzzard, 4 Ark. at 27-28 (highlighting that the Supreme Court of Alabama in Reid and the Supreme Court of Indiana, State v. Mitchell, 3 Blackf. 229 (1833), upheld concealed-carry bans despite individualistic phrasing in their state constitutional rights to bear arms); Heller,

That understanding of broad regulatory authority continued through to late 19th and early 20th century licensing schemes and other restrictions on carry.  See Decl. of Brennan Rivas ¶¶ 23-27, Dkt. 33-16 (discussing broad discretion of officials in administering licensing schemes); Strickland, 72 S.E. at 264 (upholding licensing restrictions that were not "so arbitrary or unreasonable as to amount, in effect, to a prohibition of the right to bear arms"); State v. Kerner, 107 S.E. 222, 225 (N.C. 1921) (discussing as "reasonable regulation[s]" prohibitions on carry while inebriated, in sensitive places, or in a manner calculated to cause terror, or on pistols under a certain size).  Of course, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." Bruen, 597 U.S. at 66 (citing Heller, 554 U.S. at 614).  But these schemes reinforce rather than contradict earlier evidence of broad governmental discretion to regulate the manner of carry.

Finally, plaintiffs' own concessions underscore the lawfulness of this regulation. Plaintiffs' counsel at oral argument contended that the test is whether a regulation makes it "so inconvenient that you choose not to carry when you would carry if it were off-body," Oral Arg. Tr. 49:19-20, seemingly advancing the theory that this restriction effectively destroys the right to bear arms. But under Bruen, D.C. could ban concealed carry, leaving only the relatively inconvenient possibility of open carry—which would also prevent carry in a purse or bag.  See 597 U.S. at 59.  Indeed, plaintiffs' counsel went on to concede that it would be "extremely difficult" to jog while carrying openly.  Oral Arg. Tr. 50:23. And recalling that the Second Amendment protects the right to carry publicly for self-defense, on-body carry vindicates that right

---

554 U.S. at 600-03 (comparing the breadth of state constitutional rights to bear arms).  Selective enforcement of gun laws against Blacks in the Reconstruction period is abhorrent but does not bar future legislatures from regulating manner of carry in a nondiscriminatory way.

by ensuring that a licensee has their pistol on their person.  By contrast, a purse or bag could be snatched away by an assailant and, in any event, could limit access more than a holster would.[23]

* * *

One final question concerns whether the commonality of off-body carry today changes the step two analysis.  See Pls.' Mot. Summ. J. 30-42.  As a threshold matter, it is far from clear that commonality today fully determines the scope of Second Amendment rights.  See Bevis v. City of Naperville, 85 F.4th 1175, 1199 (7th Cir. 2023) ("[T]he idea of 'common use' cannot be severed from the historical scope of the common-law right that the Second Amendment was designed to protect against encroachment."); cf. Hanson, 120 F.4th at 234 (noting that Bruen's historical analysis followed its observation that handguns are in common use today).  Even assuming that off-body carry is common today, that commonality today satisfies Bruen's common-use test, and that the test extends beyond defining an "arm" under the Second Amendment, it does not follow that states may not restrict off-body carry provided that the manner-of-carry regulations remain reasonable.[24]

That is so because plaintiffs retain a wide variety of options for how to exercise their Second Amendment rights, including holstering their pistol at their waist—in a range of different ways—or at their shoulder or ankle.  See Amodeo Decl. ¶ 12.  Granted, some of those options may be relatively less convenient for yoga, jogging, bicycling, or lying at the pool, and may even be less well-suited to the constraints of women's fashion.  Pls.' Mot. Summ. J. 35-37.  But "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and the Second

---

[23] Indeed, given plaintiffs' concession that they really object only to the off-body prohibition, not the holster requirement, they seem to prefer having to deal with both a closed purse or bag and a holster to access their pistols.

[24] Because the Court assumes the commonality of off-body carry, it denies as moot the District's motion to strike evidence submitted in support of that proposition.  See Mem. in Support of Defs.' Mot. to Strike Evid., Dkt. 34.

Amendment does not grant "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." <u>Bruen</u>, 597 U.S. at 21 (quoting <u>Heller</u>, 554 U.S. at 626).

In sum, this regulation is not an effective denial of the right to bear arms. Instead, it is a modest burden on manner of carry for public safety reasons. Our nation's historical tradition permits such reasonable regulation of manner of carry, as <u>Bruen</u> explicitly recognized. Indeed, states may ban concealed carry outright, and this regulation falls far short of a ban. Plaintiffs complain of inconvenience in relation to sporting activities or women's fashion, but the Second Amendment does not guarantee the right to carry at all times and in all ways, as the sensitive-places doctrine also makes clear. And plaintiffs even concede that they do not mind the holster component of the regulation, so requiring that off-body carry be allowed would not improve the accessibility of their firearms. Accordingly, because the "how" and the "why" of the District's regulation are distinctly similar to historical analogues of firearm regulation—particularly the broad range of manner-of-carry regulations—section 2344.2 does not fall afoul of <u>Bruen</u> step two and does not violate the Second Amendment.

## **CONCLUSION**

For the foregoing reasons, the Court denies plaintiffs' motion for partial summary judgment, grants the District's motion for summary judgment, and denies as moot the District's motion to strike evidence. A separate order will accompany this opinion.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>September 24, 2025</u>