No. 25-7163

# In the United States Court of Appeals for the District of Columbia Circuit

_____

LYNNE ANNE-BRIGITTE RUSSELL, ET AL.,

*Plaintiffs-Appellants*,

v.

DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees*,

_____

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

_____

On Appeal from the United States District Court
for the District of Columbia (No. 1:24-cv-01820-JDB)

_____

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
1929 Biltmore Street, NW
Washington, DC 20009
gll@bergstromattorneys.com
202-669-0442 (phone)
202-483-9267 (facsimile)

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Road, Ste C #1015
Baltimore, MD 21234
m.pennak@me.com
(301) 873-3671

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES**

**Parties:** The appellants, each of whom were plaintiffs before the District Court, are Lynne Anne-Brigitte Russell, Charles John de Caro Leanne Christine Reilly, Eric N. Christian, Jr. and Timothy R. Beck. The appellees, each of whom were defendants before the District Court, are the District of Columbia and the D.C. Metropolitan Police Department ("MPD") Chief Robert J. Contee, III, in his official capacity.[1] [2]

**Rulings Under Review:** The ruling under review is the District Court's September 24, 2025, Memorandum Opinion (JA 10) and Order (JA 9), which granted summary judgement to defendants and denied partial summary judgement to Plaintiffs.

**Related Cases:** There are no related cases pending in this Court or before the U.S. District Court for the District of Columbia.

---

[1] Chief Contee resigned his position and was replaced by Pamela A. Smith; Chief Smith has since resigned and is replaced by Interim Chief Jeffery W. Carroll.

[2] The original complaint named certain MPD Third District police officers as defendants. Pursuant to the First Amended Complaint, filed October 14, 2024, counts relating to those officers were dismissed.

# TABLE OF CONTENTS

Page:

TABLE OF AUTHORITIES ……………………………………………… iii

STATEMENT OF JURISDICTION ………………………………….....… 1

STATEMENT OF THE ISSUES ……………………………………………… 2

STATEMENT OF THE CASE AND FACTS ……………………………..… 3

SUMMARY OF ARGUMENT …………………………………….....… 12

STANDARD OF REVIEW ………………………………………………....… 18

ARGUMENT …………………………………………………………..… 19

   I.  PLAINTIFFS HAVE STANDING TO CONTEST DCMR § 24.2344.2 … 19

  II. THE DISTRICT COURT ERRED BY CONDUCTING ITS *BRUEN* STEP
      TWO ANALYSIS AT TOO HIGH A LEVEL OF GENERALITY ………. 19

     A. The *Bruen* Framework …………………………………………..… 20

     B. The Supreme Court's Second Amendment Decisions Have Employed
       A Low Level Of Generality In Considering Historical Analogues …… 23

     C. 19th Century Concealed Carry Bans Are Neither Distinctly
       Nor Relevantly Similar To D.C.'s Off-Body Carry Ban ……………… 33

  III.DCMR § 24.2344.2 IS AN HISTORICAL AND CONTEMPORARY
     OUTLIER ……………………………………………………………... 48

CONCLUSION ………………………………………………………… 52

CERTIFICATE OF COMPLIANCE ……………………………………… 54

CERTIFICATE OF SERVICE …………………………………………... 54

STATUTORY ADDENDUM …………………………………………… 55

# TABLE OF AUTHORITIES

Page

*Abbott Labs v. Gardner,*
387 U.S. 136 (1967) ……………………………………………….… 9

*Andrews v. State,*
50 Tenn. 165 (1871) ........................................................ 27, 43, 45, 46

*Angelo v. District of Columbia,*
648 F. Supp. 2d 116 (D.D.C. 2022) ...................................... 9

*Antonyuk v. James,*
120 F.4th 941 (2nd Cir. 2024) ............................................ 31

*Art Midwest Inc. v. Atl. Ltd. P'ship XII,*
742 F.3d 206 (5th Cir. 2014) …………………………………………….. 21

*Attias v. Carefirst, Inc.,*
865 F.3d 620 (D.C. Cir. 2017) …………………..…………………….... 8

*Aymette* v. State,
21 Tenn. 154 (1840) ........................................................ 38, 39

*Babbitt v. UFW Nat'l Union,*
442 U.S. 289 (1979) ...................................................... 8, 19

*\*Baird v. Bonta,*
163 F.4th 723 (9th Cir. 2026) …………………….……….. 11, 12, 36, 40, 41, 42

*Barron v. Baltimore,*
32 U.S. 243 (1833) ......................................................... 43

*Carroll v. State,*
28 Ark. 99 (1872) ........................................................... 43

*\*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...................................... 7, 15, 16, 24, 25, 28, 30, 40, 50, 51

*\*Authorities upon which we chiefly rely are marked with asterisks.*

iii

*Drummond v. Robinson,*
　9 F.4th 226 (3rd Cir. 2021) ……………………………………………… 13, 23

*English v. State,*
　35 Tex. 473 (1871) …………………………………………...……… 27, 45

*Fife v. State,*
　31 Ark., 455 (1876) …………………………………………………… 43

*Frey v. City of New York,*
　157 F.4th 118 (2d Cir. 2025) ……………………………………….. 11, 42, 43

*Haile v. State,*
　38 Ark. 564 (1882) …………………………………………………… 46

*Hall v. District of Columbia Bd. of Elections,*
　141 F.4th 200 (D.C. Cir. 2025) …………………………...……….. 10

*Hanson v. Smith,*
　120 F.4th 223 (D.C. Cir. 2024), *cert. denied,* 145 S.Ct. 2778 (2025) ............... 20

*Hill v. State,*
　53 Ga. 472 (1874) …………………………………………...…………. 47

*In re Brickey,*
　8 Idaho 597, 70 P. 609 (1902) ………………………………………… 39

*Kanter v. Barr,*
　919 F.3d 437 (7th Cir. 2019) ……………………………………….. 25

*Kipke v. Moore,*
　l65 F.4th 194　(4th Cir. 2026) ………………………...…………………. 31

*Koons v. Att'y Gen. N.J.,*
　156 F.4th 210 (3d Cir. 2025), *vacated,* 162 F.4th 100 (3d Cir. 2025) …….. 31, 32

*Liberty Lobby, Inc. v. Anderson,*
　746 F.2d 1563 (D.C.Cir.1984), *vacated on other grounds,*
　*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...................................... 18

iv

*McDaniels v. State,*
  419 So.3d 1180 (Fla. Dist. Ct. App. 2025) ………………………………... 40, 41

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ............................................................... 8, 13, 51

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,*
  606 U.S. 146 (2025) …………………………………………………………… 9

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ........................................................................ 8

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) …………………………………………… 25

*\*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S 1 (2022) ......... 2, 10, 12, 14-16, 20-28, 30, 33, 42, 43, 45, 46, 48, 50, 51

*Navegar, Inc. v. United States,*
  103 F.3d 994 (D.C. Cir. 1997) .......................................................... 7

*\*Nunn v. State,*
  1 Ga. 243 (1846) ............................................................ 14, 15, 27, 39

*Page v. State,*
  50 Tenn. 198 (1871) …………..………………………………………… 46

*\*Parker v. District of Columbia,*
  478 F.3d 370 (D.C. Cir. 2007) ............................................... 7, 8, 9, 50

*Range v. Attorney General,*
  124 F.4th 218 (3rd Cir. 2024) (en banc) …………………………………… 25

*Seegars v. Ashcroft,*
  396 F.3d 1248 (D.C. Cir. 2005), *reh. denied,*  413 F.3d 1 .................................. 7

*Sir Rex v. Sir John Knight,*
  1 Comb. 38, 90 Eng. Rep. 330 (K. B. 1686) …………..……..…………… 26

*Shields v. Eli Lilly &. Co.*,
    895 F.2d 1463 (D.C. Cir. 1990) ………………………………………….. 18

*\*State* v. *Chandler*,
    5 La. Ann. 489 (1850) ................................................................. 37, 38

*State v. Duke,*
    42 Tex. 455 (1875) …………………………………….……... 27, 43, 45

*State v. Huntley,*
    25 N.C. 418 (1843) ....................................................................... 26

*State v. Jumel*,
    13 La. Ann. 399 (1858) …………………………………………….. 11, 37, 38

*State v. Kerner*,
    181 N.C. 574, 107 S.E. 222 (1921) ………………………………..… 14, 39

*\*State v. Reid,*
    1 Ala. 612, 35 Am. Dec. 44 (1840) ........................................... 35, 37

*State v. Rosenthal*,
    75 Vt. 295, 55 A. 610 (Vt. 1903) …………………………………….... 39

*State v. Smith*,
    11 La. Ann. 633 (1856) …………………………………….…..… 38

*State v. Wilburn*,
    66 Tenn. 57 (1872) …………………………………………………… 46

*State v. Workman,*
    35 W.Va. 367, 14 S.E. 9 (1891) ………………………………….. 27

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ................................................................. 8, 19

*Stockdale v. State,*
    32 Ga. 225 (1861) ................................................................. 39, 40

*Strickland v. State*,
  137 Ga. 1, 72 S.E. 260 (1911) …………………………………………... 43

*\*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .......................................................... 8, 10, 19

*United States v. Cruikshank*,
  92 U.S. 542 (1876) ……………………………………………… 43

*United States v. Diaz*,
  116 F.4th 458 (5th Cir. 2024) …………………………………… 25

*United States v. Duarte*,
  137 F.4th 743 (9th Cir. 2025) (en banc) …………………………… 25

*United States v. Hemani*,
  No. 24-1234 (U.S.) ……………………………………….......... 20

*United States v. Hunt*,
  123 F.4th 697 (4th Cir. 2024) …………………………………… 25

*United States v. Jackson*
  110 F.4th 1120 (8th Cir. 2024) ………………………………… 25

*\*United States v. Rahimi*,
  602 U.S. 680 (2024) ......................................... 12, 20, 29, 30, 34, 35

*United States v. Williams*,
  113 F.4th 637 (6th Cir. 2024) …………………………………… 25

*U.S. Telecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016) …………..………………………... 9

*Watson v. Stone*,
  148 Fla. 516, 4 So.2d 700 (1941) .............................................. 44, 45

*Wehr-Darroca v. District of Columbia*,
  No. 24-3504 (RC) (D.D.C. Sept. 22, 2025) …………………….…… 9

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) ............................................................................. 8

*\*Wolford v. Lopez,*
116 F.4th 959, 978 (9th Cir. 2024),
*cert. granted on other grounds,* 146 S.Ct. 79 (Oct. 3, 2025) …....… 28, 29, 32, 48

*Wolford v. Lopez,*
No. 24-1046 (U.S.) .…………………………………………………….. 13, 30

*Wrenn v. District of Columbia,*
864 F.3d 650 (D.C. Cir. 2017) ........................................................... 27

**Statutes and Rules**

1839 Ala. Acts 67 …………………………………………………...…… 37

18 U.S.C. § 922(g)(8) …………………………………………........ 29, 35

28 U.S.C. § 1292(a)(1) ………………………………………………… 1

28 U.S.C. § 1331 ……………………………………………………… 1

28 U.S.C. § 1343 ……………………………………………………… 1

42 U.S.C. § 1983 ……………………………………………………… 1

D.C. Code § 7-2509.02(a)(4) ………………………………………… 49

D.C. Code § 7-2509.02(a)(5) ………………………………………… 49

D.C. Code § 7-2509.05(a)(1) ……………………………………...… 3

D.C. Code § 7-2509.05(a)(4) ……………………………………...… 3

D.C. Code § 7-2509.07(a) …………………………………………… 17

D.C. Code § 7-2509.10(a) …………………………………………... 3

DCMR § 24.2341.1(2) …………………………………….............. 3

DCMR § 24.2341.3(b) …………………………………………….................. 3

DCMR § 24.2344.1 …………………………………………………............... 3, 33

DCMR § 24.2344.2 ……………...…... 3, 5, 6, 7, 9 11, 19, 22, 33, 35, 42,47, 51, 52

MD Code, Public Safety, § 5-307 …………………………………………… 41

**Other Authorities**

Black's Law Dictionary (3rd ed.) …………………………………….…………… 22

Brief Of Amicus Curiae J. Joel Alicea In Support Of Petitioners And Reversal,
    No. 24-1046 (U.S. Nov. 24, 2025) …….…………………………………… 31

*Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
    11 Tex. Rev. L. & Pol. 192 (2006) ………..………...…………….. 27, 38, 40, 44

https://www.gungoddess.com/collections/concealed-carry-purses/products/smith-
    wesson-structured-handbag ................................................................. 4

https://hidinghilda.com/products/gtm-original-slingster-minimalist-concealed-
    carry-sling-bag ……………………………………………….…………… 4

https://vertx.com/products/everyday-fanny-pack-plus …………………………… 4

Jonathan Meltzer, *Open Carry for All:* Heller *and Our
    Nineteenth-Century Second Amendment,*
    123 Yale L.J. 1486 (2014) ……………………………………………… 36, 37

Joseph Greenlee, *Disarming the Dangerous: The American Tradition
    of Firearm Prohibitions*, 16 Drexel L. Rev. 1 (2024), available at
    http://dx.doi.org/10.2139/ssrn.4317000 .............................................. 30

Kathy Jackson, *Holster Safety & The Four Rules,* available at
    https://corneredcat.com/article/holsters/holster-safety-the-four-rules/ ……..…… 49

Maureen E. Brady, *Property v. Guns: The Level-of-Generality Problem in Wolford* (Jan. 19, 2026), available at https://ssrn.com/abstract=6096206 … 30, 48

NRA Women Staff, *Women of The Well Armed Woman Tell How They Carried in 2020* (May 6, 2021), available at https://www.nrawomen.com/content/women-of-the-well-armed-woman-tell-how-they-carried-in-2020 ……………….......... 50

*The American Heritage Dictionary of the English Language, New College Edition* (1981) …………………………………….………….. 22

United State Concealed Carry Association, *What Is Open Carry and Which States Allow It?* (April 8 ,2025), available at https://www.usconcealedcarry.com/blog/what-is-open-carry-and-which-states-allow-it/ ………………………………………………………….………….. 41

**STATEMENT OF JURISDICTION**

Because plaintiffs sued under 42 U.S.C. § 1983 to vindicate their federal constitutional rights, the district court had subject matter jurisdiction under 28 U.S.C. § 1331 and under 28 U.S.C. § 1343. The district court granted summary judgement to defendants on September 24, 2025. *See* JA 9 & 10. On October 24, 2025, Plaintiffs filed a timely notice of appeal. *See* ECF No. 48. Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. § 1292(a)(1).

# STATEMENT OF THE ISSUES

In *New York State Rifle and Pistol Association, Inc. v. Bruen,* 597 U.S. 1 (2022), the Supreme Court cautioned lower courts that in comparing a challenged Second Amendment restriction with the Nation's historical tradition of firearms regulation, as that decision requires, courts should not analogize at too high a level of generality. Nonetheless, the district court derived the broad principle from 19th century concealed carry bans that legislatures could "reasonably regulate[] manner of carry in service of government goals of accident and crime prevention." ("JA 27).

The questions presented are:

1. Whether the district court erred in finding 19th century prohibitions on the concealed carry of handguns are "distinctly similar" to MPD's ban on carrying handguns in a purse, sling bag, fanny pack or similar device specifically designed for firearm carry where the MPD otherwise permits *only* concealed carry.

2. Does MPD's ban on concealed off-body carry comport with the Nation's historic tradition of firearms regulation where off-body carry was practiced historically, is a common method of carrying firearms today, is allowed by every other jurisdiction in the Nation, and where the record fails to show it has ever been prohibited within the United States up until MPD adopted its ban.

## STATEMENT OF THE CASE AND FACTS

This case involves a Second Amendment challenge to a District regulation that prevents carrying a handgun in a common manner that has never previously been prohibited anywhere in the Nation. By regulation, the Metropolitan Police Department ("MPD") requires that "[a] licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public." DCMR § 24-2344.1 Yet, in the very next subsection of its regulations, MPD requires "[a] licensee shall carry any pistol in a holster *on their person* in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol." DCMR § 24.2344.2.[3] (Emphasis added.)

The MPD interprets this latter regulation as prohibiting carrying even a *holstered* firearm in a bag or similar device specifically designed to safely carry a loaded handgun even if the device is secured on or to the body of the CPL holder.

---

[3] MPD may revoke a license if the licensee violates this rule. *See* DCMR § 2341.1(2). *See also* D.C. Code § 7-2509.05(a)(1). Revocations do not take effect until after a timely appeal to the Office of Administrative Hearings ("OAH") and appeal to the D.C. Court of Appeals. D.C. Code § 7-2509.05(a)(4). *See also* DCMR § 24-2341.3(b). Violations of CPL regulations are also criminally punishable as a misdemeanor, with up to six months in jail. D.C. Code § 7-2509.10(a).

Examples of such devices include concealed carry purses, [4] sling bags,[5] and fanny packs.[6] Because no jurisdiction in history previously restricted this common means of firearm carry, plaintiffs brought this facial and as applied challenge.

Plaintiffs are five individuals holding MPD-issued CPLs. Plaintiff Russell is a former Georgia deputy sheriff, CNN reporter and current licensed private investigator. JA 45. Plaintiff de Caro is a former Army Special Forces soldier and CNN special investigative reporter. (JA 47). Russell and de Caro currently reside in

---

[4] Concealed carry purses are equipped with a separate compartment for a personal protection firearm and accommodate a holster. *See, e.g.,* https://www.gungoddess.com/collections/concealed-carry-purses/products/smith-wesson-structured-handbag.

[5] Sling bags are designed to be worn cross body for maximum security. *See, e.g.,* https://hidinghilda.com/products/gtm-original-slingster-minimalist-concealed-carry-sling-bag. They also can accommodate a holster. *Id.*

[6] Fanny Packs may be worn cross body or secured around the waist. *See, e.g.,* https://vertx.com/products/everyday-fanny-pack-plus. Below are photos illustrating a holstered firearm (Sig Sauer 365 XL) in a Vertx fanny pack. *See* JA 321.



Georgia and West Virginia but visit the District regularly. JA 47, 317-18. Both are writers and attend meetings in the District of the Washington Writers Group and their counsel's annual summer party. JA 317-18. In June of 2015 they were victims of an attempted armed robbery that ended in a gun fight. JA 40, 42. As Russell was returning to her and her husband's motel room after putting something in her vehicle, the assailant forced himself into their room at gun point. JA 40. During an intense standoff, Russell handed de Caro her purse which contained a handgun. JA 40, 42. Convinced the assailant was likely to kill them, de Caro drew the gun from the purse and fired on the assailant who also fired. JA 42. During the exchange of gun fire de Caro took three rounds while killing the assailant in self-defense. JA 41-42.

Due to the limitations of women's fashion, Russell often carries her personal protection firearm off-body in a concealed carry purse or similar device specifically designed for firearm carry. JA 40-41. She would do so when visiting the District but for DCMR § 24.2344.2 and fear of arrest or loss of her District CPL if she violates DCMR § 24.2344.2. Plaintiff de Caro would likewise utilize off-body carry when expedient in the District were it not for fear of enforcement of DCMR § 24.2344.2. JA 42.

Plaintiff Reilly was a District resident when the initial complaint in this case was filed. JA 43. She is currently a Pennsylvania resident but regularly visits the District to see her brother, a uniformed Secret Service officer. JA 320. She formerly

served in U.S. Army and is currently a sergeant in the Pennsylvania National Guard. *Id*. Similar to Plaintiff Russell, in light of restrictions in women's fashions plaintiff Reilly often employs off-body carry using a concealed carry purse when not present in the District and would do so in the District in the future were it not for fear of enforcement of DCMR § 24.2344.2. JA 43.

Plaintiff Beck, a District resident, was pulled over in 2024 and arrested for allegedly soliciting prostitution and for a CPL violation. JA 12. Beck's arresting officer characterized his firearm offense as failing to disclose his pistol – which body worn camera video showed he plainly disclosed – but Beck states the officer told him the offense was not carrying his gun either holstered on his person or unloaded and out of reach. *See* JA 12. The government brought no formal charges against him; instead, MPD issued Beck a notice of revocation for violating a D.C. rule that weapons "shall be carried in a holster approved by" MPD. JA 12-13. Beck timely appealed and OAH reversed the notice of revocation because the regulation in question – the forerunner of DCMR § 24.2344.2 – had been repealed. JA 13

Plaintiff Christian, a District resident, was pulled over in 2024 for alleged failure to use his turn signal. *Id*. During the traffic stop, officers discovered Christian's pistol was not carried pursuant to DCMR § 24.2344.2 and confiscated it. JA 13. Officers then released Christian but also "submitted an arrest warrant" to the D.C. Attorney General's Office for a CPL violation. *Id*. Christian was not arrested

but MPD later issued him a notice of revocation for violating DCMR § 24.2344.2. *Id*. He also timely appealed but during the pendency of that appeal, his license expired and as a result, he voluntarily dismissed his appeal as moot on the "understand[ing] that the incident leading to the revocation notice" would "not bar him from receiving a newly issued [license]." *Id*. Christian has informed undersigned counsel that he has subsequently been reissued a CPL.

The court below resolved this case on cross-motions for summary judgement. JA 11. First addressing jurisdiction, the court found plaintiffs had standing. In so doing it rejected the District's claim the case was governed by the "idiosyncratic" standing doctrine exemplified in the *Navegar/Seegars* line of cases. JA 16-22. *See Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997); *Seegars v. Ashcroft*, 396 F.3d 1248 (D.C. Cir. 2005), *reh. denied,* 413 F.3d 1. *See also Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008).[7] That doctrine holds that in a pre-enforcement challenge to a criminal statute in a non-First Amendment context plaintiff must

---

[7] The Supreme Court did not reach the standing issue in *Heller* as this Court held Mr. Heller had standing as a result of applying to register a handgun and MPD having denied that application. *See Parker,* 478 F.3d at 375-76.

allege he has been singled out or uniquely targeted for enforcement to meet the Article III standing requirement. *Parker,* 478 F.3d at 374-75.[8]

The court declined to adopt plaintiffs' view that *SBA List* and *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) had abrogated the *Navegar/Seegars* rationale. JA 17-18.[9] Nevertheless, the court explained "this Circuit has applied *SBA List's* "substantial risk" test beyond the First Amendment or even pre-enforcement context." JA 18, citing *Attias v. Carefirst, Inc.*, 865 F.3d 620, 626-27 (D.C. Cir. 2017). Additionally, the court pointed out that *SBA List* "does not cabin its test for pre-enforcement standing to the First Amendment context. Indeed, *SBA List* cited as support for its rule *MedImmune [Inc. v. Genentech, Inc.]*, 549 U.S. [118] 128-29 [2007], which was not a First Amendment case. 573 U.S. at 158." *Id.* The court further noted, "Not confining *SBA List* to the First Amendment context also avoids treating the Second Amendment as a second-class right. *Id.*, citing *McDonald v. City of Chicago*, 561 U.S. 742, 778-79 (2010) and *Parker*, 478 F.3d at 375 n.1 "(stating

---

[8] By contrast, Supreme Court decisions in the First Amendment context had stated, "An 'actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.'" JA 16, citing *Susan B. Anthony List v. Driehaus*, 573 U.S.149, 158 (2014) in turn citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). *See also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

[9] Under *SBA List*, "'a plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."'" 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298).

that the *Seegars* majority implicitly agreed that 'the injury-in-fact requirement should be applied uniformly over the First and Second Amendments')." JA 18.

The court distinguished the *Navegar/Seegars* line on the basis that DCMR § 24.2344.2 is an administrative rule, not a statute. JA 19-21.[10] And the court further emphasized the strong presumption of reviewability of agency rules. JA 20, citing *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739-40 (D.C. Cir. 2016); *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967); and *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155-57 (2025). In light of that discussion, the court found that the *SBA List* framework applied. JA 20.

Accordingly, the court determined this "dispute turns on whether plaintiffs' fears of enforcement are credible." JA 21. The court found "there has been past enforcement, including as to these plaintiffs specifically. Beck was arrested in part for a pistol-related violation and police initiated a license revocation proceeding under a similar, albeit then-repealed, rule to section 2344.2." *Id.* "Moreover, although the District has not prosecuted Beck it has not said that it would not prosecute section 2344.2 violations in the future. Indeed, at oral argument it declined to disavow future prosecutions. Oral Arg. Tr. 29:8." *Id.* Because of the

---

[10] For the same reason the court distinguished the district court decisions in *Angelo v. District of Columbia,* 648 F. Supp. 3d 116, 123 (D.D.C. 2022) and *Wehr-Darroca v. District of Columbia*, No. 24-3504 (RC) (D.D.C. Sept. 22, 2025) as involving pre-enforcement challenges to *statutes*. JA 18 n.7.

"'combination' of the threat of license revocation and prosecution, at least Beck has standing. *See SBA List*, 573 U.S. at 166. And because plaintiffs' partial motion for summary judgment seeks only declaratory and injunctive relief, 'only one plaintiff need have standing.'" JA 20-21, quoting *Hall v. District of Columbia Bd. of Elections*, 141 F.4th 200, 209 (D.C. Cir. 2025).

Turning to the merits, the court stated, "the 'manner of public carry' is 'subject to reasonable regulation,' which at least includes banning the carry of firearms in a manner 'likely to terrorize others,' providing 'financial incentives for responsible arms carrying,' or 'eliminat[ing] one kind of public carry—concealed carry—so long as . . . the option to carry openly' remains." JA 22, quoting *Bruen*, 597 U.S. at 59.[11] Purporting to apply *Bruen's* two step analytical framework, the court rejected the District's claim that plaintiffs' proposed conduct was outside the text of the Second Amendment (*Bruen's* step one) saying that *Bruen* has already provided the appropriate level of generality for arms-bearing conduct, defining the conduct at issue there as "carrying handguns publicly for self-defense." JA 23-24, citing *Bruen,* 597 U.S. at 32. The court thus held plaintiffs' proposed conduct of utilizing off-body carry came within the text of the Second Amendment. JA 24.

Moving on to *Bruen's* step two, whether MPD's rule is consistent with the Nation's historical tradition of firearms regulation, *see Bruen, 5*97 U.S. at 19, the

---

[11] None of those circumstances apply here, however.

court rejected reliance on recommendations that cavalry officers be supplied holsters and militia laws requiring militia members to come equipped with pistols and holsters, noting that plaintiffs were not contesting the requirement of DCMR § 24.2344.2 that pistols be holstered, only the off-body carry prohibition. JA 29 n.13.[12]

However, the court found that 19th century laws which banned concealed carry of handguns were "distinctly similar" to the off-body carry ban. JA 30. The court said DCMR § 24.2344.2 comports with the principles underpinning the Second Amendment because it reasonably regulates manner of carry in service of government goals of accident and crime prevention. JA 27, citing *Frey v. City of New York*, 157 F.4th 118, 138-40 (2d Cir. 2025) "(affirming denial of preliminary injunction as to open-carry ban because states have police power 'to regulate "a particular mode of bearing arms" that the legislature deems "dangerous to the peace of society"' (quoting *State v. Jumel*, 13 La. Ann. 399, 400 (1858)))." *Contra Baird v. Bonta,* 163 F.4th 723, 737 n.17 (9th Cir. 2026) (holding the "generic safety rationale" relied upon to support California's ban on open carry in counties with population greater than 200,000 was not relevantly similar to the "rationales underlying

---

[12] The court also rejected the District's reliance on the "going armed" laws, stating "there is no suggestion that plaintiffs pose a clear threat of violence to others, so the 'why' of going-armed (or surety) laws is not distinctly similar to this regulation." JA 31 n.15.

historical concealed carry bans -- rationales that were explicitly about *concealed* carry."). (Emphasis in original).

The district court concluded that the

District's regulation imposes a comparable burden because it provides similar procedural protections to historical concealed-carry restrictions and imposes a similar level and duration of punishment for violations. It is comparably justified because state legislatures and courts in the Antebellum and Reconstruction eras recognized broad police powers to reasonably regulate manner of carry, including by taking the more drastic step of banning concealed carry altogether.

JA 28. Finding the District's regulation consistent with the principle of broad police power to regulate the mode of carry, the district court granted the District's motion for summary judgement and denied plaintiffs' partial motion for summary judgement. JA 39.

## SUMMARY OF ARGUMENT

The district court's holding that 19th century prohibitions on concealed carry of handguns are distinctly similar to the District's ban on off-body carry suffers from applying the *Bruen* step two analysis at too high a level of generality. The Supreme Court has specifically cautioned against such an approach that "'risks endorsing outliers that our ancestors would never have accepted.'" *Bruen,* 597 U.S. at 30, quoting *Drummond v. Robinson,* 9 F.4th 217, 226 (3rd Cir. 2021). Both *Bruen* and *United States v. Rahimi,* 602 U.S. 680 (2024), analyzed the issues in those cases at a low level of generality to arrive at narrow principles governing those cases. In *Bruen,*

that there is a history and tradition of public handgun carry for self-defense, and in *Rahimi* that principle was the government may temporarily disarm a person a court determines presents a threat of harm to the public. The pending case of *Wolford v. Lopez*, No. 24-1046 (U.S.), likewise presents the issue of the appropriate level of generality in conducting the *Bruen* step two analysis, *viz.*, whether historical laws which prohibited hunting on other persons' lands *closed* to the public without express permission justify a law which prohibits going legally armed onto property *otherwise open* to the public without express permission.

Deriving from concealed carry bans a Second Amendment principle that legislatures may reasonably regulate the manner of carry to prevent crime and accidents as did the court below, s*ee, e.g.,* JA 27, relegates the bulk of firearms regulations to rationale basis review and eviscerates the analysis *Bruen* mandates. That formulation tips the balance heavily in favor of the government whereas *Bruen* deliberately tips the balance the other way in light of the Second Amendment codification of a fundamental right. *See McDonald*, 561 U.S. 742.

Nineteenth century concealed carry bans, predominately a phenomenon of Southern states, were addressed specifically to the prevention of violent surprise assaults and sustained on that basis as the court below recognized. JA 31-32. Courts did not suggest, for example, that manner of carry regulation could support a restriction on open carry; in fact, where open carry was banned, it was found

unconstitutional. *See Nunn v. State,* 1 Ga. 243 (1846); *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 225 (1921).

In a very few cases, courts expounded on the expansive authority of the states' police power, or courts approved more restrictive limitations on firearm carry as the district court acknowledged, JA 32-37, but those decisions do not evince a historical tradition of broadly regulating carry methods for several reasons. First, they are few in number, principally in Tennessee and Arkansas. Second, they arose in the last third of the 19th century and thus come too late to shed much light on the original meaning of the Second Amendment. *See Bruen,* 597 U.S. at 66. Third, courts in those jurisdictions rejected the applicability of the federal Second Amendment to their states, even after the 14th Amendment's ratification. Fourth, the few states that adopted such regulations had constitutional provisions that either specifically allowed such regulations, protected the right to bear arms only for the "common defense," or judicially adopted a militia centric interpretation of their state constitutional provisions that failed to acknowledge the broad right to publicly carry handguns for personal defense that *Bruen* found.

The District's off-body carry ban is both a historical and modern day outlier. The District was unable to point to a single instance of legislation directed to off-body carry in the Nation's history. Although an historical twin may not be required under *Bruen,* the total absence of similar legislation is nonetheless probative of the

public meaning of the right to bear arms. *Id.* at 26. The Supreme Court has specifically cautioned against reliance on outlier laws. *Id.* at 30, 65, 70. *See also Id.* at 78 (Alito, J., concurring); *Id.* at 79 (Kavanaugh, J., concurring). Indeed, the District regulation is not even a law, it's a regulation adopted by a former MPD Chief.

Off-body carry is not a new or novel way to carry a handgun that merits a nuanced analysis under *Bruen*. *See Id.* at 27. Defendants even presented evidence that off-body carry was common. *See* ECF 21-2 at 15 ("Modified purses, tablet cases, briefcases and other bags are common ways to carry concealed firearms"). Defendants' expert witness acknowledged it was common to carry handguns in bags such as purses. JA 295 n.4. And "horse pistols" carried in holsters draped over a horse's saddle, not carried on body, were common weapons at the Founding. *See, e.g., Nunn v. State,* 1 Ga. 243. Plaintiffs presented evidence from firearms trainers and published articles showing off-body carry is a common means of handgun carry by citizens and off-duty police. JA 59-172. And plaintiffs presented evidence that devices designed for off-body carry are widely available. JA 173-89. The district court assumed off-body carry is common. JA 38 n.24. *Heller* emphasized that commonly owned firearms are protected. *See* 554 U.S. at 624-25. It is not a great leap in logic to conclude that commonly employed carry methods are also protected

under the Second Amendment as it is the choice "struck by the traditions of the American people [] that demands our unqualified deference." *Bruen,* 597 U.S. at 26.

Moreover, that off-body carry has never previously been prohibited is persuasive evidence that the practice is neither considered inherently dangerous nor threatening, traditional rationales for arms regulations, such as laws limiting the storage of gun powder, the placement of trap guns, or the carrying of dangerous and unusual weapons to the terror of the people.

The district court rationalized its decision concluding the restriction was not a substantial burden on defensive carry and that the "Second Amendment does not grant 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" JA 38-39, quoting *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). Whether the regulation is a substantial burden on defensive carry is not the test under *Bruen*. If the regulation regulates arms bearing conduct, and the district court is plainly correct in holding that this regulation does, then "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. The regulation can only be constitutional if the government satisfies the history and traditional inquiry required by *Bruen* step two. Whether the burden is "substantial" is simply irrelevant.

Plaintiffs agree that the Second Amendment right is "not unlimited," *Heller*, 554 US. at 595, but the district court's invocation of that truism simply begs the

question presented here. We can agree there is no right to carry dangerous and unusual weapons. We can agree there is no right to carry weapons in a threatening or reckless manner or under the influence of alcohol or other mind altering substances. And we can agree there are locations where the government can restrict carrying weapons; indeed, the District has delineated a plethora of such locations. *See* D.C. Code § 7-2509.07(a). Plaintiffs simply wish to comply with the District's concealed carry requirement by carrying concealed commonly possessed handguns holstered in devices specifically designed for safe handgun carry where the circumstances are otherwise unconducive to carrying on body.

## STANDARD OF REVIEW

Review of a trial court's decision on a motion for summary judgment is de novo. *See Shields v. Eli Lilly &. Co*., 895 F.2d 1463, 1466 (D.C. Cir. 1990); *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1571 (D.C.Cir.1984), *vacated on other grounds, Anderson v. Liberty Lobby Inc*., 477 U.S. 242 (1986).

# ARGUMENT

## I.  PLAINTIFFS HAVE STANDING TO CONTEST DCMR § 24.2344.2.

The district court correctly found that plaintiffs have standing to contest DCMR § 24.2344.2. DC has not cross-appealed on this issue. In any event plaintiffs' standing is clear. Plaintiffs "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [DCMR § 24.2344.2], and there exists a credible threat of prosecution thereunder.'" *SBA List*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). An "actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id*. at 158 (citing *Steffel,* 415 U.S. at 459. Here, however, there have actually been enforcement actions against both plaintiffs Beck and Christian. So even under the more stringent *Navegar/Seegars* line of cases, which the district court correctly found were not applicable, plaintiffs have standing. *See also* ECF 30-3 at 3-15; ECF 37 at 1-7.

## II.  THE DISTRICT COURT ERRED BY CONDUCTING ITS *BRUEN* STEP TWO ANALYSIS AT TOO HIGH A LEVEL OF GENERALITY.

The fundamental flaw in the district court's decision is it derived a governing Second Amendment principle at too high a level of generality. As *Rahimi* holds, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692. In conducting that analysis, neither *Bruen* nor *Rahimi* analogized at a high level of generality. In fact, the Court warned lower courts not to do so lest they approve

restrictions on the right to keep and bear arms that our forebears would never have tolerated. *See Bruen,* 597 U.S. at 30.

Accordingly, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). *See Hanson v. Smith,* 120 F.4th 223, 234-35 (D.C. Cir. 2024) ), *cert. denied,* 145 S.Ct. 2778 (2025) ("We think the appropriate level of generalization is one that aligns the regulation in question with the 'how' and 'why' of the historical analogue."). The pending *Wolford v. Lopez* case presents this level of generality issue. This issue is also presented in *United States v. Hemani*, No. 24-1234 (U.S.), scheduled for argument on March 2, 2026. The Supreme Court's decisions in those two cases should be instructive. Both cases present *Bruen* step two analogue inquiries. When analyzed at the appropriate level of generality, DC's off-body carry ban fails because it is a complete outlier and is thus unsupported by the Nation's historical tradition of firearms regulation. This Court should therefore reverse the judgment below and remand with directions to grant plaintiffs' motion for partial summary judgement.

### A. The *Bruen* Framework.

*Bruen* rejected the tiers of scrutiny approach the majority of the circuits had employed in analyzing Second Amendment challenges as inconsistent with the text and history approach the Court followed in *Heller.* See *Bruen,* 597 U.S. at 17-19.

*Bruen* instead adopted a two-part test based on text and history. Once the challenger shows that his intended conduct comes within the text of the Second Amendment – i.e., keep and bear arms (step one) – the government must show that its restriction is "consistent with the Nation's historical tradition of firearms regulation" (step two). *Id.* at 24. Here, the district court acknowledged plaintiffs' intended conduct came within the text of the Second Amendment and thus that plaintiffs' met *Bruen's* step one.[13]

The analysis must then move to the second step of the analysis. On that step, *Bruen* explained:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing *that problem* is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modem regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

---

[13] The District has not cross-appealed. So, they have waived any argument to the contrary. *See, e.g., Art Midwest Inc. v. Atl. Ltd. P'ship XII*, 742 F.3d 206, 211-13 (5th Cir. 2014).

*Bruen,* 597 U.S. at 26-27 (emphasis added).[14] By contrast, cases "implicating unprecedented societal concerns or dramatic technological changes" may call for a more nuanced approach that requires courts to look for "relevantly similar" historical analogues.[15]

Here DCMR § 24.2344.2 purports to address a societal problem that has persisted since the founding: security and safety of firearm carry. JA 32 (loss, theft or accidental discharge). So, the "distinctly similar" standard applies as the district court assumed. JA 27 n.11. Significantly, as we discuss below, the 19th century concealed carry bans addressed an entirely different societal problem, violent criminal attacks on unsuspecting individuals from persons with hidden weapons. There is simply **no** historical support for the District's off-body ban where concealed carry was otherwise permitted. As *Bruen* explains, "when a challenged regulation

---

[14] The word "distinctly" bears discussion. Blacks Law Dictionary, 3rd ed. defines "distinct" as: "Clear to the senses or mind; easily perceived or understood; plain; unmistakable." *See also The American Heritage Dictionary of the English Language, New College Edition* (1981) ("3. Easily perceived by the senses or intellect; clear. 4. Well defined; explicit; unquestionable.")

[15] As the Court explained, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. Thus, when confronting "present-day firearm regulations" "that were unimaginable at the founding," the "historical inquiry that courts must conduct will often involve reasoning by analogy…." *Id.* at 28. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modem firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28-29.

addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing *that problem* is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26.

Even in the context of determining what is *"relevantly similar"* under the nuanced approach – a test plainly inapplicable here – the Court cautioned lower courts not to analogize at too high a level of generality. *Id.* at 29. The task in examining the similarity of historical analogues in that context is to look at "how" the regulations burden the right of armed self-defense and "why" such regulations were enacted. *Id.* This involves determining "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified…." *Id.* at 29. The Court further said that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 30, quoting *Drummond,* 9 F.4th at 226. That caution should apply doubly so when the analysis is conducted under the "distinctly similar" rather than the more nuanced "relevantly similar" standard.

## B. The Supreme Court's Second Amendment Decisions Have Employed A Low Level Of Generality In Considering Historical Analogues.

Although the Court has cautioned against requiring an "historical twin," *Bruen*, 597 U.S. at 30, the Court's Second Amendment cases have all employed a

low level of generality in evaluating Second Amendment challenges under *Bruen's* step two. *Heller,* for example, conducted a textual analysis that "suggested that the Amendment's operative clause … 'guarantee[s] the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the militia." *Bruen,* 597 U.S. at 20 quoting *Heller,* 554 U.S. at 592. The Court then looked at history to confirm that conclusion. *Id.* Among its exhausting historical review,[16] the Court "focused on the historically unprecedented nature of the District's ban, observing that '[f]ew laws in the history of our Nation have come close to [that] severe restriction.'" *Bruen,* 597 U.S. at 22, quoting *Heller,* 554 U.S. at 629. From its historical review, the Court derived the narrow principle that the Second Amendment protects the right to possess commonly possessed arms in the home for lawful purposes unconnected with militia service. *See Heller,* 597 U.S. at 576-626. The Court declined the invitation to opine more broadly on the reach of he Second Amendment other than to suggest that longstanding bans on possession by felons or the mentally ill, possession in sensitive areas such as schools and

---

[16] The Court looked inter alia at contemporary debate concerning the need for the amendment, *id.* at 598-600, the right to arms provisions in state constitutions in the founding era, *id.* at 600-03, and how the amendment was interpreted from ratification through the end of the 19th century, including by commentators, state courts, reconstruction legislation and the Court's own decisions, *id.* at 605-26.

government buildings, or conditions and qualifications on the commercial sale of arms were *presumptively* valid. *See* 554 U.S. at 626-27.[17]

*Bruen* likewise analogized at a low level of generality. The Court characterized the "why" behind New York's "good cause" law for issuing gun carry licenses as addressing "the same alleged societal problem addressed in *Heller* 'handgun violence,' primarily in 'urban area[s].'" 597 U.S. at 27. This was a societal problem that had existed at the founding. *Id.* After concluding from a textual analysis that the Second Amendment presumptively protects the right to carry a firearm in public for self-defense, *Id.* at 33, the Court looked to history for arms-carry restrictions like New York's.

The Court found various historical limitations on weapons carry, but they were not sufficiently similar to New York's good cause licensing scheme. The Court rejected reliance on the 1328 Statute of Northampton as principally concerned with the wearing of armor and pointed out that it was a widespread practice for persons

---

[17] Some circuits seem to take the position these presumptions are irrebuttable at least as to felon disarmament. *See, e.g., Medina v. Whitaker,* 913 F.3d 152 (D.C. Cir. 2019); *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024); *United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024). *Contra Range v. Attorney General,* 124 F.4th 218 (3rd Cir. 2024) (en banc)*; United States v. Diaz,* 116 F.4th 458, 466-467 (5th Cir. 2024)*; United States v. Williams,* 113 F.4th 637, 646-47 (6th Cir. 2024); *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) (en banc). *See also Kanter v. Barr,* 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting) (arguing for a test based on dangerousness). The Supreme Court's pending decision in *Hemani* may well resolve this circuit split.

to carry edged weapons in medieval times. *Id.* at 41. The Court further pointed to *Sir Rex* v. *Sir John Knight,* 1 Comb. 38, 38-39, 90 Eng. Rep. 330 (K. B. 1686) where the Chief Justice explained the statute had fallen into disuse and the statute was simply an affirmance of the common law rule that "'go[ing] armed *to terrify* the King's subjects' was 'a great offence at the *common law.'"* 597 U.S. at 43-44. Thus, peaceable carry was not implicated by the statute.

*Bruen* similarly rejected reliance on colonial statutes that penalized riding armed offensively as merely codifying the common law offense discussed above of "bearing arms to terrorize the people." *Id.* at 47. The Court likewise rejected a 1686 East New Jersey statute that banned the concealed carry of pocket pistols and restricted arms carry by planters for several reasons, including that it was an outlier statute that appeared of limited duration. *Id.* at 49.

Turning to the period after the Second Amendment's ratification, *Bruen* rejected reliance on common-law offenses, statutory prohibitions, and surety statutes. *Id.* at 50. Common law offenses such as "affrays" or "going armed" offenses were simply addressed to going armed to the terror of the people. *Id.* at 50-51.[18] The Court found laws against the concealed carry of weapons not analogous to the New York good cause requirement because they did not ban carry altogether as they left

---

[18] *See State v. Huntley,* 25 N.C. 418, 423 (1843). Only carrying a gun for a "wicked purpose" with a "mischievous result ... constitute[d a] crime."

persons free to carry openly. *Id.* at 53-54. And where Georgia sought to ban almost all pistol carry, both concealed and open, a near twin of the New York statute at issue in *Bruen,* the Georgia court found the open carry ban unconstitutional. *See Nunn v. State,* 1 Ga. 243. The Court also rejected surety statutes as not bans on public carry, but instead regulations targeted to persons threatening to do harm. 597 U.S. at 55.[19] "'[Under surety laws ... everyone started out with robust carrying rights' and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Bruen,* 597 U.S. at 57, quoting *Wrenn v. District of Columbia,* 864 F.3d 650, 661 (D.C. Cir. 2017).

Post enactment of the 14th Amendment, the Court acknowledged that two Texas cases *English v. State,* 35 Tex. 473 (1871) and *State v. Duke,* 42 Tex. 455 (1875),[20] and a West Virginia decision, *State v. Workman,* 35 W.Va. 367, 371-74, 14 S.E. 9, 11 (1891),[21] supported the New York good cause provision. *Bruen,* 597 U.S.

---

[19] The Court acknowledged Tennessee's 1821 ban on carry of pocket and belt pistols was uniquely severe, but pointed to the decision in *Andrews v. State*, 50 Tenn. 165, 187 (1871), that allowed carry of larger military style pistols. 597 U.S. at 54. We will have more to say on *Andrews,* on which the opinion below heavily relies, infra.

[20] *English* took a militia centric view of Texas's Second Amendment analogue, saying, "only those arms 'as are useful and proper to an armed militia,' including holster pistols," are protected, "but not other kinds of handguns." *Bruen,* 597 U.S. at 64, quoting 35 Tex. at 474-75.

[21] West Virginia did not adopt a Second Amendment analogue until 1986. *See* Eugene Volokh, *State Constitutional Rights To Keep And Bear Arms.* 11 Tex. Rev. L. & Pol. 191, 204 (2006) ("Volokh").

at 65. However, the Court rejected those cases as outliers that contradicted "'the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public." *Id.* at 66, quoting *Heller,* 554 U.S. at 632.

Lastly, the Court discounted the "slight uptick in gun regulation during the late-19th century-principally in the Western Territories," which substantially restricted firearm carry, for a number of reasons: the temporal distance from the founding;[22] the restrictions tended to be localized; the transitional and temporary character of the territorial system; the minuscule populations that lived under these restrictions; and that these laws were rarely subject to judicial review. 597 U.S. at 66-70.

In sum, *Bruen* looked for closely related historical analogues to New York's good cause requirement. Even when finding near twins among Texas, West Virginia, and late 19th century territorial laws, the Court determined these were outliers and rejected them. As the 9th Circuit put it in *Wolford v. Lopez,* 116 F.4th 959, 978 (9th Cir. 2024), *cert. granted on other grounds* 146 S.Ct. 79 (2025), "*Heller* and *Bruen* imposed a challenging burden on the government where the regulation in question addressed an issue that has existed since the Founding, had not been affected by a technological change, and did not concern a uniquely modern problem."

---

[22] The Court completely disregarded 20th century analogues as "not provid[ing] insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66 n.28.

*Rahimi* likewise analyzed that case at a low level of generality. *Rahimi* addressed the facial constitutionality of 18 U.S.C. § 922(g)(8)'s prohibition on firearm possession by persons under a domestic abuse restraining order. *See* 602 U.S. at 693. The Court found two sets of laws that were widely in force in the period prior to and immediately following ratification of the Second Amendment. *Id.* at 694-95. These were the surety laws and the "going armed" laws. *Id.* at 695-98. Each allowed a temporary disarmament of an individual based on a judicial finding he represented a threat to innocent persons. *Id.* at 699. Although not *identical* in "how" they effected a temporary disarmament, they were sufficiently similar to meet the how component of *Bruen,* and they were plainly synonymous as to the "why" component. *See Id.* at 698-99.[23]

The Court declined to address the constitutionality of 18 U.S.C. § 922(g)(8) at a higher level of generality. It did not, for example, find a principle that governments may disarm certain groups of persons the legislature determines represent a threat to public safety, although in the colonial period certain groups

---

[23] Justice Thomas dissented because he concluded the two analogues on which the Court relied failed to sufficiently meet *Bruen's* "how" component. 602 U.S. at 747. He agreed that the surety laws shared the "why" with Section 922(g)(8) but argued they "imposed a far less onerous burden," i.e., the "how." *Id.* at 753, 762-67. As to "going armed" or affray laws, Justice Thomas opined that these laws had a dissimilar burden (how) and justification (why). *Id.* at 767, 768-71. He also objected to the Court looking at a combination of the two analogues to arrive at a governing principle. *Id.* at 771-72.

certainly were disarmed for that reason, albeit often on the basis of prejudice. *See* Joseph Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1 (2024), available at http://dx.doi.org/10.2139/ssrn.4317000. Indeed, the Court specifically rejected that Mr. Rahimi could be disarmed because he was not "responsible," *Rahimi, 6*02 U.S. at 701, despite dicta in *Heller* and *Bruen* stating the Second Amendment protects the rights of "responsible law abiding citizens." *See, e.g., Bruen,* 597 U.S. at 3, 6, 26, 57 & 70; *Heller,* 554 U.S. at 635. The Court was hesitant to find a Second Amendment principle deriving from such a vague term. 602 U.S. at 702. Rather, the Court derived the narrow principle based on its "how" and "why" analysis that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* Justice Barrett opined "that the Court settle[d] on just the right level of generality." *Id.* at 740 (Barrett, J., concurring).

The level of generality question is directly presented in *Wolford v. Lopez,* No. 24-1046, now pending at the Supreme Court.[24] The issue in *Wolford* is whether a Hawaii law, which prohibits handgun carry for self-defense on property otherwise

---

[24] *See generally* Maureen E. Brady, *Property v. Guns: The Level-of-Generality Problem in Wolford* (Jan. 19, 2026), available at https://ssrn.com/abstract=6096206; Brief Of Amicus Curiae J. Joel Alicea In Support of Petitioners and Reversal, No. 24-1046 (Nov. 24, 2025).

open to the public without express permission from the owner or agent violates the Second Amendment. *See* Petition for a Writ of Certiorari, No. 24-1046 at i-ii (U.S. April 1, 2025). Hawaii has sought to justify its law principally by reference to 18th century laws in various colonies that prohibited hunting on closed lands absent the owner's expressed consent. *See* Respondent's Brief, No. 24-1046 at 28-32 (U.S. Dec. 17, 2025). Hawaii would have the Court draw a governing principle from these laws at a high level of generality that the state may fashion a default rule for firearm carry on any property, even property generally open to the public.

The 2nd, 3rd and 4th Circuits, when confronted with laws similar to Hawaii's, rejected the states' reliance on the colonial hunting laws as directed at preventing poaching, a different "why" than addressed by the default rules at issue in those cases. *See Antonyuk v. James*, 120 F.4th 941, 1045-47 (2d Cir. 2024) *cert. denied*, 145 S.Ct. 1900 (2025) (finding three of the state's analogs were enacted for different reasons than the law at issue and all of the purported analogs were significantly less burdensome); *Koons v. Attorney Gen*., 156 F.4[th] 210, 251-52 (3rd Cir. 2025) (finding the state's law failed to meet both the how and why tests of *Bruen)*; *Kipke v. Moore,* l65 F.4th 194, 219 (4th Cir. 2026) (dismissing reliance on the state's proffered analogues as concerned with hunting or were otherwise outliers.) The decision in *Wolford* is likely to provide this Court substantial guidance for the resolution of this case.

Even though the 9th Circuit in *Wolford* erroneously sustained Hawaii's "default rule" presumptively banning carry on private property held open to the public, the court's *sensitive places* analogue reasoning is nonetheless instructive. The court upheld a preliminary injunction against bans on carrying firearms in medical facilities, houses of worship, financial institutions and permitted public gatherings based on the lack of historical restrictions on carry at such locations. *See Wolford,* 116 F.4th at 996-1000. *Wolford* thus required close analogues to support restrictions on carry at these locations, all which existed at the Founding.

What the Ninth Circuit in *Wolford* did *not* do is what the district court did in this case. Specifically, the district court relied on *Koons v. Att'y Gen. N.J.*, 156 F.4th at 242, to "draw[] from the 'sensitive places' doctrine the principle that 'legislatures may impose conditions on the carry of weapons outside the home that are designed to ensure that those who choose to carry such weapons do so safely.'" JA 27-28. That was error. First, the *Koons* panel opinion has been "vacated" and en banc review granted. *Koons v. Att'y Gen. of N.J.*, 162 F.4th 100 (3d Cir. 2025). The panel's decision is thus no longer binding or precedential. More to the point, as the dissent in *Koons* makes clear, the panel majority erroneously defined controlling principles at an "astonishing" high level of generality. 162 F.4th at 275-76 (Porter, J., dissenting in part, concurring in part). The en banc Third Circuit is likely to correct that error. And even more fundamentally, sensitive places limitations are not about carrying

firearms "safely" because, by definition, sensitive places are historically locations "where weapons were *altogether prohibited*." *Bruen*, 597 U.S. at 30 (emphasis added).

## C. 19th Century Concealed Carry Bans Are Neither Distinctly Nor Relevantly Similar To D.C.'s Off-Body Carry Ban.

Nineteenth century concealed carry bans are not an appropriate analogue to D.C.'s off-body carry prohibition because the off-body carry ban differs in both the "how" *and* the "why" from the concealed carry bans. The concealed carry laws addressed different societal issues altogether.

The "how" question is easy. The two sets of laws address different conduct: the historical concealed carry bans prohibited concealed carry but allowed open carry. *See Bruen*, 597 U.S. at 68 & n.30. In contrast, D.C. *mandates* concealed carry (§ 24.2344.1) while banning *concealed* off-body carry in purses and the like. (§ 24.2344.2). Plainly, the historical rationale for *banning* concealed carry cannot possibly apply to laws that *mandate* concealed carry, much less to an outlier law that requires that such concealed carry be only "on their person." The opinion below never addressed this distinction and the distinction is important. *Heller* addressed handgun bans. *Bruen* addressed handgun carry bans. *Rahimi* addressed laws disarming persons found by a court to pose a threat to others. Each case looked for historical analogs *directly* addressing the conduct at issue in those cases.

The district court's "how" analysis looked instead at procedural protections and levels of punishment to suggest that the "how" of the off-body carry ban was either consistent with 19th century concealed carry bans in terms of penalty and procedural protections and/or a lesser restriction than the concealed carry bans in terms of CPL revocation or suspension. JA 28-31. But similar *penalties* for conduct do not make the *conduct* similar. Similar penalties for an off-body carry violation and 19th century concealed carry violations are merely the result that the 19th century concealed carry laws and the DC regulation both carry criminal sanctions. The district court's "how" analysis could have used as an analogue any 19th century gun regulation, including prohibitions on public discharge, trap gun bans, or gunpowder storage regulations. That mode of analysis substantially and impermissibly waters down the "how" as a limiting metric in evaluating the constitutionality of criminal laws regulating firearms.[25]

Although *Rahimi* discussed the similarity of the penalty provisions and procedural protections in conducting its "how" analysis, that was only *after* finding that although the surety laws and the going armed laws were not identical in their operation to 18 U.S.C. § 922(g)(8), they were similar enough in that,

> Section 922(g)(8) applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another. §

---

[25] Compare the discussion by the 2nd, 3rd and 4th Circuits on the express permission laws discussed above.

922(g)(8)(C)(i). That *matches* the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon.

*Rahimi,* 602 U.S. at 698-99 (emphasis added). In this case, unlike *Rahimi,* the concealed carry bans and DCMR § 24.2344.2 address **different** conduct. So, the "how" is materially different notwithstanding that both laws may have similar criminal penalties and procedural protections.

The district court seemed to accept that the concealed carry bans also banned off-body carry. *Cf.* JA 28 (off-body carry rule "is comparably justified because state legislatures and courts in the Antebellum and Reconstruction eras recognized broad police powers to reasonably regulate manner of carry, including by taking the more drastic step of banning concealed carry altogether."), However, the notion that concealed carry bans necessarily prohibited off-body carry is misplaced. As discussed above, horse pistols were common arms in the founding period and they were commonly carried draped over a horse's saddle, not carried on the body. So, they were a form of off-body carry that was not restricted by concealed carry bans. To the extent concealed carry bans may have prevented other means of off-body carry, that was an incidental effect of the laws rather than the intention.

Even more salient, however, is the "why" of the concealed carry bans. Review of 19th century decisions upholding concealed carry bans shows they were directly addressed to the perceived evils of carrying arms secretly and do not support a

general principle that legislators have carte blanche to regulate any and all manner of carry. "In 1789, despite there being 'a series of laws that regulated the discharge, storage, and aggressive use of firearms,' 'there were *no* direct statutory bans on the carry of arms.'" *Baird,* 163 F.4th at 733, quoting Jonathan Meltzer, *Open Carry for All:* Heller *and Our Nineteenth-Century Second Amendment,* 123 Yale L.J. 1486, 1505 (2014) (emphasis in original) ("Meltzer"). "This absence is particularly conspicuous because the founding generation was clearly aware of the dangers of gun violence, and states enacted a variety of regulations addressing the lawful use of firearms." *Id.*

Although several states in the antebellum period – mainly in the South – adopted restrictions on concealed carry of various arms, including handguns, the courts were clear that legislators could not at the same time ban open carry or ban open carry while allowing concealed carry. "The general consensus … was that open carry was essential to protect the natural and common law right of self-defense, while 'those who relied on concealed weapons could not possibly be interested in self-defense, but instead must have an improper, aggressive motive.'" *Baird,* 163 F.4th at 734, quoting Meltzer at 1511-12. Between 1822 and 1850, "six state high courts explicitly found constitutional significance in the distinction between open and concealed carry. *Id.,* citing Meltzer at 1512. Open carry was broadly protected,

"while the exigencies and interests of public safety were sometimes deemed to justify a ban on concealed carry." *Id.*

*State v. Reid,* 1 Ala. 612, 35 Am. Dec. 44 (1840), upheld an Alabama statute entitled "An Act to Suppress the Evil Practice of Carrying Weapons Secretly." 1839 Ala. Acts 67. The court held that a concealed weapons ban was constitutional, but a ban on open carry would not be. 1 Ala. at 619. The court stated, "only when carried openly, [could weapons] be efficiently used for defence." *Id.* The court explicitly rejected an argument that open carry and concealed carry are functionally interchangeable, and it also rejected the idea that as long as one mode of carry was permitted it was irrelevant which was allowed and which was barred. *Id.* at 618.

*Reid* made plain the "why" for this law, explaining that "a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution." *Id.* at 617.

Similarly, in *State v. Chandler,* 5 La. Ann. 489, 489-90 (1850),[26] the court explained:

---

[26] *See also State v. Jumel,* 13 La. Ann. At 400 ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms *which is found dangerous to the*

This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's right to carry arms (to use its words) "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.

The view that the purpose of the laws against carrying arms concealed was to prevent surprise attacks and assassinations, runs throughout the 19th century state court decisions. *See, e.g., Aymette v. State,* 21 Tenn. 154 (1840):

To hold that the legislature could pass no law upon this subject, by which to preserve the public peace, and protect our citizens from the terror, which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms, would be to pervert a great political right to the worst of purposes, and to make it a social evil, of infinitely a greater extent to society, than would result from abandoning the right itself.

* * *

---

*peace of society*") (emphasis added); *State v. Smith*, 11 La. Ann. 633 (1856) ("[The Second Amendment] was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used *most frequently by evil-disposed men who seek an advantage over their antagonists*, in the disturbances and breaches of the peace which they are prone to provoke."). (Emphasis added).

It should also be noted Louisiana did not have a Second Amendment analogue prior to 1879. *See* Volokh, at 197.

> The citizens may bear them for the *common defence*; but it does not follow, that they may be borne by an individual, merely to terrify the people, or for purposes of private assassination.

*Id.* Similarly, in *Nunn,* 1 Ga. at 251, the court held that "[s]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid….") (Emphasis added.)[27] *Nunn* thus invalidated the remaining provisions of the Georgia statute that outlawed possession and carry – including open carry of arms, and including most handguns. *See also State v. Kerner,* 181 N.C. at 579 (striking down under North Carolina's Second Amendment analogue a licensing scheme applying even to open carry whereby the citizen must apply to the court describing the weapon, giving the time and purpose for which it may be carried off his premises, must pay the clerk $5 for each permit and must file a bond in the amount of $500 that he will not carry the weapon except as authorized). *Accord In re Brickey*, 8 Idaho 597, 599, 70 P. 609 (1902) ("the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages"); *Stockdale v. State*, 32 Ga. 225 (1861) (describing the state's protection of open-carry as a way "to compel persons who carried those weapons to so wear them . . . that

---

[27] In *State v. Rosenthal*, 75 Vt. 295, 55 A. 610 (1903), the court struck down a municipal prohibition on concealed carry without the mayor's or police chief's written permission. Vermont has never restricted concealed carry and requires no license to carry openly or concealed.

others . . . might see that they were armed, and dangerous persons, who were to be avoided in consequence").

Note that in line with its state constitution, *see* Volokh, at 203, the *Aymette* court viewed the right as limited to the "common defense," suggesting it did not extend to protect an individual's private right to use arms for self-defense. Justice Stevens cited this case to support his dissent in *Heller,* 554 U.S. 570, that the Second Amendment did not protect an individual right to keep and carry arms. *Id.* at 648 n.10. Thus, *Aymette* and later Tennessee decisions on which the district court relied are weaker cases for gauging the Second Amendment's scope than some of the other 19th century cases discussing concealed bans since that court's and subsequent courts' views of the scope of the Second Amendment were inconsistent with the Supreme Court's view in *Heller, Bruen* and *Rahimi.*

The Ninth Circuit's recent decision in *Baird* is even more instructive. *Baird* struck down California's ban on open carry in counties with populations of more than 200,000, holding "the historical record clearly evinces that *open* carry was universally considered to be protected by the right to keep and bear arms, not just that *some form* of carry was protected." 163 F.4th at 739. The court thus rejected the view that California could ban open carry if it allowed licensed concealed carry. *Id.* at 739-40. Likewise, Florida's First District Court of Appeal held: "[T]he historical record from the relevant period shows that our Nation did not regard concealed carry

and open carry as interchangeable." *McDaniels v. State,* 419 So.3d 1180, 1193 (Fla. Dist. Ct. App. 2025). The court went on to declare Florida's open-carry ban unconstitutional, ruling that [n]o historical tradition supports Florida's Open Carry Ban. To the contrary, history confirms that the right to bear arms in public necessarily includes the right to do so openly." *Id.* at 1194.

The discussion above shows that concealed carry bans were directly addressed to a specific societal problem: criminal violence perpetrated by persons who were secretly armed. The specific carry mode of concealed carry was considered conducive to criminal attacks and ambushes from people carrying secret weapons. Courts made it clear that the legislature's authority did not extend to prohibiting the open carry of arms. It is noteworthy that the record fails to reflect any instance of states banning open carry while allowing concealed carry in the 19th century. Even today such laws are rare and of dubious constitutionality. *See Baird,* 163 F.4th at 733-34.[28]

_____

[28] *Baird* places the number of open carry states at more than 30. *Id.* However, according to the United States Concealed Carry Association 31 states allow open carry without a permit, 10 states allow open carry with a permit, and five states have local rules that may limit open carry. *See What Is Open Carry and Which States Allow It?* (April 4, 2025, available at https://www.usconcealedcarry.com/blog/what-is-open-carry-and-which-states-allow-it/. California, D.C., Illinois and New York prohibit open carry. *Id.* Maryland likewise requires concealed carry. MD Code, Public Safety, § 5-307.

The opinion below nonetheless relied on the 2nd Circuit's decision in *Frey,* 157 F.4th at 138-40, upholding New York's ban on open carry, to support its derived principle that "the government may reasonably regulate manner of carry in service of government goals of accident and crime prevention." JA 27. The principal flaw of that reasoning is that concealed carry bans addressed a distinct social problem of deterring violent assaults, not accidents or crime prevention in general. The distinctly similar analysis must under *Bruen* address the same societal problem. 597 U.S. at 26-27. DCMR § 24.2344.2 addresses a different social problem of safely securing firearms from accident or theft. *Bruen* requires a distinctly similar well established analogue for the "why," 597 U.S. at 26, and there is simply no such analogue imposing such a similar restriction for that reason. The district court and DC were unable to point to such an analogue. Moreover, *Baird,* sharply criticized *Frey* as relying on a "misreading of *Bruen,"* in treating open and concealed carry as fungible "as well as approaching historical evidence at too high a level of generality." *Baird,* 163 F.4th at 736. The court stated:

> The Second Circuit then cited a number of historical state laws and cases that upheld *concealed-carry* bans. *Frey,* [157 F.4th at 138–40]. Ignoring the fact that not a single one of its examples involved an open-carry ban, the court described these laws and cases as "evinc[ing] a strong historical tradition of regulating, and often criminalizing, one manner of public carry, so long as the government does not 'altogether prohibit public carry.'" *Id.* (quoting *Bruen,* 597 U.S. at 54). The court's own examples demonstrate the flaw in its logic: because those examples upheld concealed carry bans for reasons unique to *concealed*

carry, they are not "relevantly similar" to New York's *open-carry* ban. *Frey,* [157 F.4th at 139] (quoting *Bruen,* 597 U.S. at 29.

*Id.*

Some 19th century decisions speak in broad terms of the state's police power to regulate the manner of carrying arms for general public safety and crime prevention purposes,[29] but that does not transform the "why" of the concealed carry bans that were specifically addressed to the problem of violent criminal assaults to the "why" of the district's off-body carry ban. Moreover, in the 19th century there were very few outlier decisions that went beyond upholding concealed carry bans. And there are good reasons to discount their discussions.

First, with the exception of *Nunn,* which is devoid of any discussion of a broad police power regulation of handgun carry, none of these decisions considered the Second Amendment applicable to their states.[30] *Barron v. Baltimore,* 32 U.S. 243 (1833), held that the bill of rights was not binding on the states. And even after the ratification of the 14th Amendment, *United States v. Cruikshank,* 92 U.S. 542 (1876) erroneously held that the Second Amendment was not binding on the states. So, state

---

[29] *See* JA 32-34, citing various cases from Arkansas and Tennessee, including *Andrews*, 50 Tenn. at 169-70 and *Carroll v. State*, 28 Ark. 99, 101 (Ark. 1872).

[30] *See, e.g., Andrews*, 50 Tenn. at 172-75. *Fife v. State,* 31 Ark., 455 (1876); *State v. Duke*, 42 Tex. At 457-58; *Strickland v. State*, 137 Ga. 1, 72 S.E. 260, 262 (1911).

courts looked to their own constitutions. And state constitutions varied a great deal in the language used.

Second, many state constitutions lacked an individual guarantee of the right to bear arms, qualifying the right as for the common defense.[31] Several others specifically qualified an individual right to bear arms to allow regulation of concealed carry[32] as opposed to a more general right to regulate manner of carry.[33]

Third, all of these cases come from former confederate states and the laws were enacted shortly after the Civil War, suggesting a likely motivation for adopting the restrictions was to limit the carry rights of Freedmen – albeit phrasing the restrictions in race neutral terms.[34]

---

[31] *See* Volokh at 193-204 (Arkansas, 1836 to 1861, 1864 on; Florida, 1838-1865; Maine, since 1819; Massachusetts, since 1780; North Carolina (defense of the state 1776-1868); South Carolina, 1868-1895; and Tennessee, since 1796).

[32] *See id.* (Colorada, since 1876; Kentucky, since 1850; Louisiana, since 1879; Mississippi, since 1890; Missouri, since 1875; Montana, since 1889; North Carolina, since 1876; New Mexica, since 1912; Oklahoma, since 1907).

[33] *See id.* (Florida, since 1885, manner of carry; Georgia, since 1868, manner of carry; Idaho, since 1889, regulate the exercise; Tennessee, since 1870, common defense and regulate the wearing of arms to prevent crime; Texas, 1868 to 1876, under lawful regulations, since 1876, regulate wearing of arms to prevent crime; Utah, since 1895, regulate the exercise).

[34] *See Watson v. Stone,* 148 Fla. 516, 524, 4 So.2d 700, 703 (1941) (Buford, J., concurring):

> The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers….The

Fourth, all of these cases come from the period well after the ratification of the Fourteenth Amendment, a period *Bruen* considered less probative of how the Second Amendment was understood at the founding. *See Bruen,* 597 U.S. at 35-39.

The opinion below heavily relies on late 19th century cases from Tennessee and Arkansas. *See* JA 32-36. The firearms laws of both Tennessee and Arkansas, however, were outliers.[35] The Second Amendment analogues of both jurisdictions limited the right to bear arms to the "common defense."[36] And Late 19th century cases from those jurisdiction reflect a militia centric view allowing restrictions that *Bruen* plainly would not have countenanced.[37] *Andrews*, 50 Tenn. at 169-70, for example largely upheld a Tennessee statute which outlawed the carry, open or concealed, of a number of arms, including pistols. The court remanded the case, however, as to carry of revolvers stating, "we hold this may or may not be such a

_____

statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in rural sections of Florida have violated this statute…[but there has] never been, within my knowledge, any effort to enforce the provisions of this statute as to white people.

[35] *Bruen* rejected two Texas decisions as "providing little insight into how postbellum courts viewed the right to carry protected arms in public." 597 U.S. at 65 (discussing *English v. State,* 35 Tex. 473 and *State v. Duke,* 42 Tex. 455. The opinion below nevertheless relies on *Duke. See* JA 33 n.18. That was error.

[36] *See* note 31, supra.

[37] *See* 597 U.S. at 54 & nn. 20-21.

weapon as is adapted to the usual equipment of the soldier, or the use of which may render him more efficient as such, and therefore hold this to be a matter to be settled by evidence as to what character of weapon is included in the designation "revolver." *Id.* at 186-87. *See also Page v. State,* 50 Tenn. 198 (1871) (holding that the pistol defendant carried was not a war arm and therefore the legislature could constitutionally prohibit it). Tennessee's laws exhibited such an enmity to handgun carry that after *Andrews* the legislature limited carry of military pistols – the only ones *Andrews* found were protected – to ones carried in the hand. JA 33-34, citing *Bruen,* 597 U.S. at 54 n.21. In *State v. Wilburn*, 66 Tenn. 57, 58-63 (1872), the court held the law did not "interfere with the right of keeping the arm, or of bearing it for the common defense." *Id.* at 62-63.

As the opinion below notes, JA 34, *Haile v. State*, 38 Ark. 564, 567 (1882), upheld a similar restriction though conceding that carrying a pistol in one's hand "is a very inconvenient mode of carrying them habitually," but emphasized that "habitual carrying does not seem essential to 'common defense.'" *Id.* at 566. The opinion below acknowledged *Haile's* tension with *Heller's* rejection of the militia model of the Second Amendment but nonetheless cited the case for the proposition it was permissible to impose a "'police regulation' of the manner of carrying arms."

JA 34-35. The opinion below failed to acknowledge, however, that *Haile* is plainly

inconsistent with *Bruen's* holding of a general right to carry.[38]

The district court's reliance on outliers that rejected the Second Amendment's

applicability to their states, that limited the right to bear arms to the common defense

or otherwise adopted a militia centric view of the right to bear arms, that come too

late to be probative of the original meaning of the amendment, and that are

fundamentally inconsistent with *Heller* and *Bruen* was error even if the laws at issue

in those cases could somehow be considered distinctly similar to DCMR §

24.2344.2, which they plainly were not.

---

[38] Similar cases which adopted a militia centric view of their state's Second Amendment suggested expansive authority to restrict public carry under the banner of manner of carry regulations. *See, e.g., Hill v. State,* 53 Ga. 472 (1874). The opinion below implies *Hill* did not endorse the militia centric view of the right to bear arms. JA 35 n.20. To the contrary, *Hill* is plain that this was exactly what it was doing. As the court said (53 Ga. at 475-76):

> Upon its very front, as we have said, the object of the clause is declared to be to secure to the state a well regulated militia.
>
> * * *
>
> But it is obvious that the right to bear or carry arms about the persons at all times and places and under all circumstances, is not a necessity for the declared object of the guarantee; nay, that it does not even tend to secure the great purpose sought for, to-wit: that the people shall be familiar with the use of arms and capable from their habits of life, of becoming efficient militiamen.

## III. DCMR § 24.2344.2 IS AN HISTORICAL AND CONTEMPORARY OUTLIER.

Although *Bruen* may not require an historical twin, the absence of an historical twin, or near twin, is nonetheless highly probative as to how the Second Amendment was interpreted during the relevant timeframe where we are not employing the "nuanced" approach for "cases implicating unprecedented societal concerns or dramatic technological changes. *Bruen,* 597 U.S. at 27:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation *addressing that problem* is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.

*Id.* at 26 (emphasis added). *See also Wolford,* 116 F.4th at 996-1000. Issues of firearm safety and security have plainly persisted since the founding,[39] yet no jurisdiction ever went so far as to prohibit handgun carry in a purse or satchel. Although in the predominately Southern states that prohibited conceal carry, carry in a bag or satchel would not have been feasible, the majority of states at least until the late 19th century did not prohibit concealed carry. And there is no record that any of the states which allowed concealed carry prohibited off-body carry.

Defendants' expert, Ms. Rivas, testified that in the late 1800s and into the 20th century concealed carry regulation began migrating to licensing schemes, and

---

[39] *See* Brady, at 13 (recounting reports of firearm accidents in the Founding era).

suggested these schemes *could* have imposed conditions on licenses like the off-body carry ban. JA 306-10. However, defendants pointed to no instances of such conditions ever having been imposed. Indeed, even to date *only* the District prohibits off-body carry.

MPD justifies its rule on the basis of preventing accidents and thefts of firearms. JA 32.[40] Yet, the universal absence of off-body carry restrictions belies that off-body carry presents a substantial threat of public danger. As veteran firearms instructor Jerah Hutchins explains, it is simply a matter of training. JA 152. In fact, proper training is required to safely employ any gun carry method, including a holstered gun on the waist. *See, e.g.,* Kathy Jackson, *Holster Safety & The Four Rules,* available at https://corneredcat.com/article/holsters/holster-safety-the-four-rules/. D.C. accommodates precisely this sort of training by imposing an 18-hour training requirement.[41] Off-body carry is therefore neither inherently unsafe nor threatening.

There is no serious dispute that off-body carry is a common method of handgun carry. Defendants' expert, Ms. Rivas, presented evidence that historically

---

[40] The record is devoid of any evidence that off-body carry, especially holstered off-body carry, is a contributor to firearm accidents.

[41] The District requires CPL applicants to undergo 16 hours of classroom training and two hours of range training for an initial license. D.C. Code § 7-2509.02(a)(4) & (5). Nothing prevents the District from requiring that training to include carry methods such as off-body carry.

it was common for persons to carry handguns in bags. JA 295 n.4. Defendants submitted evidence of the commonality of off-body carry. *See* ECF 21-2 at 15. Plaintiffs' evidence included declarations from firearm instructors and published articles on the use of off-body carry, including its use by off-duty law enforcement officers. JA 59-172. A 2020 survey of more than 5,000 female gun carriers found that 32 percent of them carry in a concealed carry purse. NRA Women Staff, *Women of The Well Armed Woman Tell How They Carried in 2020* (May 6, 2021), available at https://www.nrawomen.com/content/women-of-the-well-armed-woman-tell-how-they-carried-in-2020.

The opinion below, and without the aid of any expert testimony, appears to discount the utility of off-body carry, *see* JA 38 & n.23, but *Heller* and *Bruen* make clear such interest balancing is forbidden because Second Amendment rights are not dependent on judicial determinations "whether the right is *really worth* insisting upon." *Bruen,* 597 U.S. at 23, quoting *Heller,* 554 U.S. at 634. "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.* Likewise, that there are a variety of other methods available for gun carry is not an answer. *See* JA 38. This court in *Parker,* 478 F.3d at 400, labeled the District's similar argument that it could ban handguns because it allowed some rifles and shotguns as "frivolous." *See also Heller,* 554 U.S. at 629. Moreover, that

reframe does not answer the fact that on body carry is problematic in many situations, especially for women. *See generally* JA 109-56.

Plaintiffs' evidence was that there are situations where on body carry is not feasible. JA 68, 72, 117, 152, 155-56. The district court's response was simply to recite that the "Second Amendment does not grant 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" JA 39, citing *Bruen,* 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). That mantra does not answer the question. That the Second Amendment is not unlimited is a given. That does not give the government power to restrict the carrying of commonly possessed arms by commonly used means in non-sensitive places. *Bruen* found a broad right to carry a firearm in public for self-protection. That right is fundamental. *McDonald,* 561 U.S. 742. Given the fundamental nature of the right, the balance is not up to the government, but a matter of choice of the American people. *Bruen,* 597 at 26, quoting *Heller,* 554 U.S. at 635 ("The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law abiding, responsible citizens to use arms' for self-defense."). *Bruen* expressly bans the interest balancing that the district court performed in this case. 597 U.S. at 22-23.

The district court correctly determined that the constitutionality of DCMR § 24.2344.2 turns on whether there exists a well established, distinctly similar

historical analog to the regulation. The district court's determination that 19th century concealed carry laws are distinctly similar to DCMR § 24.2344.2, however, is plainly erroneous and inconsistent with Supreme Court precedent. The concealed carry laws were addressed to distinctly different conduct and addressed a distinctly different societal problem. Under *Bruen,* the concealed carry laws cannot possibly qualify as distinctly similar to the off-body carry ban. Only by analogizing at a high level of generality could one consider the two laws similar.

## CONCLUSION

For the foregoing reasons the decision below should be reversed. This Court should remand for entry of a declaration that DCMR § 24.2344.2 is unconstitutional, for issuance of an injunction against enforcement of the regulation, and for trial of plaintiffs' damages claims.

Respectfully Submitted,

*/s/ George L. Lyon, Jr.*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Road, Ste C #1015
Baltimore, MD 21234
(301) 873-3671
m.pennak@me.com

*Counsel for Plaintiffs-Appellants*

February 17, 2026

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume and word-count limits of Federal Rule of Appellate Procedure 27(d) because, excluding the parts of the document exempted by, this document contains 12600 words.

2. This document complies with the typeface and type-style requirements of because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ George L. Lyon, Jr.*
George L. Lyon, Jr.

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 17th day of February, 2025, a true copy of the Plaintiffs' Opening Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ George L. Lyon, Jr.*
George L. Lyon, Jr.

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

Page:

United States Constitution, Amendment Two …………………………....… 57

D.C. Code § 7-2509.02. Application requirements …………………………... 57

D.C. Code § 7-2509.05. Revocation and suspension of licenses ……………….. 58

D.C. Code § 7-2509.05. Prohibitions on carrying licensed pistols …………….... 59

D.C. Code § 7–2509.10. Penalties ………………………………………………… 62

DCMR § 24.2341.1 ………………………………………………………………... 62

DCMR § 24.2344.1 ..……………………………………………………………… 62

DCMR § 24.2344.2 ………………………………………………………………... 62

*U.S. Constitution, Amendment Two.*

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

*D.C. Code § 7-2509.02. Application requirements.*

[Non relevant provisions omitted]

(a) A person who submits an application pursuant to § 22-4506 shall certify and demonstrate to the satisfaction of the Chief that he or she:

(4) Has completed a firearms training course or combination of courses, conducted by an instructor (or instructors) certified by the Chief, which includes at least 16 hours of training, and covers the following:

(A) Firearm safety;

(B) Firearm nomenclature;

(C) Basic principles of marksmanship;

(D) Care, cleaning, maintenance, loading, unloading, and storage of pistols;

(E) Situational awareness, conflict management, and use of deadly force;

(F) Selection of pistols and ammunition for defensive purposes; and

(G) All applicable District and federal firearms laws, including the requirements of this unit, Chapter 45 of Title 22 [§ 22-4501 et seq.], and District law pertaining to self-defense;

(5) Has completed at least 2 hours of range training, conducted by an instructor certified by the Chief, including shooting a qualification course of 50 rounds of ammunition from a maximum distance of 15 yards (45 feet); and

(6) Has complied with any procedures the Chief may establish by rule.

(b) An applicant shall satisfy the requirements of subsection (a)(4) and (a)(5) of this section with a certification from a firearms instructor that the applicant:

(1) Demonstrated satisfactory completion of the requirements of subsection (a)(4) and (a)(5) of this section; and

(2) Possesses the proper knowledge, skills, and attitude to carry a concealed pistol.

(c) An applicant may be exempt from some or all of the requirements of subsection (a)(4) and (a)(5) of this section if the applicant has submitted evidence that he or she has received firearms training in the United States military or has otherwise completed firearms training conducted by a firearms instructor that, as determined by the Chief, is equal to or greater than that required under subsection (a)(4) and (a)(5) of this section.

(d) An applicant for a license may satisfy any component of the requirements of subsection (a)(4) and (a)(5) of this section by demonstrating to the satisfaction of the Chief that the applicant has met that particular component as part of a successful application to carry a concealed pistol issued by the lawful authorities of any state or subdivision of the United States.

(g) Any person whose application has been denied may, within 15 days after the date of the notice of denial, appeal to the Office of Administrative Hearings pursuant to § 7-2509.08.


*D.C. Code § 7-2509.05. Revocation and suspension of licenses.*

[Non relevant provisions omitted]

(a)(1) The Chief may limit or revoke a license upon a finding that the licensee no longer meets the requirements of § 22-4506 and this subchapter, or as a penalty as specified in this unit.

**(4)** Before a limitation or revocation taking effect, the Chief shall serve a notice of intent to limit or revoke the license. The limitation or revocation shall take effect unless the licensee requests an appeal to the Office of Administrative Hearings pursuant to § 7-2509.08 no later than 15 days after the date of the notice of intent.

*D.C. Code § 7-2509.05. Prohibitions on carrying licensed pistols.*

[Non relevant provisions omitted]

(a) No person holding a license shall carry a pistol in the following locations or under the following circumstances:

(1) A building or office occupied by the District of Columbia, its agencies, or instrumentalities;

(2) The building and grounds, including any adjacent parking lot, of an childcare facility, preschool, public or private elementary or secondary school; or a public or private college or university;

(3) A hospital, or an office where medical or mental health services are the primary services provided;

(4) A penal institution, secure juvenile residential facility, or halfway house;

(5) A polling place while voting is occurring;

(6) A public transportation vehicle, including the Metrorail transit system and its stations;

(7) Any premises, or portion thereof, where alcohol is served, or sold and consumed on the premises, pursuant to a license issued under Title 25; provided, that this prohibition shall not apply to premises operating under a temporary license issued pursuant to § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to § 25-113, or premises with small-sample tasting permits issued pursuant to § 25-118, unless otherwise prohibited pursuant to subsection (b)(3) of this section;

(8) A stadium or arena;

(9) A gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

(A) The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

(B) The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

(11) The White House Complex and its grounds up to and including to the curb of the adjacent sidewalks touching the roadways of the area bounded by Constitution Avenue, N.W., 15th Street, N.W., H Street, N.W., and 17th Street, N.W.;

(12) The U.S. Naval Observatory and its fence line, including the area from the perimeter of its fence up to and including to the curb of the adjacent sidewalks touching the roadway of Observatory Circle, from Calvert Street, N.W., to Massachusetts Avenue, N.W., and around Observatory Circle to the far corner of Observatory Lane;

(13)(A) When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

(i) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

(ii) The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

(iii) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

(B) For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

(14) When demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

(A) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;

(B) The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

(C) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; or

(15) Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

(b) Except to the extent of any inconsistency with 18 U.S.C. §§ 926B and 926C, the carrying of a concealed pistol:

(1) On private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner or person in control of the premises and communicated personally to the licensee in advance of entry onto the residential property;

(2) In a church, synagogue, mosque, or other place where people regularly assemble for religious worship shall be presumed to be prohibited unless the property is posted with conspicuous signage allowing the carrying of a concealed pistol, or the owner or authorized agent communicates allowance personally to the licensee in advance of entry onto the property; provided, that such places may not authorize the carrying of a concealed pistol where services are conducted in locations listed in subsection (a) of this section; and

(3) On private property that is not a residence shall be presumed to be permitted unless the property is posted with conspicuous signage prohibiting the carrying of a

concealed pistol, or the owner or authorized agent communicates such prohibition personally to the licensee.

*D.C. Code § 7–2509.10. Penalties.*

(a)(1) Except as otherwise provided in this subchapter, a person convicted of a violation of a provision of this subchapter, or rules or regulations issued under the authority of this subchapter, shall be fined not more than the amount set forth in § 22-3571.01, or imprisoned for not more than 180 days.

(2) Civil fines, penalties, and fees may be imposed as alternative sanctions for any infraction of the provisions of this subchapter, or any rules or regulations issued under the authority of this subchapter.

(b) All prosecutions for violations of this subchapter shall be brought in the name of the District of Columbia and prosecuted by the Office of the Attorney General for the District of Columbia.

*DCMR § 24.2341.1.* The Chief may revoke a concealed carry license on a finding that the licensee:

(1) No longer satisfies one or more of the concealed carry license qualifications set forth in the Act or any regulation authorized by the Act; or

(2)Failed to comply with one or more requirements or duties imposed upon the licensee by the Act or any regulation authorized by the Act.

*DCMR § 24.2344.1.* A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public.

*DCMR § 24.2344.2.* A licensee shall carry any pistol in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol.