NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 25-7163

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

LYNNE ANNE-BRIGITTE RUSSELL, *et al.*,
APPELLANTS,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLEES.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEES THE DISTRICT OF COLUMBIA
AND INTERIM CHIEF OF POLICE JEFFERY W. CARROLL**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

MARCELLA COBURN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5693
marcella.coburn@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—Plaintiffs below and appellants here are Lynne Anne-Brigitte Russell, Charles John De Caro, Leanne Christine Reilly, Eric N. Christian, Jr., and Timothy R. Beck. Defendants below and appellees here are the District of Columbia and Interim Chief of the Metropolitan Police Department (MPD) Jeffery W. Carroll. MPD Commander James M. Boteler, MPD Officer Wilson, and MPD Officers John and Jane Does 1-12 were also named as defendants in plaintiffs' original complaint but were not named as defendants in the amended or second amended complaint and are not parties to this appeal. There were no amici curiae in the district court and no amici to date have appeared in this Court.

B. *Ruling under review*.—The ruling of the district court (Bates, J.) under review is the Memorandum Opinion and Order dated September 24, 2025 (ECF Nos. 46 & 47) denying plaintiffs' partial motion for summary judgment, granting defendants' motion for summary judgment, and denying defendants' motion to strike evidence as moot. This opinion is reported at 804 F. Supp. 3d 192 (D.D.C. 2025).

C. *Related cases*.—This case has not previously been before this Court or any other court. Counsel is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

STATEMENT OF THE ISSUES..................................................................1

STATEMENT OF THE CASE...................................................................2

    1.    Legal Background ..........................................................2

    2.    Factual Background.........................................................4

    3.    District Court Proceedings And Decision ...............................7

STANDARD OF REVIEW ....................................................................12

SUMMARY OF ARGUMENT ................................................................13

ARGUMENT ....................................................................................16

    I.    Plaintiffs Lack Standing Under *Navegar* And *Seegars* ..................16

    II.    Plaintiffs' Challenge To The Holster Rule Fails At *Bruen*'s First Step Because Storing Guns In A Purse, Fanny Pack, Or Sling Bag Is Not Protected Conduct............................................20

    III.    Plaintiffs' Challenge Fails At *Bruen*'s Second Step Because The Holster Rule Is Consistent With The Nation's Historical Tradition Of Firearm Regulation .......................................24

        A.    There is a historical tradition of reasonable restrictions on the manner of carry, including concealed carry, as long as public carry is not "altogether prohibited." ............................25

        B.    The "how" of the concealed-carry restrictions is relevantly similar to the "how" of the holster rule....................................33

        C.    The "why" of the concealed-carry restrictions is relevantly similar to the "why" of the holster rule....................................36

        D.    Plaintiffs' remaining arguments lack merit .............................43

CONCLUSION ..................................................................................46

# TABLE OF AUTHORITIES*

*Cases*

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) .................................................................. 20, 21

*Andrews v. State*,
50 Tenn. 165 (Tenn. 1871) ......................................................................... 37

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ..................................................................... 26

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ................................................................................... 18

*Baird v. Bonta*,
163 F.4th 723 (9th Cir. 2026) ..................................................................... 42

*Baird v. Bonta*,
No. 24-565, 2026 WL 1021186 (9th Cir. Apr. 15, 2026) ........................... 43

*Bank of N.Y. Mellon Tr. Co. N.A. v. Henderson*,
862 F.3d 29 (D.C. Cir. 2017) ..................................................................... 12

*Carroll v. State*,
28 Ark. 99 (Ark. 1872) ..................................................................... 29, 36, 39

*Consol. Edison Co. of N.Y., Inc. v. FERC*,
510 F.3d 333 (D.C. Cir. 2007) .................................................................... 16

*Diffey v. State*,
86 Ala. 66 (Ala. 1889) ................................................................................ 28

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................................................... 9, 21, 24, 27, 32, 41

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Frey v. City of New York*,
 157 F.4th 118 (2d Cir. 2025) ....................................................... 29, 42

*Gov't of Manitoba v. Bernhardt*,
 923 F.3d 173 (D.C. Cir. 2019) ............................................................ 16

\*Hanson v. District of Columbia*,
 120 F.4th 223 (D.C. Cir. 2024).................................. 10, 23, 25, 26, 39, 40, 41

*Int'l Longshore & Warehouse Union v. Nat'l Lab. Rel. Bd.*,
 971 F.3d 356 (D.C. Cir. 2020) ............................................................ 16

*Jennings v. Stephens*,
 574 U.S. 271 (2015) ................................................................. 17, 24

*Massachusetts v. Murphy*,
 44 N.E. 138 (Mass. 1896) .................................................................. 38

*McDaniels v. Florida*,
 419 So.3d 1180 (Fla. Dist. Ct. App. 2025) ................................................ 42

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010) ........................................................................ 44

*M.M.V. v. Garland*,
 1 F.4th 1100 (D.C. Cir. 2021) ............................................................. 19

*Murthy v. Missouri*,
 603 U.S. 43 (2024) ......................................................................... 17

\*Navegar, Inc. v. United States*,
 103 F.3d 994 (D.C. Cir. 1997) ........................................................ 7, 17, 18

\*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
 597 U.S. 1 (2022) ............................... 9, 10, 12, 21, 23-31, 38, 41, 42

*Oakland Tactical Supply, LLC v. Howell Township*,
 103 F.4th 1186 (6th Cir. 2024) ........................................................... 23

*Ord v. District of Columbia*,
 587 F.3d 1136 (D.C. Cir. 2009) ........................................................... 19

iv

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) ........................................................ 7, 19

*Seegars v. Gonzales*,
396 F.3d 1248 (D.C. Cir. 2005) ................................................ 7, 18, 19

*State v. Buzzard*,
4 Ark. 18 (Ark. 1842) .......................................................................... 37

*State v. Huntly*,
25 N.C. 418 (N.C. 1843).................................................................... 33

*State v. Jumel*,
13 La. Ann. 399 (1858).......................................................... 28, 37, 40

*State v. McManus*,
89 N.C. 555 (N.C. 1883).................................................................... 28

*State v. Reid*,
1 Ala. 612 (Ala. 1840) ......................................................... 28, 37, 39

*State v. Speller*,
86 N.C. 697 (N.C. 1882).......................................................... 29, 37, 40

*Steffan v. Perry*,
41 F.3d 677 (D.C. Cir. 1994)........................................................... 20

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)............................................................................. 8

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)........................................................................... 20

*United States v. Am. Ry. Express Co.*,
265 U.S. 425 (1924)........................................................................... 17

*United States v. Bridges*,
150 F.4th 517 (6th Cir. 2025) ........................................................... 34

*United States v. Manney*,
114 F.4th 1048 (9th Cir. 2024) ......................................................... 23

*United States v. Price*,
   111 F.4th 392 (4th Cir. 2024) ................................................................... 21

*\*United States v. Rahimi*,
   602 U.S. 680 (2024)...................................... 10, 11, 25, 31-35, 40, 42

*United States v. Reyna*,
   No. 21-CR-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022)...................... 23

*United States v. Wilson*,
   240 F.3d 39 (D.C. Cir. 2001) ..................................................................... 21

*Victory Processing, LLC v. Fox*,
   937 F.3d 1218 (9th Cir. 2019) .................................................................... 17

*Whalen v. Roe*,
   429 U.S. 589 (1977)...................................................................................... 44

*Whole Woman's Health v. Jackson*,
   595 U.S. 30 (2021)........................................................................................ 17

*Willis v. State*,
   105 Ga. 633 (Ga. 1898) ............................................................................... 28

### *Statutes and Regulations*

D.C. Code § 2-1831.16 ............................................................................................ 4

D.C. Code § 7-2509.03 ............................................................................................ 5

D.C. Code § 7-2509.05 ............................................................................................ 4

D.C. Code § 7-2509.07 ............................................................................................ 2

D.C. Code § 7-2509.08 ............................................................................................ 4

D.C. Code § 7-2509.10 ............................................................................................ 4

D.C. Code § 7-2509.11 .................................................................................... 3, 36, 37

D.C. Code § 22-4504 ............................................................................................... 2

D.C. Code § 22-4506 ............................................................................ 2

1 Stat. 272, ch. 33, § 4 (May 8, 1792) .............................................. 31

42 U.S.C. § 1983 ............................................................................... 7

*An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania*, ch. 1696, § 5 (Apr. 11, 1793) ........................................ 32

Ark. Rev. Stat. § 13 (1838) .............................................................. 28

The Militia Law of New Hampshire, § 13 (1829) ............................ 31

N.J. Rev. Stat. § 2C:58-4 ................................................................ 44

24 DCMR § 2304.9 ............................................................................ 6

24 DCMR § 2341.1 ............................................................................ 4

24 DCMR § 2344.2 ................................................................. 3, 11, 36

## Other

Benjamin Vaughan Abbott, *Judge and Jury* (1880) ............................ 32

1 William Blackstone, *Commentaries on the Laws of England* (George Chase ed., 3d ed. 1894) ..................................................................... 36

4 William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787) ............................................................................................... 32

# GLOSSARY

MPD          Metropolitan Police Department

OAH         Office of Administrative Hearings

## STATEMENT OF THE ISSUES

Historically, many states have outright prohibited carrying concealed firearms. The District, however, permits concealed carry for license-holders—as long as they do so safely. Specifically, the District has adopted a regulation that requires licensed individuals to carry firearms in a holster on their person in a firmly secure manner reasonably designed to prevent loss, theft, or accidental discharge. Individuals can purchase any holster they wish, which they can wear in a variety of places on the body (waist, hip, back, shoulder, thigh, ankle, etc.).

Plaintiffs insist that this modest burden on the manner of concealed carry violates the Second Amendment. They would rather carry their firearms in purses, sling bags, or fanny packs than holstered on their person. Some plaintiffs want to carry their guns this way because of "limitations on women's fashion." Other plaintiffs offer no reason, but in the past have carried their guns loose under the seat of their car while driving, or stored alongside a hairbrush in a sling bag. The inability to carry concealed firearms loosely or in bags, they allege, infringes the Constitution.

The Supreme Court, however, has already endorsed states' ability to *completely* ban concealed carry, provided that some alternative mode of carrying is allowed. And the Court held in *Heller* and reiterated in *Bruen* that a state may reasonably regulate the manner of carrying firearms without violating the Second

Amendment at all. Plaintiffs do not dispute that the District permits them to publicly carry firearms or that their challenge relates only to the manner of carrying.

The questions presented on appeal are:

1. Whether plaintiffs have preserved any argument regarding standing and, if so, whether they satisfy the rigorous standards for bringing a pre-enforcement challenge to a criminal provision;

2. Whether plaintiffs have satisfied their burden to show that their proposed conduct—carrying a firearm in a purse, sling bag, or fanny pack, as opposed to on their person—is covered by the plain text of the Second Amendment, as historically understood; and

3. Whether the district court erred in concluding that the District's holster rule is consistent with this Nation's historical tradition of restricting the manner of carrying concealed firearms to promote public safety and prevent crime.

## STATEMENT OF THE CASE

**1. Legal Background.**

In the District, an individual may carry a concealed pistol if they are licensed to do so by the Metropolitan Police Department (MPD). D.C. Code §§ 22-4504(a), 22-4506. Open carry (i.e., non-concealed carry) of pistols is prohibited. *Id.* § 7-2509.07(e). District law directs the Chief of MPD to issue rules to establish, among other things, "the methods by which a pistol may be carried, including any

standards for safe holstering." *Id.* § 7-2509.11(3). Pursuant to that statute, the Chief promulgated a rule more than a decade ago that licensees "shall carry any pistol in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol." 24 DCMR § 2344.2.

The holster rule allows for a variety of carrying methods. JA 206. Holsters may be worn in many different locations on the body, including anywhere at the waist, hip, back, under the shoulder, on the thigh, or on the ankle. JA 206. No particular make or model of holster is required. JA 206.

Most violations of the holster rule involve the loose carrying of a gun, for instance, shoved into a waistband, compression shorts, or a jacket pocket. JA 264. Carrying in this manner is dangerous to the person carrying the gun and to others. JA 264. A firearm carried in a purse can accidentally discharge if other items in the purse get inside the trigger guard. JA 264. Or the purse might be unintentionally left behind in a public place where others may find it, or stolen from the shoulder of the victim. JA 264. Either outcome could result in a firearm falling into the hands of someone prohibited from firearm possession or untrained to handle firearms safely. JA 264. By contrast, firearms securely holstered on the person are extremely unlikely to be left behind or stolen. JA 264. Unholstered firearms and off-body carry also present serious risks to law enforcement officers in encounters with the

public because it is much more difficult to safely identify and secure firearms that are not holstered on an individual's body.  JA 264-65.

If a licensee violates the holster rule, MPD may revoke their concealed-carry license.  24 DCMR § 2341.1(2).  To do so, MPD serves a notice explaining the reasons for the proposed revocation, D.C. Code § 7-2509.05(a)(4), which the licensee may appeal to the District's Office of Administrative Hearings (OAH), *id.* § 7-2509.08(a)(3).  If OAH affirms the revocation, the licensee may petition the D.C. Court of Appeals for review.  *Id.* § 2-1831.16(e).  Violations of concealed-carry regulations are also punishable as misdemeanor criminal offenses.  *Id.* § 7-2509.10(a).  But violations of the holster rule are usually resolved by an agreement between MPD and the licensee for a temporary suspension of the license. JA 207.

## 2.   Factual Background.

Plaintiffs in this case are four current concealed-carry licensees and one former licensee.  JA 11.  Plaintiffs Lynne Russell, Charles de Caro, and Leanne Reilly are current licensees who live in Georgia and Pennsylvania.  JA 45, 47, 48. Russell and Reilly prefer to carry a handgun in a purse or sling bag rather than on their person because the holster rule "does not comport with" women's fashion or the way they usually dress.  JA 53, 56.  Reilly also notes that if she becomes pregnant, carrying a firearm around her waist will be "problematic."  JA 56.  De

Caro wishes to carry a firearm off-body because carrying in a holster on the body "is not the way [he] always carr[ies] a firearm." JA 55.

Russell and de Caro, a married couple, "regularly visit" the District and "intend to continue to do so," and they refrain from carrying off-body in the District because of the holster rule. JA 54, 55. Reilly stated only that she would carry off-body in the District if not for the holster rule; she stated no intention to visit the District in the future. JA 56. All three plaintiffs submitted new declarations at the reply brief stage of summary judgment proceedings adding plans to visit the District. JA 317-20; *see* JA 21 n.9.

Plaintiff Eric Christian, Jr., is a former licensee who lives in the District. JA 49.[1] During a traffic stop in January 2024, MPD officers found a loose, loaded gun under the seat of Christian's car. JA 207, 214. Christian, who had a concealed-carry license at the time, was not arrested. JA 207, 211-12. Instead, MPD issued him a notice of proposed revocation of his license for violating the holster rule. JA 207, 216. Christian appealed the proposed revocation to OAH, but his license expired during the pendency of the appeal. JA 57, 207, 219-38; *see* D.C. Code § 7-2509.03(a), (b)(1) (concealed carry licenses are valid for two years and require

---

[1] Although Christian states that he has been reissued a concealed-carry license, Russell Br. 7, the District refers to him as a former licensee because he offered no evidence that he possessed a license at the time of the summary judgment proceedings.

renewal).  Christian voluntarily dismissed the administrative appeal, conceding that it was moot and stating that he understood that "the incident leading to the revocation notice at issue in th[e OAH] proceeding will not bar him from receiving a newly issued" license.  JA 57, 207-08.

Plaintiff Timothy Beck is a licensee who lives in the District.  JA 50.  While Beck was driving around the District in the early morning hours in January 2024, he pulled over to speak to a woman who was, unbeknownst to him, an undercover agent with MPD.  JA 208, 242-43.  Beck described the sexual acts he wanted to engage in with the woman and agreed to a price.  JA 208, 242-43.  MPD officers then initiated a vehicle stop.  JA 208, 243.  Beck was wearing a sling bag across his chest with a handgun inside, along with a hairbrush and other items.  JA 208, 245.  Beck was arrested for soliciting prostitution and for failing to notify officers that he was in possession of a firearm, but no charges were filed.  JA 208, 243.  Instead, MPD issued Beck a notice of proposed revocation for violating 24 DCMR § 2304.9.  JA 208, 247.  At the time, that was a repealed regulation, not the holster rule at issue in this case.  JA 208, 252, 256.  Beck appealed to OAH, which agreed with Beck that MPD had cited a repealed regulation with no legal force.  JA 208, 252, 256.  MPD did not contest the point, and OAH reversed the notice of proposed revocation and ordered that it "never took effect."  JA 208, 256-57.

**3.     District Court Proceedings And Decision.**

In their second amended complaint, plaintiffs sued the District and Interim Chief of MPD Jeffery W. Carroll under 42 U.S.C. § 1983, alleging that the holster rule violated the Second Amendment and seeking declaratory and injunctive relief and damages.  JA 13-14.  The parties agreed to resolve the case on cross-motions for summary judgment.  JA 14.

    i.     Standing.

The district court determined that at least one plaintiff, Beck, had standing. JA 21 & n.9.  The court recognized that this Circuit's pre-enforcement standing cases set out a "hard but not impossible" test for plaintiffs seeking to challenge certain criminal prohibitions.  JA 17 n.6.  Those cases require that a plaintiff "have been singled out or uniquely targeted by the . . . government for prosecution."  JA 16 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 374-76 (D.C. Cir. 2007)).  In setting forth that test, *Parker* relied on binding Circuit precedent in *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005), as well as *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997).

The district court did not conclude that Beck satisfied the requirements for pre-enforcement standing under *Navegar* and *Seegars*, however.  Instead, the court concluded that *Seegars* and *Navegar* did not apply to plaintiffs' challenge because those cases apply only to pre-enforcement challenges to statutes, and the holster rule

7

is a regulation. JA 18-21 & nn.7-9. Plaintiffs never made that argument, despite attempting to distinguish *Seegars* and *Navegar* in other ways and even contending that the decisions were no longer binding. *See* ECF 30-3 at 9-15; ECF 38 at 1-7. Nevertheless, according to the district court, *Seegars* "suggest[s]" that *Navegar*'s analysis is limited to statutes. JA 19. The court acknowledged that *Seegars* "found it difficult to articulate why regulations are treated differently from statutes," but found the distinction dispositive in any event. JA 19.

Having declined to apply *Navegar* and *Seegars*, the district court assessed whether Beck demonstrated standing under the more generic test set forth in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (*SBA List*), which requires only a substantial risk of enforcement. JA 21-22. The court concluded that Beck had done so, relying on the "past enforcement" against him, which included his arrest and prior (unsuccessful) license revocation proceeding under a repealed regulation. JA 21. The court also noted that the District "declined to disavow future prosecutions" of the holster rule. JA 21. This "'combination' of the threat of license revocation and prosecution" was sufficient to confer standing under *SBA List*, without the evidence of singling out or unique targeting required by *Navegar*, *Seegars*, and *Parker*. JA 21 (quoting *SBA List*, 573 U.S. at 166).

ii.    The Second Amendment claim.

The district court then proceeded to the merits of the Second Amendment claim. Under the framework set out by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the analysis has two steps. At step one, plaintiffs bear the burden to show that the Second Amendment's plain text covers their proposed conduct. JA 22-23 (citing *Bruen*, 597 U.S. at 17).

The court concluded that plaintiffs' proposed conduct was, like in *Bruen*, "carrying handguns publicly for self-defense." JA 26; *see* JA 23-26. That conduct is covered by the Second Amendment's plain text, as historically understood, because "bear[ing]" arms means to "carry" them "upon the person or in the clothing or in a pocket" for the purpose of confrontation. JA 23 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008)). The court rejected the District's argument that plaintiffs' proposed conduct should be more specifically defined as "carrying guns unholstered and off their bodies." JA 23-24. The court also rejected the District's argument that the holster rule does not violate the plain text of the Second Amendment because it is de minimis, does not actually prevent plaintiffs from carrying firearms, and therefore does not "infringe[]" their rights. JA 24-25.

The district court then moved to the second step of *Bruen*'s analysis, which requires the government to show that the challenged restriction is consistent with the Nation's historical tradition of firearm regulation. JA 26. To do so, the district court

assessed whether the "how" and "why" of the historical regulations offered by the District are sufficiently similar to the holster rule. JA 26 (citing *Hanson v. District of Columbia*, 120 F.4th 223, 234 (D.C. Cir. 2024)). The court explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." JA 27 (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)).[2]

The district court concluded that the holster rule is constitutional because it is similar to the concealed-carry restrictions that many states enacted in the 19th century in both the "how" and the "why." *See* JA 27-28. Quoting *Bruen*, the court explained that "'*the manner* of public carry was subject to reasonable regulation' in our historical tradition," and states could constitutionally restrict or even prohibit concealed carry so long as some form of public carry was still available. JA 28 (quoting *Bruen*, 597 U.S. at 59). The court noted that plaintiffs "simply assert their preference to carry off-body," and that they do not allege that they "effectively cannot carry their pistols in the District," because "plainly they can under the regulation." JA 29.

---

[2]    Plaintiffs argued that the District had to show that the holster rule is "distinctly similar" to the historical tradition, which it claimed was a higher standard than the "relevantly similar" standard that the District argued applied. *See* JA 27 n.11. The district court assumed without deciding that "distinctly similar" was a higher standard than "relevantly similar" and concluded that regardless, the holster rule satisfied the higher standard. JA 27 n.11.

Applying the analysis from *Rahimi*, the district court then explained that the "how" of the concealed-carry prohibitions is similar to the holster rule because of their similar procedural protections, duration of restriction, and level of punishment. JA 29-31 (citing *Rahimi*, 602 U.S. at 690).

The district court explained in detail that the "why" of the concealed-carry prohibitions is also similar to the holster rule. JA 31-38. Importantly, "cases addressing [historical concealed-carry] laws and other contemporary evidence make clear that states have broad powers to regulate manner of carry in furtherance of police-power goals." JA 31. The district court noted that while some courts identified the desire to prevent surprise attacks and assassinations as a reason for concealed-carry bans, JA 31-32, other historical courts and commentators noted that preventing accidents, breaches of the peace, and crime generally were also important goals, JA 32-38. The district court marshaled numerous historical concealed-carry cases supporting the government's "broad authority to regulate the manner of carry in furtherance of state police power goals," JA 33, including "the safety of the people and the advancement of morals," "the peace and safety of the public," and "the general interests or welfare of the whole community," among others, JA 36 (internal quotation marks and citations omitted). The District's holster rule, which has the goals of preventing "loss, theft, or accidental discharge" of the firearm, 24 DCMR

§ 2344.2, falls neatly within this historical "why," confirming its constitutionality. JA 31-38.

The district court rejected plaintiffs' argument that the absence of a historical statute specifically prohibiting off-body carry defeated the holster rule. It explained first that no "historical twin" is required by *Bruen*, JA 29, and that in any event the historical concealed-carry prohibitions *did* prohibit off-body carry because the firearms carried off-body would be concealed, JA 37.

The court concluded by explaining that, although plaintiffs "complain of inconvenience . . . in relation to sporting activities or women's fashion," "the Second Amendment does not grant 'a right to keep and carry any weapon whatsoever in any manner whatsoever.'" JA 38-39 (quoting *Bruen*, 597 U.S. at 21). The holster rule "is not an effective denial of the right to bear arms"; rather, "it is a modest burden on manner of carry for public safety reasons," and "plaintiffs retain a wide variety of options for how to exercise their Second Amendment rights." JA 38-39. That modest manner of carry restriction, the court reasoned, is consistent with the Constitution.

**STANDARD OF REVIEW**

This Court reviews a district court's summary judgment decision de novo. *Bank of N.Y. Mellon Tr. Co. N.A. v. Henderson*, 862 F.3d 29, 32 (D.C. Cir. 2017).

## SUMMARY OF ARGUMENT

1. The district court erred in concluding that any plaintiff has Article III standing. The court determined that this Court's pre-enforcement standing precedents in *Navegar* and *Seegars* do not apply because the holster rule is a regulation, not a statute. But plaintiffs never made that argument in the district court, and they do not meaningfully defend it now. As a result, the contention is forfeited.

In addition to being forfeited, the district court's holding is also incorrect. *Navegar* and *Seegars* do not turn on whether the challenged provision is a statute or a regulation. Neither Beck, nor any other plaintiff, can make the required showing under those cases that they have been singled out or uniquely targeted for enforcement in the future. In particular, Beck was arrested for soliciting prostitution and failing to notify officers that he had a concealed-carry license, not for violating the holster rule. And MPD's proposed revocation of his license cited a similar, albeit repealed, regulation, and the revocation was dismissed with no effect on his license. This Court should vacate the district court's decision and remand for dismissal for lack of standing.

2. If the Court reaches the merits, it should affirm the district court's grant of summary judgment to the District on plaintiffs' Second Amendment claim. Plaintiffs pursue only an as-applied constitutional challenge to the holster rule, which fails at each step of the *Bruen* analysis.

13

At step one, plaintiffs had the burden to show that their proposed conduct falls within the plain text of the Second Amendment, as historically understood. They failed to address step one at all and therefore forfeited the claim. But even if they had made an argument, it would fail. Plaintiffs' proposed conduct is carrying their firearms in purses, sling bags, and fanny packs. As *Bruen* and *Heller* make clear, that conduct is not within the scope of the Second Amendment as historically understood. States may restrict and even prohibit concealed carry through manner of carry restrictions, so long as they do not prohibit public carry altogether. That is all the District has done here. As applied to plaintiffs, the holster rule prohibits a narrow type of concealed carry—off-body carry in purses and the like. District law maintains many options for lawful public carry and plaintiffs have never argued (nor could they) that public carry is altogether prohibited. Their conduct falls outside the Second Amendment's scope, and their claim fails at *Bruen* step one.

Plaintiffs' challenge also fails at *Bruen* step two because the Nation's historical tradition of regulating the manner of carrying firearms is consistent with the holster rule. In the 19th century, many states enacted manner of carry restrictions that outright prohibited concealed carry. As *Bruen* and *Heller* explain, state courts reached a clear consensus on the principle that such restrictions on manner of carry were consistent with the individual right to bear arms, so long as some form of public carry remained available. Unsurprisingly, these restrictions did not specifically

mention bags or purses, since men in the 19th century tended to carry personal items in their pockets. But the statutes were nevertheless interpreted to encompass, and prohibit, concealed carry of firearms in satchels, traveling bags, and handbags, which are materially indistinguishable from the items that plaintiffs wish to carry their firearms in today. The holster rule is also consistent with the principles underlying other historical manner-of-carry laws, like 18th-century militia rules requiring holsters for firearms and "going-armed" laws that prevented carrying firearms in a manner that would breach the public peace or terrify people.

As the district court correctly concluded, the concealed-carry prohibitions are appropriate historical analogues for the holster rule because they are relevantly similar on the "how" and the "why." On the "how," the concealed carry statutes prohibited the same conduct that plaintiffs wish to engage in here—carrying concealed weapons, including in bags. They also contained comparable procedural protections, duration of restrictions, and level of punishment as the District's holster rule. On the "why," the concealed carry statutes were justified by the legislature's desire to prevent accidents and crime, which matches up exactly with the holster rule's text. The holster rule is also consistent with the exercise of police powers and goals of public safety identified in numerous state-court decisions. Plaintiffs' arguments to the contrary—including their insistence that the district court analyzed the District's analogues at too high a level of generality—lack merit.

15

**ARGUMENT**

## I.    Plaintiffs Lack Standing Under *Navegar* And *Seegars.*

The district court erred in concluding that any plaintiff has standing under this Court's precedent.  The district court held that *Navegar* and *Seegars* do not apply to plaintiffs' challenge because the holster rule is a regulation, not a statute.  JA 18-21.  But that argument is both forfeited and incorrect.

To begin, the argument that the *Navegar* standard does not apply to regulations is forfeited twice over: it was not briefed below, *see* ECF 30-3 at 9-15; ECF 38 at 1-7, and is not developed on appeal, *see* Russell Br. 19 (stating only that "the district court correctly found" that *Navegar* and *Seegars* did not apply); *see also Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (failure to press a claim in district court is "textbook forfeiture"); *Consol. Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").  Although courts have a duty to confirm their jurisdiction over a case—and hence arguments *against* jurisdiction cannot be forfeited—parties "can forfeit a claim that [the court] possess[es] jurisdiction."  *Int'l Longshore & Warehouse Union v. Nat'l Lab. Rel. Bd.*, 971 F.3d 356, 363 (D.C. Cir. 2020) (internal quotation marks omitted).  No

extraordinary circumstances excuse plaintiffs' forfeiture here, so this theory of standing should not be considered.[3]

In any event, the district court's conclusion that *Seegars* and *Navegar* do not apply to the holster rule is incorrect. In general, to establish standing, a plaintiff must demonstrate an injury that is either actual or "imminent[]" and "certainly impending." *Murthy v. Missouri*, 603 U.S. 43, 56, 58 (2024). Pre-enforcement suits add an extra layer to plaintiffs' burden, as no litigant has "an unqualified right to pre-enforcement review of constitutional claims in federal court." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). In *Seegars* and *Navegar*, this Court required pre-enforcement challengers seeking review of criminal prohibitions to demonstrate that they were "in effect single[d] out" as "intended targets," *Navegar*, 103 F.3d at 1000, or to articulate "characteristics indicating an especially high probability of enforcement against them," *Seegars*, 396 F.3d at 1255. Otherwise,

---

[3] Plaintiffs' only remaining contention relevant to the correct test for standing is the assertion that the District "has not cross-appealed on this issue" and so cannot prevail. Russell Br. 19. But that is irrelevant, for two reasons. First, standing is a necessary element of federal-court jurisdiction, so the District was not required to cross-appeal in order to address it. *See Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1225 n.5 (9th Cir. 2019). Second, "[a]n appellee who does not take a cross-appeal may 'urge in support of a decree any matter appearing in the record'" so long as it does not expand the scope of relief. *Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)).

the possibility of enforcement is "too remote and speculative to render [plaintiffs'] challenges justiciable" under Article III. *Navegar*, 103 F.3d at 1001.

Contrary to the district court's reasoning, *Seegars* did not "suggest[]" that *Navegar* applied only to statutes. JA 19. The key question in *Seegars* was a general one concerning the "requisite level of probability of enforcement" of a statute against a plaintiff in order to confer standing for a pre-enforcement challenge. 396 F.3d at 1252. The court identified *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), as relevant to the question, but noted that the Circuit's "single post-[*Babbitt*] case" dealing with a "preenforcement challenge[] to a criminal statute not burdening expressive rights and not in the form of [an] appeal from an agency decision"—*Navegar*—appeared to demand "more than . . . a conventional background expectation that the government will enforce the law." 396 F.3d at 1253. The court noted the "tension" between the *Navegar* standard and other precedent "governing preenforcement challenges to agency regulations" and "cases upholding preenforcement review of First Amendment challenges to criminal statutes." *Id.* at 1253-54. Still, the *Seegars* Court concluded that it was bound to follow *Navegar* because it was "the only circuit case dealing with a non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings." *Id.* at 1254.

To the extent *Seegars* suggested any distinction related to regulations, it would be from an "appeal from an agency decision" under the APA. *Id.* at 1253 (citing APA cases). But this case is not an appeal from an agency decision and has nothing to do with the APA. The holster rule is indistinguishable from a criminal statute for the purpose of the Circuit's pre-enforcement standing precedent, as it is backed by criminal penalties.

Thus, like *Seegars* itself, this Court should "faithfully apply the analysis" articulated by *Navegar*. *Id.* at 1254. Doing so confirms that Beck—and all the other plaintiffs—lack standing. The most Beck can show is past enforcement under a different regulation. JA 208, 242-43. That does not show that he will be "singled out or uniquely targeted" for enforcement in the future. *Parker*, 478 F.3d at 375; *Ord v. District of Columbia*, 587 F.3d 1136, 1140-41 (D.C. Cir. 2009). Nor has any other plaintiff been uniquely targeted for future enforcement. Indeed, plaintiffs have not argued to the contrary with any specificity, meaning that any such contention is also forfeited. *See supra* n.3.[4]

---

[4] Even if this Court agrees with the district court's analysis, Beck's standing does not establish standing for the other plaintiffs. Each plaintiff makes an as-applied claim and seeks damages, which are forms of individualized relief that require individualized standing analyses. *See M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021); *see also infra*, Part II.

**II.  Plaintiffs' Challenge To The Holster Rule Fails At *Bruen*'s First Step Because Storing A Gun In A Purse, Fanny Pack, Or Sling Bag Is Not Protected Conduct.**

Even if the Court concludes that plaintiffs have standing, their Second Amendment challenge fails on the merits.  As a threshold matter, plaintiffs have cabined their argument to an as-applied challenge and have not advanced any contention that the holster rule is facially invalid (i.e., unconstitutional in all circumstances), either on appeal or below.  *See, e.g.*, Russell Br. 17.  As a result, any facial challenge to the holster rule has long been forfeited, *see Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019), as well as conceded, *see* ECF 41 at 16-17 (acknowledging that the holster rule is lawful in at least some circumstances); *Steffan v. Perry*, 41 F.3d 677, 693 (D.C. Cir. 1994) (en banc).  In addition, broad injunctive relief related to the regulation is unavailable, for the same reason.  *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (holding that injunctive relief cannot be "broader than necessary to provide complete relief to each plaintiff with standing to sue").  *But see* Russell Br. 52 (requesting remand for "issuance of an injunction against enforcement of the regulation").

Plaintiffs' as-applied challenge falters at step one of the *Bruen* analysis because the text of the Second Amendment does not guarantee the right to carry firearms in fanny packs.  At *Bruen* step one, plaintiffs bear the burden to show that their "proposed course of conduct" is protected by the "plain text of the Second

Amendment" "as informed by history." *Bruen*, 597 U.S. at 19, 32, 34; *see United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (en banc) ("*Bruen* made clear that the limitations on the scope of the Second Amendment right identified in *Heller* are inherent in the text of the amendment" so the court must "look[] to the historical scope of the Second Amendment right" to "properly apply step one of the *Bruen* framework"). They have forfeited this issue on appeal by not making any argument on this point, even though they bear the burden of persuasion. *See Al-Tamimi*, 916 F.3d at 6; *United States v. Wilson*, 240 F.3d 39, 45 (D.C. Cir. 2001) (a claim "necessarily fails" where a party made "no effort" to carry its burden in the opening brief).

But even had they tried, plaintiffs could not satisfy their step-one burden. The reason is simple. Plaintiffs' proposed course of conduct is carrying their firearms in handbags, purses, sling bags, and the like. *See, e.g.*, Russell Br. 2. In other words, they seek to engage in a particular manner of concealed carry in which their firearms are concealed in containers off their body, rather than concealed by clothes on their person. But both *Bruen* and *Heller* are clear that, as a general matter, the Second Amendment does not "cover[]" plaintiffs' right to "keep and carry any weapon whatsoever in any manner whatsoever." *Bruen*, 597 U.S. at 21, 24; *Heller*, 554 U.S. at 626. And in particular, the scope of the right enshrined in the Second Amendment allows the government to regulate and even prohibit concealed carry, so long as it

21

does not "altogether prohibit the public carry of 'arms.'" *Bruen*, 597 U.S. at 55; *Heller*, 554 U.S. at 626 (explaining that 19th-century courts consistently held that such "prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues").

That is all the District has done here. It has not prohibited public carry or in any meaningful way infringed that right. As relevant to plaintiffs, the holster rule restricts a particular manner of concealed carry—carrying firearms off-body in concealed containers. There are still numerous options for public carry available to plaintiffs, *see* JA 206, and plaintiffs never suggest (nor could they) that the District has "altogether prohibit[ed] the public carry of 'arms.'" So under a straightforward application of *Bruen*'s first step, plaintiffs cannot meet their burden to show that their proposed course of conduct is protected by the text of the Second Amendment as historically understood.

The district court and plaintiffs disagree, on the theory that plaintiffs' proposed course of conduct is more properly described as "carrying handguns publicly for self-defense." JA 26. But that is not an accurate description of plaintiffs' proposed course of conduct. Indeed, if it were, they would have no case—there would be no injury, no causation, and no redressability, because duly licensed individuals *can* carry handguns publicly for self-defense in the District.

As it did in *Hanson*, this Court should conduct the step one analysis with "more precise" attention to the conduct that plaintiffs actually seek to engage in. *Hanson*, 120 F.4th at 232-34. Indeed, "[f]or Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text—a plain text that is more complex than mere possession." *United States v. Reyna*, No. 21-CR-41, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022); *see also United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024) ("[W]hether a regulation is covered by the Second Amendment's plain text must be tied to the conduct the regulation prevents [the individual] from engaging in" and cannot "describ[e] the conduct in question at such a high level of generality." (internal quotation marks omitted)); *Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1196 (6th Cir. 2024) (rejecting the idea that "a plaintiff's proposed conduct must be defined with maximal breadth" and instead holding that, "in defining a plaintiff's proposed conduct, courts should look to the intersection of what the law at issue proscribes and what the plaintiff seeks to do"). Indeed, eschewing specificity at *Bruen* step one could lead to absurd results. Under plaintiffs' view, an individual who asserted a constitutional right to twirl his gun like a baton in public could force the government to dredge up a trove of historical analogues prohibiting dangerous methods of carrying, simply on the theory that twirling a gun equates to "keeping" or "bearing" it. That cannot be right.

Here, plaintiffs wish to carry handguns concealed in purses, sling bags, and fanny packs, and they assert that such conduct is prohibited by the holster rule. *See* JA 38 n.23 (noting that plaintiffs "really object only to the off-body prohibition, not the holster requirement" and "seem to prefer having to deal with both a closed purse or bag and a holster to access their pistols"). Given that specific conduct, they cannot seek refuge in the much broader characterization of a desire to "carry[] handguns publicly for self-defense," or "possess[]" "handgun[s] in the home," as in *Bruen* and *Heller*. *See Bruen*, 597 U.S. at 32; *Heller*, 554 U.S. at 628. Not only is plaintiffs' desired conduct much more specific than carrying writ large, but the plaintiffs in those cases also challenged laws that prohibited far more extensive conduct than what plaintiffs wish to engage in here. This Court should reject plaintiffs' invitation to thoughtlessly import the course of conduct and step one analysis from *Bruen* and *Heller* to a far narrower manner of carry case like this one.[5]

## III. Plaintiffs' Challenge Fails At *Bruen*'s Second Step Because The Holster Rule Is Consistent With The Nation's Historical Tradition Of Firearm Regulation.

Even if the Court disagrees with the straightforward step one analysis set out above, it still should reject plaintiffs' challenge and affirm the district court's decision. As the district court concluded, the District has shown that the holster rule

---

[5] There was no need for the District to cross-appeal on this issue either. *Contra* Russell Br. 21 n.13. *See Jennings*, 574 U.S. at 276.

is "consistent with this Nation's historical tradition of firearm regulation" and is therefore constitutional at *Bruen*'s second step. *Bruen*, 597 U.S. at 17.

**A. There is a historical tradition of reasonable restrictions on the manner of carry, including concealed carry, as long as public carry is not "altogether prohibited."**

*Bruen* step two requires the government to show that the challenged law is "relevantly similar" to historical analogues "from before, during, and even after the founding." *Bruen*, 597 U.S. at 27, 29. Under this standard, modern gun laws need not be a "'dead ringer' or a 'historical twin'" for "historical precursors." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). Instead, they must simply "comport with the principles underlying the Second Amendment" in terms of "how" and "why" they regulate arms-bearing conduct. *Id.* The critical question is whether the relevant historical practices, "[t]aken together," show that a law's application is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 698; *Hanson*, 120 F.4th at 234. This is true even for modern gun laws "that were unimaginable at the founding." *Bruen*, 597 U.S. at 28. Were it otherwise, the Second Amendment would become "a law trapped in amber," *Rahimi*, 602 U.S. at 691, or a "regulatory straightjacket," *Bruen*, 597 U.S. at 30—a result that the Supreme Court has expressly rejected.

For laws that implicate "unprecedented societal concerns" or "dramatic technological changes," courts apply a "more nuanced" approach to the historical

inquiry. *Id.* at 27. That approach should apply to the holster rule. The holster rule, along with the trend toward requiring concealed carry of firearms, grew out of a tradition that responded to rapid developments in the size and lethality of handguns and in methods of carry, in addition to the increasing density of urban areas and need for secure methods of carrying. *See Hanson*, 120 F.4th at 241; JA 292-95 ("The carrying of deadly weapons, such as revolvers, . . . as an everyday matter of course became a significant cause of concern during the nineteenth century" because of the "development of small, easily concealable, repeat-fire pistols" that were "far more likely to be used recklessly than muzzle-loaders had been."). For instance, it is estimated that "firearms became ten times more lethal over the course of the nineteenth century." *Antonyuk v. James*, 120 F.4th 941, 993 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025). At the same time, "increasingly populous cities" led to "greater concern about interpersonal violence" and the growth of regulations meant to prevent violent or irresponsible firearm deployment. *Id.* at 992-93. Policies like the holster rule are a direct response to this deadly combination. In any event, whether the Court applies a nuanced approach or simply looks for historical analogues that are relevantly (or distinctly) similar, the district court's determination that the holster rule passes muster is correct. *See* JA 27 n.11.

Several historical analogues, taken together, support the holster rule's constitutionality. *First*, the district court correctly concluded that the holster rule is

"relevantly similar" to the Nation's historical tradition of regulating the concealed carry of firearms. *See* JA 26-39.

The Supreme Court concluded in *Bruen* and *Heller* that a tradition of banning concealed carry exists and that it justifies similar restrictions on the manner of carrying firearms. *Heller* observed that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Specifically, *Heller* explained that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* (collecting cases and commentaries). *Bruen* reiterated the point, explaining that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry." 597 U.S. at 38. These "manner of carry" restrictions included "laws that proscribed the concealed carry of pistols and other small weapons," which were enacted by states in the "early to mid-19th century." *Id.* at 52.

*Bruen* lists several historical examples of lawful statutory prohibitions on concealed carry, *see id.* at 53 n.16 (collecting statutes from, *inter alia*, Louisiana, Indiana, Arkansas, Virginia, Alabama, Ohio, Tennessee, and the territory of

Florida), and the state decisions upholding them against challenges under the Second Amendment and state analogues, *see id.* at 52 nn.17-19 (citing, *e.g.*, *State v. Reid*, 1 Ala. 612, 616 (Ala. 1840), *State v. Jumel*, 13 La. Ann. 399 (1858)). A typical statute might provide that "[e]very person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor." Ark. Rev. Stat. § 13, p. 280 (1838), https://tinyurl.com/38r528zr. These concealed-carry restrictions generally prohibited carrying concealed weapons "about [the] person." JA 301 (collecting statutes). And 19th-century courts understood that phrase to encompass weapons carried in a bag, affirming convictions for persons carrying firearms in a "travel-bag or satchel," a "basket or bag upon his arm," and in a "hand-basket, or other receptacle held by the hand." JA 301-02 (quoting *Willis v. State*, 105 Ga. 633, 633 (Ga. 1898); *Diffey v. State*, 86 Ala. 66, 67 (Ala. 1889)). As one historical court explained, "[i]t makes no difference how [the weapon] is concealed, so it is on or near to and within the reach and control of the person charged." JA 302 (quoting *State v. McManus*, 89 N.C. 555, 559 (N.C. 1883)). As the District's historical expert Brennan Rivas explained in unrebutted testimony, most historical concealed-carry restrictions did not need to specifically address carrying weapons in bags because by the 18th century, men typically carried their belongings in their pockets rather than in purses

or personal bags.  JA 301.  Nevertheless, the language used applied to pockets and bags alike.

These manner of carry restrictions were lawful because the states did "*not* ban public carry altogether."  *Bruen*, 597 U.S. at 53; *id.* at 55.  Manner of carry restrictions that "altogether prohibit[ed] the public carry of arms" would run afoul of the Second Amendment, *id.* at 55, but manner of carry restrictions that still allowed for public carry—for example, "concealed-carry prohibitions . . . [that] did not similarly prohibit *open* carry," *id.* at 53—would not.  *See also id.* at 59 ("States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").  To illustrate the point, *Bruen* highlighted the "[m]any other state courts during this period [that] continued the antebellum tradition of upholding concealed carry regimes that seemingly provided for open carry."  *Id.* at 68 n.30 (citing, *e.g.*, *State v. Speller*, 86 N.C. 697 (N.C. 1882); *Carroll v. State*, 28 Ark. 99 (Ark. 1872)).  Other courts applying *Bruen* have recognized the same historical principle.  *See Frey v. City of New York*, 157 F.4th 118, 138-40 (2d Cir. 2025); *Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 253 N.E.3d 346, 354-57 (Ill. Ct. App. 2024), *appeal denied*, 270 N.E.3d 808 (Ill. 2025), *cert. denied*, No. 25-995, 2026 WL 795094 (U.S. Mar. 23, 2026).

The District's holster rule fits neatly within that tradition.  It regulates manner of carry by requiring licensees to carry concealed firearms in a holster on their person

in a firmly secure manner.  Framed another way, it prohibits one aspect of concealed carry—off-body concealed carry—but does not "altogether prohibit the public carry of 'arms.'" *Bruen*, 597 U.S. at 55.  In fact, unlike the relevant analogues, the holster rule does not *ban* concealed carry at all—rather, it encourages concealed carry, but in a secure manner.  It would be passing strange if states could ban concealed carry altogether but could not allow concealed carry conditioned on reasonable, safety-related precautions.

Plaintiffs agree with the District on the key point that, even with the holster rule, public carry is not "altogether prohibit[ed]" (or anything close to it) in the District.  *See, e.g.*, JA 29.  Instead, they contend that the holster rule makes public carry during certain activities (like "yoga, jogging, bicycling, or lying at the pool") inconvenient.  JA 12, 37-39.  But of course, "the right secured by the Second Amendment is not unlimited," and does not grant the right to "carry any weapon whatsoever in any manner whatsoever." *Bruen*, 597 U.S. at 21.  Many lawful firearm regulations—like shall-issue licensing regimes or prohibitions on specific dangerous firearms—may create a slight burden.  But the fact that it is inconvenient to, say, pull the trigger every time one wishes to fire a bullet does not mean that the government must permit individuals to carry machine guns.  To be sure, manner of carry restrictions cannot be put to "abusive ends" so as to effectively deny ordinary citizens the right to public carry.  *See id.* at 38 n.9.  Yet the holster rule comes

nowhere close to that line. Plaintiffs' challenge is not about effective denial of the right to carry or an abusive or arbitrary rule; instead, it is a quibble over convenience.

For those reasons, the holster rule "is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (emphasis added). Although the District need not show a "historical twin" for the challenged rule, it has identified several historical concealed-carry prohibitions that banned concealed carry in "travel-bag[s]," "satchel[s]," and "basket[s] or bag[s] upon [the] arm." JA 301-02. Plaintiffs' purses and sling bags are indistinguishable from those 18th-century "receptacle[s]," JA 302, and so the holster rule is more than "analogous enough to pass constitutional muster," *Bruen*, 597 U.S. at 30.

*Second*, although the concealed-carry prohibitions are sufficient on their own to justify the holster rule under *Bruen*'s second step, other historical regulations illustrate the government's tradition of regulating manner of carry and are also consistent with the modern holster rule. Militia holster rules are an early example of the government's authority to regulate manner of carry—and specifically, of its authority to require firearms to be holstered. *See* JA 272-74. The Second Militia Act of 1792, for example, required "officers" to "be armed with" a "pair of pistols" and "holsters." 1 Stat. 272, ch. 33, § 4 (May 8, 1792), https://tinyurl.com/45yd8jnb. And states adopted similar rules, including New Hampshire, which fined militiamen "twenty cents" for failing to carry "holsters." The Militia Law of New Hampshire,

§ 13, at 53 (1829), https://tinyurl.com/52emcswf; *see An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania*, ch. 1696, § 5, at 458 (Apr. 11, 1793), https://tinyurl.com/4y52j3c8. As some commentators recognized, these holster rules reflected a broader historical truth: the Second Amendment allows the carrying of firearms "under judicious precautions"—not "carrying them carelessly in the pocket." Benjamin Vaughan Abbott, *Judge and Jury* 333 (1880), https://tinyurl.com/4yjv2eab, *cited with approval by Heller*, 554 U.S. at 626.

The district court concluded that requiring militiamen to own holsters was "hardly akin to a regulation prohibiting off-body carry." JA 29 n.13. True, it is no historical twin, but it is relevant because it illustrates that the government may regulate manner of carry to promote safety specifically by requiring holsters, which is similar to both the how and the why of the holster rule. And as *Rahimi* noted, historical analogues should be "[t]aken together" to establish "principles," not dissected and considered in isolation. *Rahimi*, 602 U.S. at 692.

The "affray" and "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land," are also relevant. *Rahimi*, 602 U.S. at 697-98 (quoting 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787)). Such conduct was punishable by forfeiture of the arms and imprisonment because it "disrupted the

public order and led almost necessarily to actual violence." *Id.* (quoting *State v. Huntly*, 25 N.C. 418, 421-22 (N.C. 1843)); *see also* JA 274-75.

The district court declined to rely on these laws to support the holster rule because the Court in *Rahimi* concluded that they stood for the principle that individuals who pose a clear threat of physical violence to another may be disarmed. JA 31 n.15 (citing *Rahimi*, 602 U.S. at 698). And because plaintiffs do not pose a clear threat of violence to others, the district court concluded that "why" of the going-armed laws is not similar to the holster rule. JA 31 n.15.

But limiting historical laws to support only one principle is not a requirement of *Bruen* or *Rahimi*. Here, the going-armed laws *also* illustrate the principle that the government may punish a form of carrying that disrupted public order and created a heightened risk of violence—again, relevantly similar to the how and why of the holster rule.

### B. The "how" of the concealed-carry restrictions is relevantly similar to the "how" of the holster rule.

The district court correctly concluded that the "how" and the "why" of the concealed-carry restrictions are relevantly similar to the holster rule. For the "how," as discussed, the concealed carry statutes prohibited the same conduct that plaintiffs wish to engage in here. And as the district court explained, those historical laws also contained comparable procedural protections, duration of restrictions, and level of punishment as the District's holster rule—similarities that were also relevant in

*Rahimi*. JA 28-31 (citing *Rahimi*, 602 U.S. at 698-99). Plaintiffs do not dispute that the procedural protections, duration of restrictions, or level of punishment are similar. *See* Russell Br. 34-35.

Instead, plaintiffs claim that the concealed carry statutes address "different conduct" than the holster rule, so those admitted similarities are insufficient. Russell Br. 33. As discussed *supra*, Part III.A, that is not correct. The conduct at issue is off-body carry in purses, sling bags, and fanny packs. That conduct is prohibited both by historical prohibitions on concealed carry and by the District's holster rule.

Plaintiffs then claim that the concealed-carry prohibitions did not necessarily prohibit off-body carry in bags and the like. Their evidence is an assertion, without citation, that "horse pistols" were "a form of off-body carry that was not restricted by concealed carry bans," so it cannot be the case that "concealed carry bans necessarily prohibited off-body carry." Russell Br. 35. That undeveloped argument is unpersuasive. Horsemen's pistols were "meant to be draped over a saddle" and were "impracticable for anyone not riding a horse." *United States v. Bridges*, 150 F.4th 517, 536 n.15 (6th Cir. 2025) (Nalbandian, J., concurring in part and concurring in the judgment). They were also "intended for use by mounted troops, like cavalry," in "militia service." JA 304. That bags only used on horseback by mounted troops may have been exempt from concealed-carry prohibitions does not support plaintiffs' broad assertion that off-body carry in purses, sling bags, and the

34

like were permitted, especially in light of the District's expert testimony to the contrary. *See* JA 301 (citing cases affirming convictions for carry in bags, baskets, and satchels). Indeed, the District introduced expert testimony to show that concealed-carry prohibitions prohibited off-body carry, and plaintiffs put on no expert or evidence to rebut that testimony.

Although plaintiffs try to frame their argument as one about analogizing at "too high a level of generality," their argument boils down to an insistence that the District identify a historical twin—a specific law prohibiting off-body carry and only off-body carry. *See* Russell Br. 2, 14-16, 22, 48-49. That argument fails too. That legislatures enacted and courts upheld broad restrictions on concealed-carry rather than narrow restrictions on off-body carry does not mean that the narrower restrictions are not relevantly similar. If that were the case, the Supreme Court would not have upheld the statute in *Rahimi*. Plaintiffs' logic would mean that the historical tradition of disarming individuals who posed a credible threat to the physical safety of another person would be insufficient because there was no historical tradition of disarming individuals who posed a credible threat to the physical safety of an intimate partner, the narrower restriction that the modern statute requires. Of course, *Rahimi* rejected that argument. 602 U.S. at 700-01. This Court should, too.

**C.     The "why" of the concealed-carry restrictions is relevantly similar to the "why" of the holster rule.**

The district court correctly concluded that the historical evidence shows that the concealed-carry restrictions were enacted in furtherance of the states' "broad powers to regulate manner of carry in furtherance of police-power goals."  JA 31. That is wholly consistent with the holster rule, issued by the Chief pursuant to the D.C. Council's direction to provide "standards for safe holstering," D.C. Code § 7-2509.11(3), and which requires holstering "on the[] person in a firmly secure manner" "to prevent loss, theft, or accidental discharge of the pistol," 24 DCMR § 2344.2.  In other words, the holster rule seeks to minimize the harm posed by a particular form of carry to protect public safety.

The district court cited a wide swath of decisions and legal commentary confirming the relevant similarity of the purpose of the concealed-carry prohibitions and the holster rule.  JA 32-37 (collecting cases).  Courts and well-regarded commentators justified concealed-carry restrictions so that "those associating with the bearer may guard against injury by accident," *Carroll*, 28 Ark. at 101, and to prevent a manner of carry "likely to lead to breaches of the peace and provoke . . . the commission of crimes," 1 William Blackstone, *Commentaries on the Laws of England* 84 n.11 (George Chase ed., 3d ed. 1894).  Those reasons line up precisely with the "why" of accident and theft prevention as stated expressly in the holster rule.

Courts also justified the historical concealed-carry restrictions because of the broader need to protect public peace and safety. For instance, states may require carry "to be exercised in a manner conducive to the peace and safety of the public," *Speller*, 86 N.C. at 700; *see also Andrews v. State*, 50 Tenn. 165, 187-88 (Tenn. 1871) (restricting carry to a manner "most conducive to the public peace"); and may enact manner of carry laws "dictated by the safety of the people and the advancement of public morals," *Reid*, 1 Ala. at 616, and "the general interests or welfare of the whole community," *State v. Buzzard*, 4 Ark. 18, 19 (Ark. 1842) (opinion of Ringo, C.J.). And, critically, states may also prevent harm by restricting manners of carry that are "dangerous to the peace of society." *Jumel*, 13 La. Ann. at 400. That same goal is reflected in the statute that required the Chief to issue rules for "safe holstering" and led to the holster rule. D.C. Code § 7-2509.11(3).

Again, this historical evidence is perfectly consistent with the rationale behind the District's holster rule. Loose carry of guns in waistbands, compression shorts, or jacket pockets is a common violation of the holster rule and poses a danger to the person wearing the gun and to others. JA 264. Equally dangerous is carrying a loose gun under a car seat, as Christian did, which plaintiffs have not even tried to defend. JA 207, 212, 214. Guns in purses or bags, especially with other items (e.g., the hairbrush in Beck's sling bag, JA 245), can accidentally discharge, can be stolen, or can be left behind for anyone—including children—to find. JA 264. All these risks

are reduced by holstered, on-body carry.  JA 264.  And unholstered and off-body carry puts law enforcement officers in danger because firearms that are not holstered on the body are more difficult to safely identify and secure.  JA 264-65.  Plaintiffs' insistence that they would use "devices" with holsters designed for off-body carry, Russell Br. 17, does little to mitigate this risk; such devices may still be lost, stolen, or pose a danger to law enforcement and others.  *See* JA 264-65.

Plaintiffs concede that the state-court decisions discussed above "speak in broad terms of the state's police power to regulate the manner of carrying arms for general public safety and crime prevention purposes."  Russell Br. 43.  That should be the end of the matter.  The "right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry," including restrictions on concealed carry.  *Bruen*, 597 U.S. at 38; *see Massachusetts v. Murphy*, 44 N.E. 138, 172-73 (Mass. 1896) (observing that defendants frequently argued that the right to bear arms protected them from being "charged with carrying concealed weapons," but such arguments failed because "it has been almost universally held that the legislature may regulate and limit the mode of carrying arms").  And those restrictions have been justified both in specific terms that line up with the text of the District's holster rule and in broad terms that support the state's authority to restrict the manner of carry to promote safety and prevent crime.  *Bruen*'s test demands nothing more.

Yet plaintiffs insist that is not enough.  They attempt to shrink the historical record, insisting that this Court look only at cherry-picked cases stating that concealed-carry bans were "specifically addressed to the problem of violent criminal assaults."  Russell Br. 43.  That argument fails for two reasons.  For one, it has already been rejected by *Hanson*.  This Court said that it does not matter that a historical prohibition "may target different crimes" than the modern regulation.  *Hanson*, 120 F.4th at 239-40.  What matters is whether the regulations "share the same basic purpose."  *Id.*  Here, they plainly do.

Regardless, plaintiffs' basic premise is also incorrect.  The district court ably explained that some decisions did indeed focus on the danger of "surprise attacks and assassinations" as a reason to prohibit concealed carry.  JA 31.  But other decisions—and even other parts of *the same* decisions—spoke more broadly to the risks that manner of carry posed to the public and the state's authority to restrict forms of carry that it deemed dangerous or unsafe.  JA 31-37; *see, e.g.*, *Carroll*, 28 Ark. at 101 (legislature may restrict concealed carry to "guard against injury by accident or otherwise"); *id.* (legislature may enact "police regulations as may be necessary for the good of society, as to the manner in which such arms shall be born"); *Reid*, 1 Ala. at 616 (legislatures may "adopt such regulations . . . as may be dictated by the safety of the people and the advancement of public morals"); *id.* at 617 (laws that "inhibit[] the wearing of certain weapons, in such a manner as is

calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others," are constitutional); *Speller*, 86 N.C. at 700 (legislature can "require [the right to bear arms] to be exercised in a manner conducive to the peace and safety of the public"); *Jumel*, 13 La. Ann. at 399-400 (these restrictions "prohibit[] only a particular mode of bearing arms which is found dangerous to the peace of society" (emphasis omitted)).

There is no principled reason to ignore those decisions or the rationale they provide for concealed carry laws. And doing so commits a critical error, because this Court and the Supreme Court have emphasized time and again that the modern regulation "must comport with the principles underlying the Second Amendment, *but it need not be a dead ringer or a historical twin.*" *Hanson*, 120 F.4th at 240 (quoting *Rahimi*, 602 U.S. at 692) (emphasis added). Focusing solely on a small sliver of the "why" would require just that.

Plaintiffs then attempt to nitpick various aspects of the state cases upholding concealed-carry prohibitions. Among other things, they argue that some states qualified the right to bear arms for the common defense. Russell Br. 43-47. But *Bruen* already considered these cases and the statutes they assessed. And the Court concluded that, as recognized in *Heller*, the cases establish that "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state

40

analogues," as long as the states did "not altogether prohibit the public carry of 'arms.'" *Bruen*, 597 U.S. at 52, 55, 68; *see id.* & nn.17-19, 30 (relying on many of the same cases as the District and the district court); *see also Hanson*, 120 F.4th at 239 (same). That makes sense, because *Heller* read state constitutional provisions that qualified the right to bear arms for "common defence" to also "secure[] an individual right to bear arms for defensive purposes," and concluded that, generally speaking, "19th-century courts and commentators interpreted these state constitutional provisions to protect an individual right to use arms for self-defense." *Heller*, 554 U.S. at 602-03. If plaintiffs are correct, then a key pillar of *Heller* is wrong. That obviously cannot be.

Plaintiffs' other arguments, that post-Civil War laws may have been racially motivated and that some of the state-court cases were decided later in the 19th century, are also unpersuasive. Russell Br. 43-47. *Heller* and *Bruen* acknowledged these obvious possibilities but concluded that concealed-carry prohibitions are lawful anyway. *See Heller*, 554 U.S. at 614 ("Blacks were routinely disarmed by Southern States after the Civil War."); *Bruen*, 597 U.S. at 68 & n.30 (relying on state court decisions from the "late-19th century" and noting that they "continued the antebellum tradition of upholding concealed carry regimes that seemingly provided for open carry"). The possibility that racial animus motivated such laws is obviously heinous, but the Court did not consider this history "good reason[] to discount" these

41

laws wholesale. Russell Br. 43. And plaintiffs have not identified any specific historical evidence about any particular concealed-carry prohibition either.

Plaintiffs also argue that the "why" of the concealed-carry bans depended on the availability of open carry, and that because the District prohibits open carry, the holster rule cannot be relevantly similar to the historical tradition. Russell Br. 33. Again, that is an unduly narrow reading of the historical record, which speaks more broadly to the states' authority to restrict *any* manner of carry that it considered dangerous to the public. *See Frey*, 157 F.4th at 138-40 (rejecting the argument that the only way to regulate manner of carry is to prohibit concealed carry while allowing open carry); *Sinnissippi*, 253 N.E.3d at 354-57 (same). To the extent that plaintiffs make the more general argument that one manner of carry may be regulated only if the other is left completely untouched, that argument is ahistorical and also fails. States that prohibited concealed carry also enacted significant manner of carry restrictions on open carry, including the "going armed" laws discussed in detail in *Bruen* and *Rahimi*. *See, e.g.*, *Bruen*, 597 U.S. at 51-53; *Rahimi*, 602 U.S. at 697-98; JA 304-05. So it is not the case that, having exercised its authority to prohibit open carry, the District is constitutionally prohibited from further manner of carry regulations of concealed carry.

Plaintiffs' reliance on *Baird v. Bonta*, 163 F.4th 723 (9th Cir. 2026), and a similar Florida intermediate appellate court decision, *McDaniels v. Florida*, 419

So.3d 1180 (Fla. Dist. Ct. App. 2025), is unavailing. *Baird* has been vacated pending rehearing en banc. *See Baird v. Bonta*, No. 24-565, 2026 WL 1021186 (9th Cir. Apr. 15, 2026). And regardless, those decisions are of limited use here because they turn on whether the government may constitutionally prohibit *open* carry. Plaintiffs not only fail to challenge the District's prohibition on open carry in this case, but they also conceded at oral argument that activities like jogging (which they claimed the holster rule made too difficult) would also be "extremely difficult" if open carry were the only authorized form of public carry. 9/12/25 Tr. 52 (noting that "[l]uckily," the District has not made the choice to require open carry). In other words, permitting open carry would not solve plaintiffs' problems. And the historical rationale employed in *McDaniels* and the now-vacated *Baird* decision was limited to open carry; it bears no relevance to more limited restrictions on one aspect of concealed carry, a context in which historical restrictions were more prevalent.

**D.    Plaintiffs' remaining arguments lack merit.**

The remainder of plaintiffs' arguments are beside the point and unpersuasive. They argue that off-body carry is "common" nowadays. Russell Br. 15-16. And they claim that it is "not a great leap in logic to conclude that commonly employed carry methods are also protected under the Second Amendment." Russell Br. 15-16. But no precedent supports that, and *Bruen* specifically addressed manner of carry restrictions and said nothing about special protection for "common" methods of

carry.  In fact, concealed carry is now quite common, but *Bruen* and *Heller* both went out of their way to note the tradition of banning concealed carry and its implications for the constitutionality of other reasonable manner of carry regulations.  Plaintiffs have no path to success under the established Second Amendment test, and they cannot create a new one from whole cloth that turns on whether a manner of carry is "common."  Their argument has no basis in *Bruen* and this Court should reject it.

Plaintiffs also argue that the District's holster rule is a modern-day outlier. Russell Br. 14.  Actually, New Jersey has a similar rule.  9/12/25 Tr. 14; *see* N.J. Rev. Stat. § 2C:58-4.  But regardless, whether other states have restrictions similar to the holster rule does not affect its constitutionality.  "States have broad latitude" to legislate according "to problems of vital local concern."  *Whalen v. Roe*, 429 U.S. 589, 597 (1977).  And in *McDonald*, the Court emphasized that the Second Amendment "by no means eliminates" the states' "ability to devise solutions to social problems that suit local needs and values."  *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality).  Recognizing that "conditions and problems differ from locality to locality," the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment."  *Id*. at 785 (citation modified).  The Nation's historical tradition shows that states may regulate manner of carry to promote public safety and prevent crime

as long as public carry is not prohibited altogether. The District has chosen to do so with a holster rule. As a densely populated urban jurisdiction, ensuring secure and safe carriage makes good sense. Other states may regulate manner of carry in other ways, but that does not undermine the constitutionality of the District's modest regulation.

*  *  *

States have long had the authority to completely prohibit concealed carry, so long as an alternative manner of public carry is allowed. The District's holster rule is a reasonable safety precaution that falls far short of a complete prohibition and leaves ample opportunities for public carry. Plaintiffs' challenge boils down to a preference to carry firearms concealed in fanny packs rather than concealed by clothing. But the Second Amendment does not grant an unlimited right to carry a weapon in any manner whatsoever, and it does not invalidate the holster rule.

# CONCLUSION

This Court should vacate and remand with instructions to dismiss the complaint for lack of standing. In the alternative, the decision of the district court should be affirmed.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

/s/ Marcella Coburn
MARCELLA COBURN
Assistant Attorney General
Bar Number 1616416
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5693
April 2026                        marcella.coburn@dc.gov

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 11,037 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Marcella Coburn
MARCELLA COBURN