NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 25-7163

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

LYNNE ANNE-BRIGITTE RUSSELL, *et al.*,

*Plaintiffs-Appellants*,

v.

DISTRICT OF COLUMBIA, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

Janet Carter
William J. Taylor, Jr.
Rachel A.B. Danner
Everytown Law
450 Lexington Avenue,
P.O. Box 4184
New York, NY 10163
rdanner@everytown.org
(347) 674-0972

April 30, 2026

# COMBINED CERTIFICATES

## Certificate as to Parties, Rulings, and Related Cases

A. *Parties and Amici.* Except for Everytown for Gun Safety ("Everytown") and any other amici who had not yet entered an appearance in this case as of the filing of the Brief for Appellees, all parties, intervenors, and amici appearing before the district court and this Court are listed in the Brief for Appellees.

B. *Rulings Under Review.* References to the rulings under review appear in the Brief for Appellees.

C. *Related Cases.* This case has not previously been before this Court or any other court. Counsel is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

## Corporate Disclosure Statement

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## Statement Regarding Separate Briefing

Everytown is unaware of any other amicus briefs being filed in support of Defendants-Appellees.

Dated: April 30, 2026 /s/ Rachel A.B. Danner
*Counsel for amicus curiae*
*Everytown for Gun Safety*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 1

ARGUMENT...................................................................................... 4

    I. *Rahimi* Clarifies That Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases……..... ...................................................................... 4

    II. Tragic Incidents of Unintentional Shootings With Unsecured Handguns Highlight the Historically-Supported "Why" Behind the Holster Rule ...................................................... 11

    III. Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis............................... 15

        A. Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus ....... 16

        B. If the Court Reaches the Time-Period Question, the Proper Focus in the Reconstruction Era............................... 20

CONCLUSION ............................................................................... 28

**Cases**

*Antonyuk v. James*,
120 F.4th 942 (2d Cir. 2024)................................................... 19, 22, 23

*Bianchi v. Brown,*
111 F.4th 438 (4th Cir. 2024) (en banc),
*cert. denied,* 145 S. Ct. 1534 (2025).................................................... 19

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................ 16

*Duncan v. Bonta,*
133 F.4th 852 (9th Cir. 2025) (en banc),
*petition for cert. filed,* No. 25-198 (U.S. Aug. 15, 2025)................. 10, 19

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011)............................................................ 22

*Frey v. City of New York,*
157 F.4th 118 (2d Cir. 2025)...................................................... 17, 19

*Gould v. Morgan,*
907 F.3d 659 (1st Cir. 2018) ........................................................... 22

*\*Hanson v. District of Columbia,*
120 F.4th 223 (D.C. Cir. 2024),
*cert. denied,* 145 S. Ct. 2778 (2025)............ 2, 3, 5, 6, 7, 9, 11, 18, 19, 20

*LaFave v. County of Fairfax,*
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024),
*aff'd in part and vacated in part,* 149 F.4th 476 (4th Cir. 2025),
*cert. denied,* --- S. Ct. ----, 2026 WL 642852 (Mar. 9, 2026) ................ 22

*Mahanoy Area Sch. Dist. v. B. L.,*
594 U.S. 180 (2021) ........................................................................ 24

---

* Authorities upon which we chiefly rely are marked with asterisks.

*McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
140 F.4th 568 (4th Cir. 2025),
*petition for cert. filed*, No. 25-24 (July 3, 2025) .................................. 19

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................................ 21

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) ........................................................................ 25

*Md. Shall Issue, Inc. v. Montgomery County,*
680 F. Supp. 3d 567 (D. Md. 2023),
*appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023)........................ 23

*Nat'l Rifle Ass'n v. Bondi,*
133 F.4th 1108 (11th Cir. 2025) (en banc),
*petition for cert. filed sub nom.*, *Nat'l Rifle Ass'n v. Glass*, No. 24-1185
(May 16, 2025)........................................................... 19, 23, 24

*Nat'l Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir. 2023),
*vacated on grant of reh'g en banc*, 72 F.4th 1346
(11th Cir. 2023) ......................................................................... 23, 24

*\*New York State Rifle and Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022).......................... 2, 9, 11, 17, 18, 20, 21, 22, 26, 27, 28

*Ocean State Tactical, LLC v. Rhode Island,*
95 F.4th 38 (1st Cir. 2024),
*cert. denied*, 145 S. Ct. 2771 (2025)...................................................... 19

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
127 F.4th 583 (5th Cir. 2025) ............................................................ 26

*Rupp v. Bonta,*
723 F. Supp. 3d 837 (C.D. Cal. 2024),
*appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024)........................ 23

*Schoenthal v. Raoul,*
150 F.4th 889 (7th Cir. 2025),
*cert. denied*, --- S. Ct. ----, 2026 WL 922526 (Apr. 6, 2026) ................ 19

*United States v. Diaz*,
116 F.4th 458 (5th Cir. 2024),
*cert. denied*, 145 S. Ct. 2822 (2025) ...................................................... 8

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ................................................................. 22

*United States v. Harrison*,
153 F.4th 998 (10th Cir. 2025) ............................................................... 9

*United States v. Minor*,
165 F.4th 616 (1st Cir. 2026) ............................................................... 10

\*United States v. Rahimi*,
602 U.S. 680 (2024) .................................. 2, 4, 5, 6, 8, 11, 17, 18, 20, 26

*United States v. Reyna*,
165 F.4th 1056 (7th Cir. 2026) ............................................................. 10

*United States v. Vereen*,
152 F.4th 89 (2d Cir. 2025),
*cert. denied*, --- S. Ct, ----, 2026 WL 79986 (Jan. 12, 2026) .................. 8

*We the Patriots, Inc. v. Lujan Grisham*,
697 F. Supp. 3d 1222 (D.N.M. 2023),
*appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024) ............................. 23

## Other Authorities

#NotAnAccidentIndex, Everytown Research & Policy (2025),
everytownresearch.org/maps/notanaccident ...................................... 12

*4-Year-Old Girl, Makalah McKay, Dies After Being Accidentally Shot By
Another Child In Englewood*, CBS Chicago (Aug. 5, 2021),
perma.cc/43FL-7S65 ........................................................................... 13

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*
(1998) .................................................................................................. 27

Emma Brustkern, *14-year-old injured after accidentally shooting himself in the leg, Des Moines police say*, We Are Iowa (Dec. 2, 2025), perma.cc/CGK8-GJEL ............................................................... 12

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ...................................................................... 24

EveryStat (2020-2024), Everytown Research, everystat.org ................. 12

Gun Goddess (2026), perma.cc/452Y-KFMT ......................................... 14

Jeremy Jones & Summer Poole, *Toddler finds gun in grandmother's purse, shoots grandma: Mobile Police*, CBS42 (Aug. 2, 2023), https://www.cbs42.com/news/toddler-finds-gun-in-grandmothers-purse-shoots-grandma-mobile-police/ .................................................. 12

Kelli Dugan, *Ohio woman charged after child grabs her gun, fires shot at Sam's Club*, KIRO7 (Oct. 23, 2020), perma.cc/L7LE-XPF3 ........... 15

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ......................................... 25, 28

Marissa Suleck, *Tennessee family remembers 5-year-old killed in accidental shooting*, WVLT8 (Aug. 16, 2022), perma.cc/M8SA-BWYE .................................................................. 13

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ... 24

Nathan Vicar & Jennifer Baker, *Boy, 3, fatally shot himself playing with gun he took from mom's purse*, Fox19 NOW (June 13, 2015), https://perma.cc/N59E-BS57 .............................................................. 13

Parker Collins, *Family split up after accidental shooting of child*, abc13 KTNV Las Vegas (Oct. 17, 2016), perma.cc/3AJG-EETX ................... 14

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) .......................... 24

Transcript of Oral Argument, *New York State Pistol & Rifle Ass'n v. Bruen* (No. 20-843) .............................................................................. 24

Tyisha Fernandes, *Mother surrenders to police after toddler injures sister with gun*, WSB-TV Atlanta (Feb. 18, 2017), perma.cc/888C-RRCZ. ............................................................................................... 14

WTHR.com staff, *Indianapolis mother faces neglect charges in 6-year-old son's self-inflicted shooting death*, 13 WTHR (Aug. 21, 2023), perma.cc/MKR4-7YL8 ......................................................................... 13

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The District of Columbia's rule that concealed carry licensees who choose to carry a pistol in public must keep the pistol safely holstered on their person (the "holster rule") is constitutional under the approach

---

[1] No party's counsel authored this brief in whole or in part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

to Second Amendment cases established in *New York State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), for the reasons set out in the District's brief, Dkt. 2170183 ("District Br."). As the District has explained, Plaintiffs' as-applied constitutional challenge to the holster rule "fails at each step of the *Bruen* analysis." District Br. 13. Everytown submits this amicus brief to expand on three points relevant to the second, historical step of the *Bruen-Rahimi* framework.

*First*, *Rahimi* clarifies that Second Amendment analysis requires a flexible, principles-based approach to history. Plaintiffs' suggestion that the Court should undertake a search for "narrow principles" at "a low level of generality" is contrary to *Rahimi* and should be rejected. *See* Dkt. 2159220 ("Pls. Br.") 12. Plaintiffs are likewise wrong to insist that a "distinctly similar" standard governs here. *See id.* at 21-23. *Bruen*, *Rahimi*, and this Court's decision in *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024), *cert. denied,* 145 S. Ct. 2778 (2025), all make clear that courts should undertake a flexible search for "relevantly similar" historical analogues in all Second Amendment cases.

*Second*, as the district court correctly held, the holster rule "comports with the principles underpinning the Second Amendment because it reasonably regulates manner of carry in service of government goals of accident and crime prevention." JA 27. The District and its experts have explained the accident- and crime-related risks of off-body carry that the holster rule addresses. *See* District Br. 36-38. This amicus brief expands upon those concerns by highlighting some of the potential dangers of carrying handguns in bags and purses.

*Third*, consistent with its precedent, this Court should give significant weight to Reconstruction-era and later evidence when conducting the historical inquiry. *See Hanson*, 120 F.4th at 237-40 (relying on such history). This is so regardless of which time period is the central focus of the inquiry: the founding era, when the Second Amendment was ratified, or the Reconstruction era, when it was made applicable to the states through the Fourteenth Amendment. Thus, as in *Hanson*, there is no need to resolve which of those periods should be the central focus—though if the Court chooses to do so, originalist principles require focusing on the Reconstruction era, including for District of Columbia laws.

## ARGUMENT

### I. *Rahimi* Clarifies That Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases

Plaintiffs' principal argument is that the district court applied the *Bruen-Rahimi* historical analysis "at too high a level of generality." Pls. Br. 12. They also suggest that the court should have demanded historical laws that are "distinctly similar" to the District's law; "relevantly similar" laws are not enough. *See id.* at 21-23. Plaintiffs are mistaken on both fronts.

*Rahimi* involved a Second Amendment challenge to the federal law that prohibits individuals subject to certain domestic violence restraining orders from possessing firearms. 602 U.S. at 688. The Supreme Court upheld the law, relying on two regulatory traditions from the 18th and 19th centuries that "specifically addressed firearms violence," *id.* at 694-95: affray laws (which prohibited "arming oneself to the Terror of the People," *id.* at 697-98 (cleaned up)), and surety laws (which "targeted the misuse of firearms" by requiring "individuals suspected of future misbehavior" to post a bond or else be incarcerated, *id.* at 695-97). Although neither of those traditions closely mirrored the

modern domestic violence prohibitor, together they established a principle of disarming "individual[s] [who] pose[] a clear threat of physical violence to another," a principle also reflected in the modern law. *Id.* at 698-99.

In clarifying the *Bruen* analysis for lower courts, *Rahimi* made clear that searching for "narrow principles" at a "low level of generality" as Plaintiffs urge here, Pls. Br. 12, is precisely what courts should *not* do. The Supreme Court emphasized that "some courts have misunderstood the methodology of [its] recent Second Amendment cases" to require overly specific historical analogues to a challenged statute. *Rahimi*, 602 U.S. at 691. It stressed that the Second Amendment "was never thought to sweep indiscriminately," and that its precedents "were not meant to suggest a law trapped in amber." *Id.* To the contrary, *Rahimi* "ma[de] clear that 'the Second Amendment permits more than just those regulations identical to ones that could be found in 1791.'" *Hanson*, 120 F.4th at 240-41 (quoting *Rahimi*, 602 U.S. at 691-92). "Holding otherwise," the Court explained, "would be as mistaken as applying the protections of the right only to muskets and sabers." *Rahimi*, 602 U.S. at 692.

Against that backdrop, the Supreme Court reiterated in *Rahimi* that "the appropriate analysis" in Second Amendment cases is not to look for a "'dead ringer' or a 'historical twin,'" *id.* (quoting *Bruen*, 597 U.S. at 30), as the Fifth Circuit had erroneously done in finding the challenged law unconstitutional, *see id.* at 701. Rather, courts should "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added); *see also id.* at 740 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." (quoting and citing *Bruen*, 597 U.S. at 28-31)); *Hanson*, 120 F.4th at 240 (emphasizing *Rahimi*'s focus on principles, rather than historical twins). Moreover, *Rahimi* confirms that different strands of historical laws may be "[t]aken together" to identify the principles against which modern laws should be judged. *See* 602 U.S. at 698.

Plaintiffs' insistence that the analysis should operate at a "low level of generality" (*see* Pls. Br. 12, 23-25, 29) and focus on "narrow principles" (*see* Pls. Br. 12, 24, 30) therefore flies directly in the face of *Rahimi*. It is also inconsistent with this Court's decision in *Hanson*,

which identified "[t]he broader regulation of weapons that are particularly capable of unprecedented lethality" as supporting the District's prohibition on large-capacity magazines. 120 F.4th at 239.[2]

Plaintiffs are further wrong to suggest that the government must demonstrate the existence of a "*distinctly similar* historical regulation" to support the challenged rule, which (in their view) addresses "a societal problem that has persisted since the founding." Pls. Br. 22-23 (emphasis added). Only where a regulation addresses an unprecedented societal concern or dramatic technological change, they contend, may a court rely on "'*relevantly similar*' historical analogues." *Id.* at 22 (emphasis added).

This argument again conflicts with binding precedent. *Rahimi* confirmed that a flexible, principles-based approach is called for in all

---

[2] Plaintiffs' error is also apparent in their insistence that the holster rule is unconstitutional because the District is "unable to point to a single instance of legislation directed to off-body carry in the Nation's history." Pls. Br. 14. This amounts to demanding a "historical twin," which is flatly inconsistent with binding precedent. *See Hanson*, 120 F.4th at 240 (explaining that a law "must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin" (quoting *Rahimi*, 602 U.S. at 692)). Plaintiffs' lip-service to the principle that twins are not required, *see* Pls. Br. 14, does not alter the effect of their argument.

step-two cases, including those where the societal issue at hand has existed since the 18th century. Domestic abuse existed before the founding, but *Rahimi* still drew broad analogies to historical sureties and going armed laws to identify principles supporting the challenged domestic violence restraining-order prohibitor. *See* 602 U.S. at 695-700. As the Fifth Circuit correctly recognized in *United States v. Diaz*, by relying on those broad analogies "despite the fact that domestic violence is not a new phenomenon," *Rahimi* rejected a "bifurcated" approach to the historical inquiry under which only "directly similar historical analogues should be considered" if the problem existed at the founding. 116 F.4th 458, 471 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025); *see also United States v. Vereen*, 152 F.4th 89, 99 (2d Cir. 2025) (explaining that "*Rahimi* applied the 'relevantly similar'" test "[w]ithout first holding that the statute implicated unprecedented societal concerns or dramatic technological changes"), *cert. denied*, --- S. Ct, ----, 2026 WL 79986 (Jan. 12, 2026). Or, as the Tenth Circuit described it, the "Supreme Court has never said the lack of a distinctly similar historical regulation is dispositive of the constitutional question. Rather, *Bruen* described this absence as 'relevant evidence,' no more

and no less." *United States v. Harrison*, 153 F.4th 998, 1018 (10th Cir. 2025). Put more simply, "[r]egardless of whether" a challenged statute "addresses a general societal problem that existed in the 18th century, … analogical reasoning still applies." *Id.* at 1018 (cleaned up).[3]

In *Hanson*, this Court asked whether a prohibition on magazines capable of holding more than ten rounds was "'relevantly similar' to a tradition of regulating firearms." 120 F.4th at 234 (quoting *Bruen*, 597 U.S. at 29). It did so even though it found that "weapons capable of holding or shooting more than ten rounds without reloading have existed since the founding." *Id.* at 240. And *Hanson* is consistent with recent decisions of other courts of appeals that have similarly adhered to *Rahimi*'s instruction to use a principles-based approach to evaluating

---

[3] Even before *Rahimi*'s clarification, it was clear in *Bruen* itself that the analysis required only "relevantly similar" analogues, not "distinctly similar" ones, because that is what the Court sought (and found lacking) in support of New York's proper cause law. *See* 597 U.S. at 27-29 (explaining that inquiry looks for "relevantly similar" historical laws, even though, in the Court's view, the problem New York was addressing—"handgun violence, primarily in urban areas" (cleaned up)—has existed since the founding); *see also, e.g.*, *id.* at 50 (dismissing reliance on certain public-carry restrictions because the burden of those laws was not "analogous" to the burden of New York's). Put differently, Plaintiffs' assertion that "*Bruen* requires a distinctly similar well established analogue," Pls. Br. 42, is impossible to square with the fact that *Bruen*'s own analysis sought "relevantly similar" analogues.

relevant similarity in all cases—including those where the challenged regulation addressed a long-standing problem. *See, e.g.*, *United States v. Reyna*, 165 F.4th 1056, 1062-63 (7th Cir. 2026) (explaining that the *Bruen-Rahimi* framework calls for "relevantly similar" historical evidence to justify a firearm serialization requirement); *United States v. Minor*, 165 F.4th 616, 624 (1st Cir. 2026) (applying the "relevantly similar" standard to the federal prohibitor for persons convicted of misdemeanor domestic violence); *see also, e.g.*, *Duncan v. Bonta*, 133 F.4th 852, 869-74 (9th Cir. 2025) (en banc) (explaining that the "relevantly similar" analysis applies under "*Rahimi*'s straightforward approach"), *petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025).

Properly applying *Rahimi*'s flexible, principles-based approach to history, the holster rule is constitutional. As the District explains, its rule fits comfortably within the nation's historical tradition of firearm regulation. *See* District Br. 24-43.

## II. Tragic Incidents of Unintentional Shootings With Unsecured Handguns Highlight the Historically-Supported "Why" Behind the Holster Rule

Plaintiffs argue that the absence of historical twins to the District's law also impugns its legislative purpose.[4] They say that the absence of twins "belies that off-body carry presents a substantial threat of public danger." Pls. Br. 49; *see also id.* at 16. To the contrary, as the District's brief explains, the holster rule furthers important public-safety mandates: "to prevent loss, theft, or accidental discharge of the pistol." District Br. 36 (quoting D.C. Mun. Regs. tit. 24 § 2344.2); *see* JA 32 & n.16. The District's expert testimony confirms these purposes. *See* JA 261-65 (Declaration of Lt. Stephen Amodeo).

To start, Plaintiffs' assertion that the record is "devoid of any evidence that off-body carry, especially holstered off-body carry, is a contributor to firearm accidents," Pls. Br. 49 n.40, is not correct. *See* JA 264 ¶ 16 (declaration explaining that "[l]oose carry of guns like this can

---

[4] As this Court has recognized, the District's task at step two of the *Bruen-Rahimi* framework is to identify a "historical tradition of regulation that burdens the right to armed self-defense in a manner similar to the burden" at issue "for a similar reason." *Hanson*, 120 F.4th at 235. In *Rahimi*'s terms, the "why" behind a regulation is "central to [the] inquiry." 602 U.S. at 692; *see also Bruen*, 597 U.S. at 29.

and does result in negligent discharge"); JA162 (Plaintiffs' exhibit explaining that off-body carry without trigger protection "leaves a pistol vulnerable to accidental discharge"); *see generally* District Br. 36-38; JA 261-65. Moreover, the public record demonstrates that the risks are not hypothetical: keeping or carrying guns in bags, the manner of off-body carry that Plaintiffs appear to prefer, *see, e.g.*, Pls. Br. 4, has contributed to many tragic firearm accidents. These dangers are particularly acute when children are nearby.[5] For example:

- A four-year-old at a store in Alabama found the gun in her grandmother's purse and unintentionally shot the grandmother in the leg.[6]
- A fourteen-year-old in the waiting room of an Iowa hospital unintentionally shot himself in the leg with the gun in his mother's purse.[7]

---

[5] On average, there are 492 unintentional gun deaths per year. EveryStat (2020-2024), Everytown Research, everystat.org. Many involve children: in 2025, for example, there were at least 232 unintentional shootings by children, resulting in 92 deaths and 147 injuries nationally. #NotAnAccidentIndex, Everytown Research & Policy (2025), everytownresearch.org/maps/notanaccident.

[6] Jeremy Jones & Summer Poole, *Toddler finds gun in grandmother's purse, shoots grandma: Mobile Police*, CBS42 (Aug. 2, 2023), https://www.cbs42.com/news/toddler-finds-gun-in-grandmothers-purse-shoots-grandma-mobile-police/.

[7] Emma Brustkern, *14-year-old injured after accidentally shooting himself in the leg, Des Moines police say*, We Are Iowa (Dec. 2, 2025), perma.cc/CGK8-GJEL.

- A five-year-old playing in a Tennessee park unintentionally shot and killed himself with a gun he found inside his father's backpack; the father had only "turned his back for a second."[8]

Carrying a gun in a bag *outside* the home also creates a risk that the bag will be left unattended *inside* the home, and a child will gain access to the firearm:

- A three-year old in Ohio found a gun in his mother's purse and fatally shot himself. On the phone with police, when asked how her son accessed the gun, the mother said, "I carry it in my purse, I laid my purse down. We just got home."[9]

- A man visiting a home in Illinois brought with him a gun carried in a bag. A young child found the gun inside the bag and fatally shot another child with it.[10]

- A six-year-old boy in Indiana fatally shot himself with a gun he found in his mother's purse hanging on a coat rack.[11]

---

[8] Marissa Suleck, *Tennessee family remembers 5-year-old killed in accidental shooting*, WVLT8 (Aug. 16, 2022), perma.cc/M8SA-BWYE.

[9] Nathan Vicar & Jennifer Baker, *Boy, 3, fatally shot himself playing with gun he took from mom's purse*, Fox19 NOW (June 13, 2015), https://perma.cc/N59E-BS57.

[10] *4-Year-Old Girl, Makalah McKay, Dies After Being Accidentally Shot By Another Child In Englewood*, CBS Chicago (Aug. 5, 2021), perma.cc/43FL-7S65.

[11] WTHR.com staff, *Indianapolis mother faces neglect charges in 6-year-old son's self-inflicted shooting death*, 13 WTHR (Aug. 21, 2023), perma.cc/MKR4-7YL8.

These risks are not eliminated by having the weapon holstered inside a bag, as Plaintiffs seem to suggest. *See* Pls. Br. at 3-4. In one instance, a two-year-old eating in a Georgia restaurant found his mother's handgun, which was in a holster inside her purse, and discharged the weapon, injuring his sister.[12] In another, a seven-year-old found a gun "holstered in a purse with the safety on" and unintentionally shot her three-year-old sister.[13] Indeed, one of the websites Plaintiffs rely on underscores that many in-bag holsters make little difference to storage security. *See* Pls. Br. 4 n.4 (citing gungoddess.com website selling Smith & Wesson-branded "structured handbag"). The website states that "[t]he nylon/elastic purse holsters that most manufacturers include with the bags are a place to start, but they will not be a good fit for many guns. Your gun won't 'snap in'— these holsters have zero retention. If you tip the holster upside down, the gun will slip out." perma.cc/452Y-KFMT (archived copy of page).

---

[12] Tyisha Fernandes, *Mother surrenders to police after toddler injures sister with gun*, WSB-TV Atlanta (Feb. 18, 2017), perma.cc/888C-RRCZ. The sister was struck not with a bullet, but with a screw from the holster. *Id.*

[13] Parker Collins, *Family split up after accidental shooting of child*, abc13 KTNV Las Vegas (Oct. 17, 2016), perma.cc/3AJG-EETX.

Similarly, marketing a bag as a "concealed carry purse" with a "separate compartment" for a firearm, *see* Pls. Br. 4 n.4, does not eliminate safety risks. As another news report explains, a seven-year-old in an Ohio store found her mother's gun in a "concealed compartment" inside her purse, "pulled the gun out of [the] purse, released the safety and pulled the trigger."[14]

These examples demonstrate the risks associated with off-body carry that the District's rule seeks to reduce—its "why." And this purpose, in turn, "comports with the principles underpinning the Second Amendment because it reasonably regulates manner of carry in service of government goals of accident and crime prevention." JA 027 (district court opinion).

## III. Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis

Plaintiffs argue that authority from the "last third of the 19th century" comes "too late to shed much light on the original meaning of the Second Amendment." Pls. Br. 14. That is not correct. Even though the Supreme Court and this Court have not yet resolved the question of

---

[14] Kelli Dugan, *Ohio woman charged after child grabs her gun, fires shot at Sam's Club*, KIRO7 (Oct. 23, 2020), perma.cc/L7LE-XPF3.

which time period is the primary focus of the historical inquiry, both have made clear that evidence from Reconstruction and beyond is a critical part of the analysis. Just as this Court did in *Hanson*, it should consider the consistent arc of regulatory tradition that the District has identified stretching from before the founding through Reconstruction and into the 20th century. If, however, the Court wishes to answer the question of which time period is the central focus, it should conclude that the inquiry centers around 1868 in cases involving federal and D.C. laws, just as in cases involving state laws.

### A. Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus

*Heller*, *Bruen*, and *Rahimi* all make clear that Reconstruction-era and later history is crucial to the Second Amendment analysis. After calling post-ratification history a "critical tool of constitutional interpretation," Justice Scalia's opinion for the Court in *Heller* examined "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." 554 U.S 570, 605 (2008). In doing so, it relied on "19th century cases that interpreted the Second Amendment," "discussion of the Second Amendment in Congress and in public discourse after the Civil War,"

and "how post-Civil War commentators understood the right." *Bruen*, 597 U.S. at 21 (describing and quoting *Heller*, 554 U.S. at 610, 614, 616-19).

*Bruen* "reaffirmed the appropriateness of relying on post-Founding history." *Frey v. City of New York*, 157 F.4th 118, 129 (2d Cir. 2025). It relied on mid-19th-century cases and statutes, *see Bruen*, 597 U.S. at 51-57, and surveyed "public discourse surrounding Reconstruction," *id.* at 60. And in discussing sensitive places, *Bruen* indicated that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis. *Id.* at 30 (emphasis added).

*Rahimi* then put the relevance of 19th-century evidence even further beyond doubt. It rested its decision upholding a challenged federal law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 695 (relying on Massachusetts surety statute from 1836); *id.* at 696 (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23, which cites 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia

surety laws). As Justice Kavanaugh explained in *Rahimi*, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. *Id.* at 725 (Kavanaugh, J., concurring); *see also id.* at 728-29 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence long after the founding). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s guidance that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up).

Following the Supreme Court, this Court and other circuits have likewise recognized that 19th-century and later evidence is critical to the historical inquiry. In *Hanson*, this Court relied on historical laws restricting Bowie knives through the late 1800s and pointed to laws banning sawed-off shot guns and machineguns from even later in the twentieth century as evidence of the "tradition of regulating weapons particularly capable of unprecedented lethality." 120 F.4th at 237-40;

18

*see also id.* at 238 n.7 (explaining why "analogues after 1791 are still relevant").

Numerous other circuits have likewise recognized that Reconstruction-era and later laws are crucial to the *Bruen-Rahimi* historical analysis.[15] Appreciating the relevance of postenactment history accords not only with Supreme Court and appellate caselaw, but also with common sense. If a regulation passed in the decades around Reconstruction did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in earlier decades, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent

---

[15] *See, e.g.*, *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-48 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025); *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives,* 140 F.4th 568, 578-79 (4th Cir. 2025), *petition for cert. filed*, No. 25-24 (July 3, 2025); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025) (en banc) ("*Bondi II*"), *petition for cert. filed sub nom.*, *Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (May 16, 2025); *Duncan*, 133 F.4th at 860, 873-77; *Frey*, 157 F.4th at 129; *Bianchi v. Brown*, 111 F.4th 438, 465-71 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1534 (2025); *Schoenthal v. Raoul*, 150 F.4th 889, 912-13 (7th Cir. 2025), *cert. denied*, --- S. Ct. ----, 2026 WL 922526 (Apr. 6, 2026); *Antonyuk v. James*, 120 F.4th 942, 988 n.36 (2d Cir. 2024).

affirmative evidence to the contrary, a court should presume that a Reconstruction-era tradition also reflects the founding-era understanding. Such a presumption reflects and confirms the principle that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

In sum, under the precedents of the Supreme Court and this Court, Reconstruction-era and later history plays a crucial role in the *Bruen-Rahimi* historical analysis.

## B. If the Court Reaches the Time-Period Question, the Proper Focus in the Reconstruction Era

The Supreme Court has expressly left open which time period to privilege in the Second Amendment analysis. In both *Bruen* and *Rahimi*, it found the public understanding of the right to have remained consistent throughout our nation's history. *See id.* at 37-38; *Rahimi*, 602 U.S. at 692 n.1. That is also the approach this Court took in *Hanson*, where the history was similarly consistent across time periods. *See* 120 F.4th at 242 n.10 ("Because the choice would not alter our conclusion, we take no position regarding whether the relevant period for analysis

is 1791 or 1868."). The same is true here, and so this Court again need not resolve the question. But if the Court chooses to address the issue, it should conclude that the proper focus of the inquiry is 1868, when the Fourteenth Amendment was ratified.

To see why, it is first necessary to understand why that is correct in cases challenging state laws. Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35), focusing on 1868 in a case concerning a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? Since the people chose to extend the Bill of Rights to the states in 1868, it is their understanding of the scope of each right at that time that should control the originalist analysis today.

Indeed, holding otherwise would not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010); *see also id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right

to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018).[16] Since *Bruen*, several well-reasoned, persuasive decisions from other courts have continued to "recogniz[e] the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era" in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL

---

[16] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

3928883, at *8 (E.D. Va. Aug. 23, 2024), *aff'd in part and vacated in part on other grounds*, 149 F.4th 476 (4th Cir. 2025), *cert. denied*, --- S. Ct. ----, 2026 WL 642852 (Mar. 9, 2026); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("*Bondi I*") ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[17] *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851, 876-78 (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 582-83 (D. Md. 2023) (agreeing with *Bondi I*), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi I* and *Maryland Shall Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024).

---

[17] Despite being vacated for rehearing en banc, *Bondi I*'s robust reasoning and authorities remain persuasive. *See Antonyuk*, 120 F.4th at 973-74 (finding *Bondi I* persuasive on this point after vacatur). The en banc Eleventh Circuit subsequently reached the same outcome as the panel in *Bondi I*, but declined to resolve this time-period question "because the law of both eras restricted the purchase of firearms by minors." *Bondi II*, 133 F.4th at 1117.

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[18] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi I*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see Bondi II*, 133 F.4th at 1154 (Rosenbaum, J., concurring) (same).[19] Both Justice Thomas and Justice Scalia have expressed similar views.[20]

---

[18] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[19] *See also, e.g.*, Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

[20] *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what

The pertinent question in this case, of course, is whether the 1868 understanding should also control in challenges to the *District's* gun laws, to which the Second Amendment applies directly rather than through the Fourteenth Amendment. If the Court decides to resolve the issue, it should conclude that 1868 is the correct focus in evaluating all gun laws—be they state, federal, or the District's.

To be sure, the choice between 1791 and 1868 is a less straightforward one for federal or District laws. "Originalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments,

---

ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution").

requiring incorporated rights to "have the same scope" against each. 597 U.S. at 37. And if the standard must be the same, then originalists must justify applying either the 1868 understanding or the 1791 understanding (if they conflict) to all levels of government.

Existing doctrine does not resolve this choice. In *Rahimi*, the Supreme Court specifically declined to resolve it—in a case concerning a federal law. *See* 602 U.S. at 692 n.1. And in *Bruen*, the Court noted only that prior decisions had "*assumed*" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." 597 U.S. at 37 (emphasis added). If the majority believed those decisions controlled the issue, it would have said so.[21]

Instead, the Court expressly left the question open, pointing to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as

---

[21] Post-*Bruen* courts that have focused on 1791 have mistakenly disregarded this point, treating the assumption in prior decisions as if it were a holding and ignoring the fact that *Bruen* would not have left the issue open if it believed that assumption were controlling. *See, e.g., Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 600 (5th Cir. 2025).

well as the scope of the right against the Federal Government).” *Id.* at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Lash, *Respeaking the Bill of Rights*, 97 Ind. L.J. at 1441). The Court’s choice to highlight *only* these two scholars suggests a belief that their views are correct, and thus that Reconstruction should be the central focus.

On Professor Amar’s account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only as to the states, but also as to the federal government and the District. *See* Amar, *The Bill of Rights*, *supra*, at 223 (“[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]”); *id.* at 243 (arguing that “the Fourteenth Amendment has a doctrinal ‘feedback effect’ against the federal government”). More recently, Professor Lash wrote—as quoted in *Bruen*—“When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, …

invest[ing] those original 1791 texts with new 1868 meanings.'" Lash, *Respeaking the Bill of Rights*, 97 Ind. L.J. at 1441; *see Bruen*, 597 U.S. at 38 (citation omitted). On this view, too, 1868 meanings bind the states, the federal government, and the District. If it reaches the time-period issue, this Court should adopt that view, following the path *Bruen* marked by citing Professors Amar and Lash.

## CONCLUSION

The Court should affirm the district court's decision.

Dated: April 30, 2026

Respectfully submitted,

/s/ Rachel A.B. Danner
Janet Carter
William J. Taylor, Jr.
Rachel A.B Danner
Everytown Law
450 Lexington Avenue
   P.O. Box 4184
New York, NY 10163
rdanner@everytown.org
(347) 674-0972

*Counsel for amicus curiae*
*Everytown for Gun Safety*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 5821 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Rachel A.B. Danner
Rachel A.B. Danner
*Counsel for amicus curiae*
*Everytown for Gun Safety*

# CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2026, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Rachel A.B. Danner
Rachel A.B. Danner
*Counsel for amicus curiae*
*Everytown for Gun Safety*